UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REVLON CONSUMER PRODUCTS LLC
and ELIZABETH ARDEN, INC.,

                  Plaintiffs,

           -against-

GIVE BACK BEAUTY S.A., GIVE BACK
BEAUTY, LLC, GIVE BACK BEAUTY
AMERICAS LLC, GIVE BACK BEAUTY
INTERNATIONAL LLC, GIVE BACK
BEAUTY HOLDING LTD., VANESSA
KIDD, DOMINICK ROMEO, REID
MULVIHILL and ASHLEY FASS,

                  Defendants.

Case No. 24-cv-_____-___

## **COMPLAINT**

Plaintiffs Revlon Consumer Products LLC ("Revlon") and Elizabeth Arden, Inc. ("Elizabeth Arden") (collectively, "Plaintiffs"), for their complaint against Defendants Give Back Beauty S.A., Give Back Beauty, LLC, Give Back Beauty America, Give Back Beauty International (collectively, "GBB"), and Vanessa Kidd, Dominick Romeo, Reid Mulvihill and Ashley Fass (collectively, the "Revlon Employees" and collectively with GBB, "Defendants") allege as follows:

## **INTRODUCTION**

1.     For more than two decades, Elizabeth Arden, a wholly-owned subsidiary of Revlon, has had an exclusive licensing relationship with Britney Brands, Inc. ("Britney Brands") to manufacture and distribute perfumes, fragrances and related products for the international celebrity and pop star Britney Spears.  Throughout their relationship, Elizabeth Arden and Revlon developed, manufactured, marketed and sold over 40 fragrances using marks associated with

Britney Spears, including Fantasy, Prerogative, Circus, Curious, Believe, and Private Show, along with their related products (collectively, all of these products are sometimes referred to as the "Britney Fragrances").

2.      At regular five-year intervals, Elizabeth Arden, Revlon and Britney Brands renewed and extended the relationship. Revlon dedicated a team of Elizabeth Arden employees to the continued development, maintenance, expansion and continuity of its relationship with Britney Brands, built both a supply and distribution chain for the fragrances, and cultivated a deep association with Britney Brands. The information about the Britney Fragrances, including the supply and distribution chains, manufacturing, marketing and advertising plans, and the costs and revenues associated with the Britney Fragrances, was treated as a trade secret and kept confidential and proprietary by Revlon and Elizabeth Arden. As a result of their extensive investment in the relationship, Revlon and Elizabeth Arden had grown the Britney Fragrances into a highly profitable venture generating tens of millions of dollars annually and delivering a lucrative long-term relationship to Britney Brands. Revlon and Elizabeth Arden had every expectation that the relationship would continue through the next turn of the Britney Brands contract.

3.      Defendants Kidd, Romeo, Mulvihill and Fass - the Revlon Employees - were employed by Revlon and/or Elizabeth Arden in the fragrance business for a combined 32 ½ years. Kidd and Romeo focused heavily on the Britney Brands account. These Revlon Employees were the cornerstone of the fragrance business and the Britney Brands relationship, allowed to see and know all of the valuable confidential proprietary information that Revlon and Elizabeth Arden created, maintained, guarded and protected concerning sourcing, manufacture, marketing, distribution and sale of fragrances generally and the Britney Fragrances in particular (generally, the "Trade Secrets"). Each of the Revlon Employees subscribed to Revlon's Code of Conduct and

Business Ethics. They were required to devote their professional efforts exclusively to Revlon and Elizabeth Arden, to closely guard the financial, operational, manufacturing, marketing and distribution information about the Britney Fragrances, to treat the Britney Brands relationship as one that belongs to Revlon and Elizabeth Arden, and not to any one of the Revlon employees. Through their employment agreements, the Revlon Employees agreed not to solicit any other Revlon or Elizabeth Arden employees to leave or to join the Revlon Employees at another company.

4.      There is a great deal of competition in the fragrance business and competitors to Elizabeth Arden would consider it a tremendous coup to take the Britney Brands business from Revlon. Revlon and Elizabeth Arden were well aware of the competitive interest in the Britney Fragrances and, as a result, were particularly careful of the sensitive nature of their contract negotiations with Britney Brands as their contract approached its next renewal, the terms of which Revlon and Elizabeth Arden also treated as Trade Secrets. With the next contract turn coming at the end of 2024, Revlon, Elizabeth Arden and Britney Brands began discussions in the fall of 2023, and spent months finalizing the next contract, working through issues of compensation, licensed appearances, performance, and goals for the next contract term, all of which information is highly proprietary and severely restricted from disclosure to competitors eager to contract with Britney Brands themselves.

5.      While still employed by Revlon and Elizabeth Arden, however, and while they owed a singular duty of loyalty to Revlon and Elizabeth Arden to maintain the confidentiality of information about the contract negotiations in which they were engaged for Revlon and Elizabeth Arden, the Revlon Employees wrongfully shared Revlon and Elizabeth Arden Trade Secret information with a new competitor entering the market, GBB. By early March, 2024, Elizabeth

Arden had completed its negotiations with Britney Brands on all material terms for a contract extension. On April 18, 2024, Britney Brands sent a final version of a written amendment to Elizabeth Arden for execution. Revlon senior management approved the contract amendment and, on April 24, 2024, Elizabeth Arden management signed the contract sent by Britney Brands and it was returned to Britney Brands that day. The only remaining detail was Ms. Spears' signature on the contract her team had fully negotiated and sent to Revlon for execution. What neither Revlon nor Elizabeth Arden knew, however, was that the Revlon Employees – the entire Britney Brands team that knew every proprietary fact about the Britney Brands-Elizabeth Arden relationship and that had negotiated the new contract with Britney Brands for Elizabeth Arden and Revlon – was moving to GBB and intent on taking the Britney Brands relationship with them.

6.     With the new Britney Brands contract in hand, signed by Elizabeth Arden and simply awaiting a counter-signature from Britney Brands, the Revlon Employees began decamping to GBB over a period of a few weeks in May 2024. Kidd, who was Senior Vice President, Global Marketing, for Revlon's Fragrance Portfolio, departed Revlon's employ on May 3, 2024. Just a few days earlier, Britney Brands declined to sign the finalized extension agreement with Elizabeth Arden.

7.     As Kidd was departing, she accessed over 250 Trade Secret files concerning Elizabeth Arden's fragrance business, including the Britney Fragrances, and also reviewed the compensation files for the other three Revlon employees who followed Kidd to GBB. The logical inference from Kidd's actions is that she was arming herself and her new employer, GBB, with the information GBB needed to value the Britney Brands relationship, assess the cost of pirating Revlon's fragrance team, and evaluate Revlon's confidential business information in order to rapidly recreate the supply and distribution chains Elizabeth Arden had spent 20 years developing.

8.    When Kidd announced her departure, she refused to tell Revlon or Elizabeth Arden where she was going, citing a non-disclosure agreement with that company.  On a call to advise Britney Brands that she was leaving Revlon, Kidd assured representatives of Britney Brands that they would be in good hands with Romeo at Elizabeth Arden, while knowing full well that Romeo would be following her to GBB.

9.    Within days of Kidd's departure, Romeo also announced that he was leaving Elizabeth Arden.  Like Kidd, Romeo refused to say where he was going, but his destination was GBB.

10.    Mulvihill and Fass also headed to GBB, but not before Fass downloaded to a personal external hard drive reams of Trade Secret information from Revlon internal servers about the fragrance licenses maintained by Elizabeth Arden.  As detailed below, the Revlon Employees violated the non-solicitation provisions in their employment agreements with Revlon:  it was no coincidence that, shortly after Kidd left with the Britney Brands account, the rest of the Revlon fragrance team gave notice and followed Kidd to GBB.  Throughout, Revlon and Elizabeth Arden were completely unaware that Revlon's own team was actively sabotaging one of their most valuable licensing relationships.

11.    As part of GBB's campaign to obtain the Britney Brands fragrance business, GBB misrepresented to the Britney Brands team in mid-April 2024 that it *had already hired* or was in the process of hiring the head of Revlon's fragrance business and her entire team (notwithstanding that only Kidd had given notice to Revlon).  Since their departure, Revlon has learned that the Revlon Employees began speaking with GBB as early as February of 2024, revealing the depth of GBB's unlawful interference with the Britney Brands relationship, GBB's unlawful inducement

of the Revlon Employees to violate their non-disclosure obligations, and GBB's repeated misrepresentations that Revlon and Elizabeth Arden were exiting the fragrance business.

12.     In the process, GBB not only misappropriated Plaintiffs' Trade Secrets, it also made false statements to Britney Brands disparaging Plaintiffs' fragrance business and suggested to Britney Brands (and likely others) – wrongly – that Revlon was getting out of the fragrance business.  And, while GBB was successful in persuading the Revlon Employees to leave Elizabeth Arden, GBB did so with full knowledge that the Revlon Employees all have non-disclosure obligations that prohibit them from using the Trade Secrets they gained while at Revlon and Elizabeth Arden for GBB or for any other purpose.

13.     This was obviously a carefully planned and executed grab by GBB for the Revlon fragrance business.  When the Britney Brands representatives suddenly announced that their client was not ready to sign the new contract that Britney Brands had sent to Revlon for signature, the delay was attributed to Ms. Spears being preoccupied with other matters.  It took less than a month after the Revlon Employees began to leave, however, for GBB to evaluate the financial prospects of a Britney Brands relationship, the costs to build the necessary supply and distribution chains, and the return on marketing investments, in order to sign a contract with Britney Brands.  The speed with which Britney Brands signed its deal with GBB was unprecedented for the Britney Brands organization and could not have been accomplished without the benefit of the Revlon Employees' deep knowledge of the misappropriated proprietary information about the relationship and GBB's unlawful utilization of that information.  Indeed, GBB could only have closed on a licensing agreement with Britney Brands at that pace with the benefit of Plaintiffs' Trade Secret information.

14.     Revlon later learned that, at the same time that Defendant Kidd was negotiating with Britney Brands on Revlon's behalf, she had interviewed and accepted a job offer with GBB. In violation of her common law and contractual duties of loyalty, Kidd effectively acted as a double-agent, assisting GBB in taking the Britney Brands business away from Plaintiffs while she was charged with cementing an extension for Elizabeth Arden and purported to be doing so.  At the same time Kidd was telling Revlon and Britney Brands representatives that the business would be in good hands with her colleague, Romeo, GBB was finalizing its arrangements to bring Romeo and the other Revlon Employees over just as soon as Kidd had settled in.

15.     Not only did the Revlon Employees have a common law duty of loyalty to Revlon, they were subject to employment agreements that explicitly prohibit them from misusing Confidential Information (defined in the agreements) to compete with Revlon and from soliciting Revlon's business partners to terminate their business relationships with the company.  The non-solicitation obligation extends for a period of one year following the termination of employment.

16.     Elizabeth Arden's exclusive license with Britney Brands continues through December 31, 2024.

17.     Plaintiffs are informed and believe that GBB is actively misusing Plaintiffs' Trade Secret information, gained from Revlon's former employees, to copy Revlon's detailed business plans for GBB's exploitation of a Britney Spears fragrance line, including but not limited to their financial constructs and models, manufacturing resources, packaging vendors, marketing plans, and distribution plans.  GBB could only have signed a licensing deal with Britney Brands so quickly by relying on Plaintiffs' work in negotiating their new contract with Britney Brands and by using Trade Secret information concerning the economics of that contract in order to understand the financial commitment that reasonably might be made to Britney Brands.

18.     Plaintiffs are informed that GBB already has made outreach to Elizabeth Arden's fragrance manufacturers asking for release of Plaintiffs' confidential and proprietary information concerning fragrance formulas, ingredients and production.

19.     Revlon and Elizabeth Arden bring this action against the Defendants for (i) trade secret misappropriation under the Defend Trade Secrets Act and New York law; (ii) tortious interference with prospective economic advantage; (iii) breach of contract; (iv) breach of the duty of loyalty; and (v) tortious interference with contract.  Revlon and Elizabeth Arden seek both injunctive relief (enjoining against the misuse of its trade secrets and wrongful solicitation of its business partners), compensatory damages and punitive damages.  Even if Defendants are promptly enjoined from using Plaintiffs' Trade Secrets, their tortious interference, misappropriation of Plaintiffs' Trade Secrets, and violation of legal obligations and duties, culminated in the illicit expropriation of Plaintiffs' Britney Brands fragrance business, which is causing and will continue to cause Plaintiffs tens of millions of dollars in damages.

**THE PARTIES**

20.     Plaintiff Revlon Consumer Products LLC is a Delaware limited liability company with its principal place of business at 55 Water Street, New York, New York.  Revlon Consumer Products LLC was formerly known as Revlon Consumer Products Corporation.

21.     Plaintiff Elizabeth Arden is a Florida corporation with its principal place of business at 55 Water Street, New York, New York.  It is a wholly-owned subsidiary of Revlon Consumer Products LLC.  Revlon acquired Elizabeth Arden in September 2016.

22.     Defendant Give Back Beauty LLC is a Delaware limited liability company with its principal place of business at 8 The Green, Suite A, Dover, Delaware.

23.     Defendant Give Back Beauty Americas LLC is a Delaware limited liability company with its principal place of business at 8 The Green, Suite A, Dover, Delaware.

24.     Defendant Give Back Beauty International LLC is a Delaware limited liability company with its principal place of business at 8 The Green, Suite A, Dover, Delaware.

25.     Defendant Give Back Beauty SA is a Swiss société anonyme with its principal place of business at Rue de Parc 3bis, 1207 Geneva, Switzerland.

26.     Defendant Give Back Beauty Holding Ltd. is a British private limited company with its principal place of business at Queen Elizabeth Street, 19 The Circle. London SE1 2JE, United Kingdom.

27.     The GBB entities are owned and controlled by an individual named Corrado Brondi, an Italian citizen, who claims to be the Founder and CEO of Give Back Beauty Group. Among other things, Brondi previously worked at Bain & Company and Goldman Sachs, and has done business with Revlon in Europe. Brondi knows how Revlon works and, by virtue of his past dealings, knows how closely Revlon guards its confidential and proprietary information.

28.     Defendant Vanessa Kidd is a natural person residing at 45 Lockwood Road, Scarsdale, New York. Kidd was employed by Revlon as Senior Vice President, Global Marketing, for Revlon's Fragrance Portfolio, working from Revlon's headquarters at 55 Water Street, New York, New York. Kidd had been an employee at Elizabeth Arden since August 2012, working in the fragrance business. Revlon acquired Elizabeth Arden in 2016. Kidd departed Revlon's employment on May 3, 2024. Kidd is currently employed by one or more of the GBB Defendants.

29.     Defendant Dominick Romeo is a natural person residing at 310 West 55th Street, New York, New York. Romeo was employed by Revlon as a Director of Marketing, Global Fragrance Team, working from Revlon's headquarters at 55 Water Street, New York, New York.

Romeo began working at Revlon in April 2019.  Romeo's job responsibilities were focused on the Britney Brands account.  Romeo departed Revlon's employment on May 29, 2024.  Romeo is currently employed by one or more of the GBB Defendants.

30.    Defendant Reid Mulvihill is a natural person residing at 330 West 55th Street, New York, New York.  Mulvihill was employed by Revlon as Director of Global Fragrance Marketing, working from Revlon's headquarters at 55 Water Street, New York, New York.  Mulvihill had been an employee at Elizabeth Arden since August 2014, working in the fragrance business.  Mulvihill departed Revlon's employment on May 31, 2024.  Mulvihill is currently employed by one or more of the GBB Defendants in New York as a Vice President, Global Marketing - Fragrance.

31.    Defendant Ashley Fass is a natural person residing at 55 Neds Mountain Road, Ridgefield, Connecticut.  Fass was employed by Revlon with the title of Global Marketing Director of Juicy Couture Fragrances, working from Revlon's headquarters at 55 Water Street, New York, New York.  Fass began working at Revlon in May 2018.  Fass departed Revlon's employment on May 23, 2024.  Fass is currently employed by one or more of the GBB Defendants.

## JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question).  This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367(a).

33.    This Court has personal jurisdiction over Defendants.  This action arises out of Defendants' wrongful conduct that took place in New York State, giving this Court specific jurisdiction over the Defendants.  In addition, Defendants Kidd, Romeo and Mulvihill are domiciled in New York.

34.     Venue is appropriate in this District, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## STATEMENT OF FACTS

**I.    ELIZABETH ARDEN'S LONG-STANDING FRAGRANCE RELATIONSHIP WITH BRITNEY BRANDS**

35.     Over the course of the 20-year relationship between Elizabeth Arden and Britney Brands, Elizabeth Arden developed scents in collaboration with fragrance houses to be marketed with the licensed Britney Spears marks, designed packaging for the fragrances, including bottling and boxes, sourced materials, designed artwork for the products, developed marketing and distribution plans, cultivated retail partners and executed on all of those plans.  Elizabeth Arden built the Britney Spears fragrance line into an extremely popular and successful global brand with substantial retail sales.  Over the course of years, Elizabeth Arden expanded the brand to add more perfume products.

36.     In February 2004, Elizabeth Arden entered into its first worldwide licensing agreement with Britney Brands to manufacture, distribute, market, advertise and sell fragrance, cosmetic and skin preparation products.  That agreement extended to December 31, 2009, with an option for Elizabeth Arden to extend it for an additional five-year term.  The agreement contained a confidentiality provision, requiring that the terms be kept strictly confidential and not disclosed to any third party.

37.     Over the course of the first five years, Elizabeth Arden launched eight fragrances with the licensed Britney Spears marks.  In 2004, Elizabeth Arden launched the "Curious" fragrance.  In 2005, Elizabeth Arden launched the "Fantasy" fragrance.  In 2006, Elizabeth Arden added "Curious: In Control" and "Midnight Fantasy."   In 2007 and 2008, Elizabeth Arden

launched "Believe" and "Curious Heart."  In 2009, Elizabeth Arden launched "Hidden Fantasy" and "Circus Fantasy."

38.    In December 2009, Elizabeth Arden exercised its option to renew the licensing agreement with Britney Brands for an additional five-year term, through December 31, 2014.

39.    As of January 1, 2010, Elizabeth Arden and Britney Brands entered into a restated license agreement (the "License Agreement" or the "Britney Brands License Agreement").  This License Agreement provided Elizabeth Arden with an exclusive worldwide license to fragrances and related ancillary products using "Licensed Marks" associated with Britney Spears through December 31, 2014.  The License Agreement contains a confidentiality provision, requiring that the terms be kept strictly confidential and not disclosed to any third party.

40.    In December 2014, Elizabeth Arden exercised an option to renew the License Agreement for an additional five-year term, through December 31, 2019.

41.    In September 2019, Elizabeth Arden and Britney Brands entered into an "Extension and Amendment to License Agreement," which extended the term of the License Agreement to December 31, 2024.

42.    Between 2010 and 2024, Elizabeth Arden launched an additional thirty-six fragrances using the Britney Spears marks.

## II.    PLAINTIFFS' TRADE SECRETS RELATING TO THE FRAGRANCE BUSINESS AND THE BRITNEY BRANDS ACCOUNT

43.    The Revlon Employees were actively involved in managing the Britney Brands account and the Elizabeth Arden fragrance business over the course of years.  In connection with that work, they had deep knowledge of confidential and proprietary Trade Secret information belonging to Plaintiffs concerning Plaintiffs' fragrance business and the Britney Brands account.

44.    Plaintiffs took reasonable precautions to protect their Trade Secrets from disclosure.  The Trade Secrets were not shared beyond those employees with a need to know them to perform their business duties.  Documents concerning the Elizabeth Arden fragrance business and the Britney Brands account were maintained in electronic folders on Revlon's servers with limited access.  Only those employees with specific permissions could open those folders.

45.    Plaintiffs maintained the Britney Brands License Agreement terms as proprietary and confidential, inclusive of the License Agreement's expiration date.  Plaintiffs did not disclose the License Agreement terms outside of the internal Britney Brands account team, in-house legal and upper management, and unauthorized employees were neither permitted nor given access to information about accounts, licenses, or financial arrangements.

46.    In addition, Plaintiffs maintained the economics surrounding the License Agreement as proprietary and confidential.  Those financial aspects of the relationship include sales volume, sales outlets, sales geographies, production and distribution costs and profit margins.

47.    Plaintiffs also maintained their fragrance supply chain, manufacturing, marketing and distribution plans and strategies as proprietary and confidential.  On the manufacturing and operations side, the proprietary and confidential information includes the vendors supplying ingredients, fragrances and packaging.  On the sales and distribution side, the proprietary and confidential information includes the distribution chain for the products and the ultimate retail destinations with which Plaintiffs have agreements, inclusive of the geographies and retail outlets where the products have the strongest sales.

48.    The Revlon Employees participated in mandatory ethics training at Revlon.  That training includes education on employee obligations to respect and protect the company's confidential and proprietary trade secret information.  The ethics training includes the following:

Revlon People may have access to the Company's confidential and proprietary information including intellectual property (defined below), which is commercially sensitive and valuable. ***Revlon People may not improperly disclose or use any confidential or proprietary information learned as a result of their relationship with the Company to benefit themselves or others, even after their relationship with Revlon ends***. Similarly, Revlon People are also prohibited from improperly using commercially sensitive, confidential or proprietary information obtained from former employers or other third parties. (Emphasis supplied.)

49.    Revlon entered into written employment agreements with certain of its employees that re-confirm their obligations to maintain Revlon's Trade Secrets in confidence.

50.    Defendant Kidd last accepted and acknowledged a written employment agreement with Revlon on June 19, 2023. The employment agreement specifies that information concerning Revlon's business affairs should be treated as confidential unless it is within the public domain. "Confidential Information" expressly includes vendor information, purchasing and internal cost information, marketing and development plans, price and cost data, marketing techniques, methods of obtaining business, forecasts and forecast assumptions and volumes, future plans and potential strategies, and contracts and their contents.

51.    In addition, Kidd's contract contains specific prohibitions on her use of Confidential Information to compete with Revlon after Kidd leaves Revlon's employ, italicized below. With respect to confidentiality, the employment agreement further provides, among other things:

I agree that during my employment with the Company and thereafter: (i) I will not at any time disclose directly or indirectly to any person or entity or use for my own benefit any such Confidential Information; (ii) I will restrict the disclosure of such Confidential Information to those Company employees and contractors with a need to know to perform services on behalf of the Company and who have agreed to be bound by similar confidentiality restrictions; (iii) I will take all reasonable precautions to prevent inadvertent disclosure of such Confidential Information; (iv) I will not at any time use, copy, or transfer such Confidential Information other than as strictly necessary to perform services on behalf of the Company;

and (v) I will take all reasonable precautions to prevent inadvertent use, copying or transfer of such Confidential Information. ***In particular, and without limitation of the above, I agree that during my employment with the Company and thereafter I will not use Confidential Information to compete against the Company***.

52. Defendant Romeo last accepted and acknowledged a written employment agreement with Revlon on April 23, 2019. With respect to confidentiality, that employment agreement contains, among other things, the same language quoted in paragraph 51 above.

53. Defendant Fass last accepted and acknowledged a written employment agreement with Revlon on May 9, 2018. With respect to confidentiality, that employment agreement contains, among other things, the same language quoted in paragraph 51 above.

## III.    THE REVLON EMPLOYEES' OTHER CONTRACTUAL OBLIGATIONS

54. The employment agreements between Revlon and the Revlon Employees prohibit them from directly or indirectly soliciting other Revlon employees to leave Revlon to work at a competing business.

55. Defendant Kidd's employment agreement with Revlon states:

I agree that I will not at any time during my employment with the Company, and for a period of twelve months following the termination thereof, directly or indirectly solicit, induce, or influence any person then employed by the Company . . . to terminate his or her employment relationship with the Company or otherwise interfere with any such employment by or association with the Company for the purpose of associating, as an employee or otherwise, with any [competitor] or otherwise encourage any such employee to leave his or her employment with the Company.

56. Defendants Romeo's and Fass's employment agreements with Revlon state:

I agree that I will not at any time during my employment with the Company, and for a period of twelve months following the termination thereof, directly or indirectly solicit, induce, influence, or attempt to solicit, induce or influence any person then employed by the Company with whom I have had business-related contact during my employment with the Company, to terminate his or her employment relationship with the Company or otherwise interfere with any such employment by or association with the

Company for the purpose of associating, as an employee or otherwise, with any [competitor] or otherwise encourage any such employee to leave his or her employment with the Company.

57.    The employment agreements between Revlon and the Revlon Employees further prohibit them from soliciting any customer, supplier or vendor to terminate its business relationship with Revlon.  That obligation continues for a period of twelve months following the end of the employment relationship.

58.    The employment agreement between Revlon and Defendant Kidd also contains non-disparagement provisions.  Kidd's employment agreement provides:  "I will not , directly or indirectly, make or cause to be made any statements or other communications in any form . . . to any third parties criticizing or disparaging, or commenting negatively on the character or business reputation of the Company."

## IV.    PLAINTIFFS' RENEWAL NEGOTIATIONS WITH BRITNEY BRANDS

59.    In the fall of 2023, Revlon began negotiating with representatives of Britney Brands to extend the Elizabeth Arden licensing relationship beyond the December 31, 2024 expiration date.  The representatives for Britney Brands in the negotiation included Britney Spears's manager, Cade Hudson ("Hudson"), and two individuals employed at Creative Artists Agency ("CAA"), Christian Carino ("Carino") and Alexandra Kopp ("Kopp"), a CAA attorney.  Plaintiffs' negotiating team included Defendant Kidd, Marni Golden ("Golden"), Global Vice President of Talent Partnerships, and in-house attorney Steven Rosenthal ("Rosenthal").

60.    Plaintiffs wanted to move quickly to lock down the extension.  However, Hudson informed Golden in February 2024 that "NOTHING moves fast in Britney world."  He asked that Revlon "follow our lead here."

16

61.    The negotiations proceeded in phases.  By March 1, 2024, Plaintiffs and Britney Brands had reached agreement on the material economic and other terms for an extension.

62.    Revlon's counsel, Rosenthal, drafted a proposed written amendment to the Britney Brands License Agreement to reflect the extension's financial and other terms.

63.    On March 20, 2024, Plaintiffs sent their draft to the Britney Brands negotiating team.

64.    On April 2, 2024, Kopp (the CAA attorney representing Britney Brands in the contract negotiations) sent Revlon comments on the draft on behalf of Britney Brands.

65.    On April 5, 2024, Hudson relayed to Golden in a one-on-one conversation that questions had been raised by someone from Britney's team about Revlon exiting the fragrance business.  He relayed that he had heard, among other things, that Revlon was considering a transaction with Give Back Beauty (GBB) that would significantly, and potentially negatively, impact the Elizabeth Arden fragrance business.  Hudson asked Golden about the accuracy of that information and whether Revlon was having any such discussions with GBB, telling Golden that this person told him that GBB was not a particularly good look for Britney Brands and had real concerns if Revlon were considering a transaction with GBB concerning the Elizabeth Arden fragrance business.  Although Hudson did not provide the source of the (false) rumor that Revlon was discussing a potential transaction with GBB that could potentially include selling the Elizabeth Arden fragrance business to GBB, upon information and belief, the source of that rumor was GBB.

66.    Golden promptly ascertained from Revlon's Chief Marketing Officer ("CMO") that none of this information about Revlon transacting with GBB or selling the fragrance business was accurate.  Golden immediately contacted Hudson to assure him that Revlon and Elizabeth Arden were not considering a transaction with GBB or transferring or discontinuing the fragrance

business.  To the contrary, Golden reaffirmed to Hudson that Revlon was fully committed to the fragrance business on a going-forward basis, that fragrance is a priority for Revlon and that, antithetical to the rumor he had reported, Revlon is investing in its fragrance business.

67.     Four days later, on April 9, 2024, as GBB must have known when GBB told members of the Britney Brands team that Revlon was considering selling or discontinuing its fragrance business, Kidd orally gave notice to Revlon's CMO that she would be leaving Revlon effective May 3, 2024.  Kidd followed-up with a formal letter of resignation addressed to the CMO on that same date.  In that letter, Kidd stated:  "I am truly grateful for the trust you placed in me to lead my team and drive the fragrance business."  She also wrote:  "I am committed to ensuring a seamless transition and I am available to assist in any way necessary to facilitate the transfer of my responsibilities and to support the onboarding process for my successor."  Kidd closed with: "*Above all, I want to ensure that I leave the team well-positioned to continue achieving success*." (Emphasis added).

68.     When asked, Kidd refused to disclose the identity of her new employer.  Kidd told her Revlon colleagues that she had signed a non-disclosure agreement with her new employer. She would state no more than that she would still be working in the beauty space.  Kidd did not tell either Revlon's CMO, Golden or Rosenthal that she was going to GBB.

69.     Trusting Kidd to abide by her duties to Revlon, which Kidd had reaffirmed in her resignation letter, Plaintiffs allowed Kidd to continue finalizing the extension of the Britney Brands License Agreement.

70.     On April 16, 2024, Hudson again reached out directly to Golden.  Hudson told Golden in that conversation that he had been informed that GBB was taking the head of Revlon's fragrance business – Vanessa Kidd – *and* the core fragrance team.

71.     Kidd had only told Golden about her resignation earlier that same day, saying that the new job opportunity had moved very quickly, over the course of only a few weeks.  Kidd did not tell Golden that she was going to GBB or that GBB was planning to sign a contract with Britney Brands for the Britney Fragrances.

72.     After her call with Hudson, Golden told Kidd that Hudson knew that Kidd was going to GBB.  Kidd turned pale.  She stared at Golden in apparent shock.  Kidd responded, "they made me sign an NDA."  The clear inference from Kidd's reaction was that GBB did not want Revlon to know that GBB was taking any – let alone virtually all – of the Elizabeth Arden fragrance team or that Kidd, an integral part of the Britney Brands negotiating team, was bringing all of her knowledge to GBB.

73.     Kidd was aware of her non-solicitation obligations.  Kidd was not permitted to recruit, or assist GBB in recruiting, the rest of the fragrance team to go to GBB.  In addition to Kidd's contractual duties, Kidd owed a duty of loyalty to Revlon that prohibited her from sabotaging the Britney Brands extension.

74.     On April 17, 2024, Revlon scheduled a videoconference meeting with the Britney Brands team to discuss the draft amendment to the Licensing Agreement.  Golden asked that Kidd take time at the end of the call to speak to Hudson to reassure Hudson about Revlon's commitment to the fragrance business and the Britney Brands account and to confirm to Hudson that the Britney Brands account would be well looked after by "pumping up" the rest of the Revlon team to Hudson. Kidd agreed to do so.

75.     At the close of the videoconference, Kidd requested time to speak just with Hudson. Golden remained on the call.  Kidd confirmed to Hudson that she was leaving Revlon.  In purportedly "pumping up" the rest of the Revlon team, Kidd stressed to Hudson that, after Kidd's

departure, Britney Brands would continue to be in good hands with Dominick Romeo, who had primary responsibility for the Britney Brands account.

76.     The new contract was fully negotiated.  Carino at CAA wrote an encouraging note to the negotiating teams following the call:  "Let's get this done everyone."

77.     The very next day, on April 18, 2024, CAA's Kopp distributed an updated version of the written amendment.  Kopp wrote, "Please let us know if any questions or comments remain. *If not, we can circulate for signature*." (Emphasis added).

78.     On April 23, 2024, Plaintiffs informed the Britney Brands team that they fully accepted the written amendment that Kopp had circulated on April 18, 2024.  Isabelle Andre at Revlon wrote in an email message:  "We are circulating the attached clean version for signature on our end and will send through for countersignature as soon as possible."

79.     On April 24, 2024, Andre circulated the April 18 agreement signed on behalf of Elizabeth Arden.  Andre asked that the Britney Brands team "Please have Britney sign and send back to us."

80.     As of April 24, 2024, Plaintiffs considered the extension completed.  They had signed on the dotted line, agreeing to all terms.

81.     On April 26, 2024, Kopp acknowledged receipt of the signed agreement.

82.     But the counter-signed agreement wasn't forthcoming.  Even though the Britney Brands negotiating team had represented that they had authorization and approval from their client on all terms, and had sent Plaintiffs a writing that was ready for signature, Kopp communicated that their client "does not want to proceed on the proposed terms."  Kopp asked to schedule a call with Plaintiffs.

83.     Plaintiffs attempted to get on the phone with the Britney Brands team immediately. The Britney Brands team delayed scheduling a call.  The Britney Brands team did not identify any issues with the contract they had sent on April 18 and that Revlon had signed on April 24, 2024. Plaintiffs attributed the delay to other issues in Ms. Spears' life and proceeded as if signing the contract was the ministerial formality that it legally was.

84.     Plaintiffs finally spoke with Carino on May 1, 2024.  Carino informed them that Britney Brands was not in a position to make a commitment at that time.  During the discussion, Carino repeatedly expressed concerns about Revlon's stability in the fragrance business.  Golden, shocked at the sudden about-face, reiterated that Revlon is fully committed to the fragrance business – a business of which Britney Brands was a highly successful cornerstone for over 20 years.

85.     Defendant Kidd departed Revlon's employ on May 3, 2024.  Immediately prior to leaving, Kidd accessed more than 250 electronic files at Revlon with Trade Secret information concerning Revlon's fragrance business and the Britney Brands account.

86.     On May 8, 2024, Carino sent an email to Plaintiffs stating, "Britney has made the decision not to extend the licensing deal with Revlon beyond its current term."

87.     The very next day, on May 9, 2024, Defendants Romeo and Fass each tendered their resignations at Revlon.  They did so in a coordinated manner, with Romeo resigning one half-hour after Fass.

88.     Prior to leaving, Fass downloaded onto a portable external hard drive a large quantity of Revlon electronic files with Trade Secret information concerning Revlon's fragrance business.

89.     On May 20, 2024, Defendant Mulvihill resigned.

90.    The Revlon Employees all departed Revlon in May 2024.

91.    Following the May 8, 2024 email message from Carino, Plaintiffs continued to communicate with Britney Brands to ascertain if there were any new deal points, but no new issues were raised by Britney Brands: Revlon had agreed to everything in Britney Brands' last draft and, after months and months of negotiations, Revlon had signed the fully negotiated final agreement.

92.    Although nothing at Britney Brands ever happened quickly, on May 30, 2024, a mere three weeks after Revlon was informed for the first time that Ms. Spears apparently had decided not to extend the licensing arrangement with Revlon, Carino sent an email message to Golden stating: "Britney has closed a licensing agreement with another partner in the beauty and fragrance space that takes effect January 1, 2025."

93.    Golden spoke on the telephone to Carino and others on the Britney Brands team soon after receiving his email message.  Carino questioned the stability of Revlon's fragrance business after recent reorganizations and told Golden, among other things, that Britney Brands was influenced to end the relationship with Revlon by the departure of Revlon's entire fragrance team, immediately on the heels of Kidd's departure.

94.    Carino did not tell Golden who had "influenced" Britney Brands or who had told Britney Brands in April 2024 that GBB was acquiring Revlon's fragrance team, but upon information and belief, those statements originated with GBB.  It did not escape Golden's notice that, when she asked Kidd to "pump up" the Revlon team to the Britney Brands team, Kidd focused almost exclusively on saying that Romeo would succeed Kidd and that Ms. Spears would be "in good hands" with Romeo, and that Romeo had resigned from Revlon to join Kidd at GBB a mere 6 days after Kidd's departure.

95.     On June 6, 2024, Revlon sent the Revlon Employees reminders by email of their post-termination obligations to Revlon.

96.     In July 2024, Revlon learned that GBB, through Britney Brands, had made outreach to one of the fragrance houses that produces scents bearing the Britney Brands Licensed Marks. The communication represented that a GBB entity in Geneva Switzerland had entered into a worldwide licensing agreement with Britney Brands for fragrance products bearing the Britney trademarks, effective as of January 1, 2025.  GBB sought to start working with Plaintiffs' suppliers to transition Plaintiffs' business months prior to the end date of the Britney Brands License Agreement.

## V.    DEFENDANTS' WRONGFUL BEHAVIOR

97.     Based on the facts pleaded above, it is readily apparent, and Plaintiffs reasonably believe, that Defendant Kidd began discussions with GBB at least as early as February or March 2024, around the same time that Plaintiffs had reached agreement with Britney Brands on the material terms for extension of the Licensing Agreement, and that Kidd also provided GBB with the information GBB wanted in order to evaluate both the financial benefits of a Britney Brands license and the costs to bring over the key members of Kidd's team at Revlon.

98.     In the course of those discussions, Plaintiffs reasonably believe that Kidd improperly disclosed Plaintiffs' trade secret information to GBB.  Plaintiffs reasonably believe that Kidd informed GBB that she was actively working on papering an extension to the Britney Brands License Agreement, which was expiring at the end of the year.  From the time that Kidd began speaking with GBB until she left Revlon, Kidd accessed over 250 confidential files concerning Revlon's fragrance businesses and placed them on her laptop. These files included details of the Britney Brands contract, the extension terms, and the extension negotiations, as well

as overall fragrance business strategy and licensing terms with other celebrity licensors. These files also included the compensation files for the other Revlon Employees, which Kidd put on her laptop on March 27, 2024. There is no business reason for Kidd to have copied all of these files to her laptop, especially the Revlon Employees' compensation information when Kidd did not put compensation information about her four other direct reports on her laptop. Plaintiffs reasonably believe Kidd copied this information in order to discuss the movement of the Britney Brands business and all four Revlon Employees to GBB.

99.    In the course of those discussions, Plaintiffs reasonably believe that Kidd provided additional Trade Secret information to GBB concerning the Britney Brands account. In addition, Plaintiffs reasonably believe that Kidd violated her duties to Revlon by assisting GBB with recruiting other members of the Revlon fragrance team, including Romeo, Fass and Mulvihill (whose compensation information was included in the files taken from Revlon's servers by Kidd). Moreover, Plaintiffs reasonably believe that Kidd violated her non-disparagement obligations to Revlon by inaccurately informing GBB that Revlon was not committed to its fragrance business.

100.    GBB wrongfully used the Trade Secret information it received from Kidd. GBB contacted the Britney Brands team in early April, prior to the time that Kidd gave notice to Revlon, and informed the Britney Brands team that it would be acquiring Revlon's fragrance business. GBB otherwise disparaged Revlon to Britney Brands, relying on information derived from its conversations with Kidd. GBB falsely informed the Britney Brands team that Revlon was exiting the fragrance business. GBB knew, based on confidential Trade Secret information wrongfully obtained from Kidd, that the time was ripe to try to wrest away the Britney Brands account, because Britney Brands and Revlon were in the midst of negotiations to formalize an extension of an agreement that was set to expire at year-end.

101.    On information and belief, GBB actively recruited Revlon's other fragrance employees with wrongful assistance from Kidd, who provided their names and contact information.  In addition, Plaintiffs reasonably believe that Kidd gave GBB information on the other Revlon Employees' compensation arrangements and the best ways to entice the other fragrance employees to leave Revlon, including providing financial terms and job titles that the individuals sought.  Romeo, Mulvihill and Fass all reported to Kidd.  Kidd not only gathered the details of their compensation and benefits at Revlon and also knew the bases on which they could earn bonuses, but also checked to confirm that none of the Revlon Employees would have to return the retention bonuses they had been paid on January 12, 2024.  It is entirely illogical, and in fact incredible, that Romeo, Mulvihill and Fass coincidentally resigned from Revlon within weeks of Kidd's departure, to go work under Kidd at GBB, without communicating with Kidd about their deliberations and decisions.  It is equally inconceivable that GBB could have analyzed the financial prospects for the Britney Brands business and determined whether it was worth the investment to enter into a license arrangement with Britney Brands without the benefit of the Trade Secrets that the Revlon Employees provided.  Plaintiffs expect that discovery will further demonstrate that which is reasonably obvious – assuming, of course, that Defendants have not taken steps to hide their tracks by destroying evidence.

102.    On April 22, 2024, Fass met with Jordi Agusti of GBB by videoconference for approximately 45 minutes.  Agusti is another former Revlon employee who, by virtue of his role in HR at Revlon, knows how closely Revlon guards its Trade Secrets as well as the restrictions on Revlon employees not to share proprietary information or to solicit Revlon employees to leave Revlon's employ.  On May 1, 2024, Defendant Fass met with GBB owner Brondi, who was recruiting Fass to join GBB's fragrance business.  As described above, Brondi also knows that

Revlon employees are not allowed to share Trade Secrets or to solicit Revlon employees, yet Brondi enticed Fass to leave, to bring Trade Secrets with her when she left, and to solicit other members of the Revlon fragrance teams to leave Revlon.  Defendant Fass drafted a thank you note to Brondi on May 3, 2024 – Kidd's last day at Revlon – from Fass's Revlon email account.  The last line of the note states "I am intrigued by the new business development aspect of the role and the opportunity that it presents to continue to curate the portfolio."

103.    On May 3, 2024, Fass also met with an individual named Gianni at GBB.  Upon information and belief, this individual is Gianni Pieraccioni, a former Revlon COO, who also knows that Revlon employees are not allowed to take Trade Secrets or to solicit other Revlon employees to leave Revlon.  As she had done with Brondi, Fass drafted a thank you note to Gianni on her Revlon computer on May 6, 2024.

104.    Plaintiffs believe that Brondi, Pieraccioni, Agusti and others at GBB held similar meetings with Defendants Romeo and Mulvihill in April and/or early May 2024.

105.    Beginning on around May 8, 2024, the day before she gave notice at Revlon, and continuing through May 22, 2024, Defendant Fass downloaded a large quantity of proprietary and confidential Revlon Trade Secret data concerning the fragrance business and transferred these Revlon proprietary files to an external portable hard drive.  There is no business reason for Fass to have copied all of these files to an external hard drive five days after her meeting with Gianni and her thank you note to Brondi, except to facilitate the movement of the Britney Brands business and other Revlon fragrance businesses to GBB.

106.    Plaintiffs reasonably believe that Kidd, and possibly one or more of the other Revlon Employees, wrongfully kept GBB informed of the progress of negotiations between Revlon and Britney Brands on an extension to the Licensing Agreement, in order to assist GBB in

obtaining the Britney Brands licensing rights.  Once Kidd accepted a job with GBB, she had a vested interest in GBB's expansion of its fragrance portfolio.  Plaintiffs reasonably believe that Kidd's job responsibilities at GBB include "business development" or poaching other fragrance business partners from Revlon.

107.    On information and belief, GBB asked Defendant Kidd to sign a non-disclosure agreement in order to conceal from Revlon that Kidd intended to leave Revlon for a competitor in the fragrance business.  At the same time that GBB contractually prohibited Kidd from disclosing its identity, GBB was actively informing Britney Brands that it had poached Revlon's fragrance lead and was hiring the rest of the fragrance team.

108.    On information and belief, when Kidd told the Britney Brands team on April 17, 2024 that they would continue to be in good hands with Romeo at Revlon after her departure, she did so with full knowledge that GBB was actively recruiting Romeo, and that he was likely to leave for GBB, if he had not already committed to do so.  Kidd made that statement to assist GBB in poaching the Britney Brands license.

109.    On information and belief, the Revlon Employees wrongfully shared Plaintiffs' Trade Secret information with GBB.  Without Plaintiffs' Trade Secret information, GBB could not reasonably have committed to a licensing agreement with Britney Brands by May 30, 2024.  GBB had to have learned details of costs and income associated with that fragrance business from the Revlon Employees in order to close the deal so swiftly.  Britney Brands required substantial financial guarantees which a competitor would be highly unlikely to give without intimate knowledge of the confidential business information the Revlon Employees had acquired concerning the economics of the Britney Fragrance business.  In addition, the speed of the deal with GBB was completely uncharacteristic for Britney Brands over the course of its more than 20-

year business relationship with Elizabeth Arden and Revlon.  And, of course, completely at odds with Cade Hudson's statement to Revlon in February 2024 that "NOTHING moves fast in Britney world."  It was also at odds with Cade Hudson's statement that Britney Brands did not want to align with GBB.  It is, therefore, a near certainty that the new agreement between Britney Brands and GBB was facilitated by Trade Secret information obtained by GBB from the Revlon Employees.

110.    On information and belief, the Revlon Employees wrongfully shared Trade Secret information on the economics surrounding the Britney Brands fragrance business, as well as the suppliers, vendors, and retailers, and the marketing and distribution strategies for the Britney Fragrances.

111.    On information and belief, the Revlon Employees wrongfully are continuing to use Plaintiffs' Trade Secret information in the course of their work at GBB.  The Revlon Employees are prohibited from duplicating Plaintiffs' business plans for the Britney Brands fragrances in their work at GBB.  The Revlon Employees also are prohibited from duplicating any of Plaintiffs' business plans for any other aspect of GBB's fragrance business.  Moreover, the Revlon Employees are prohibited from retaining Plaintiffs' information after leaving Revlon's employment.

112.    The Revlon Employees wrongfully solicited Britney Brands to terminate its business relationship with Plaintiffs.  Plaintiffs reasonably believe that the Revlon Employees and GBB wrongfully seek to solicit Plaintiffs' other valuable fragrance partners and induce them to terminate their business relationships with Plaintiffs.

## CAUSES OF ACTION

### COUNT I
### (Trade Secret Misappropriation Against All Defendants)

113.    Plaintiffs repeat, reallege and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 112 as if fully set forth herein.

114.    Plaintiffs possess Trade Secrets relating to their fragrance business and the Britney Brands account.  Those Trade Secrets include the terms of the Britney Brands License Agreement, inclusive of its expiration date.  The Trade Secrets also include Plaintiffs' detailed business plans for exploitation of the Britney Spears fragrance line, including but not limited to financial constructs and models, manufacturing resources, packaging vendors, marketing plans, and distribution plans.  The Trade Secrets further include Plaintiffs' detailed business plans for exploitation of their other fragrance lines.

115.    Plaintiffs took reasonable measures to maintain the secrecy of their Trade Secrets.

116.    Plaintiffs' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable proper means by, another person who can obtain economic value from the disclosure or use of the information.

117.    Defendants wrongfully misappropriated Plaintiffs' Trade Secrets in violation of the Defense of Trade Secrets Act, 18 U.S.C. § 1836, as well as New York law, and are improperly using Plaintiffs' trade secrets for GBB's benefit.

118.    The Revlon Employees wrongfully disclosed Plaintiffs' trade secrets to GBB.

119.    The Revlon Employees wrongfully transferred and retained Plaintiffs' Trade Secrets after leaving Revlon's employ.

120.    GBB discovered Plaintiffs' Trade Secrets by improper means, wrongfully obtaining them from the Revlon Employees.

121.    Defendants willfully and maliciously misappropriated Plaintiffs' Trade Secrets.

122.    Plaintiffs are being irreparably harmed by Defendants' misappropriation and misuse of their Trade Secrets to compete with Plaintiffs in the fragrance business.

123.    Plaintiffs have suffered actual losses from misappropriation of their Trade Secrets, in the tens of millions of dollars.

124.    Defendants have been unjustly enriched by misappropriation of Plaintiffs' Trade Secrets.

125.    Plaintiffs seek an injunction requiring return of Plaintiffs' Trade Secret information and enjoining Defendants from continuing to use Plaintiffs' Trade Secrets.

126.    Plaintiffs further seek compensatory damages, unjust enrichment damages, punitive damages and attorneys' fees.

### COUNT II
**(Tortious Interference with Prospective Economic Advantage Against All Defendants)**

127.    Plaintiffs repeat, reallege and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 126 as if fully set forth herein.

128.    Plaintiffs had a business relationship with Britney Brands over the course of 20 years.

129.    Plaintiffs fully negotiated an extension to their Britney Brands License Agreement, which was finalized and circulated for signatures.

130.    Defendants knew of that relationship.

131.    Defendants intentionally interfered with that relationship.

132.    Defendants used dishonest, unfair and improper means to interfere with Plaintiffs' relationship with Britney Brands.

133.    Defendants wrongfully used misappropriated Trade Secret information to interfere with Plaintiffs' relationship with Britney Brands.

134.    Defendants committed fraud and/or misrepresentation to interfere with Plaintiffs' relationship with Britney Brands.

135.    The Revlon Employees breached their duty of loyalty to Revlon in interfering with Plaintiffs' relationship with Britney Brands.

136.    GBB aided and abetted the Revlon Employees' breach of their duty of loyalty to Revlon to interfere with Plaintiffs' relationship with Britney Brands.

137.    Defendants' tortious interference induced Britney Brands to back out of the extension of the Britney Brands License Agreement.

138.    Plaintiffs have suffered actual damages in the tens of millions of dollars from loss of the extension of the Britney Brands License Agreement.

139.    Plaintiffs seek compensatory damages and punitive damages for Defendants tortious interference with prospective economic advantage.

<u>COUNT III</u>
**(Breach of Contract Against Defendants Kidd, Romeo and Fass)**

140.    Plaintiffs repeat, reallege and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 139 as if fully set forth herein.

141.    Defendants Kidd, Romeo and Fass entered into employment agreements with Revlon.

142.    Those employment agreements prohibit Defendants Kidd, Romeo and Fass from disclosing Revlon's Trade Secrets.

143.    Those employment agreements prohibit Defendants Kidd, Romeo and Fass from using Revlon's Trade Secrets to compete with Revlon, during their employment and thereafter.

144.    Those employment agreements prohibit Defendants Kidd, Romeo and Fass from directly or indirectly soliciting other employees to leave Revlon for a competitor.

145.    Those employment agreements require Defendants' adherence to and compliance with Revlon's corporate policies and expressly prohibit Defendants Kidd, Romeo and Fass from soliciting Revlon's business partners to terminate their business relationship with Revlon.

146.    Defendant Kidd's employment agreement with Revlon prohibits her from disparaging Revlon.

147.    Revlon performed its obligations under the employment agreements.

148.    Defendants Kidd, Romeo and Fass breached their obligations under the employment agreements.

149.    Defendants Kidd, Romeo and Fass breached their employment agreements by disclosing Revlon's Trade Secrets.

150.    Defendants Kidd, Romeo and Fass breached their employment agreements by using Revlon's Trade Secrets to help GBB poach business and other employees from Revlon.

151.    Defendants Kidd, Romeo and Fass breached their employment agreements by directly and indirectly soliciting other employees to leave Revlon for GBB, a competitor in the fragrance business.

152.    Defendants Kidd, Romeo and Fass breached their employment agreements by encouraging Britney Brands to terminate its business relationship with Plaintiffs.

153.    Defendant Kidd breached her employment agreement by disparaging Revlon.

154.    Plaintiffs have been irreparably harmed by these breaches by Defendants Kidd, Romeo and Fass.

155.    Defendants Kidd, Romeo and Fass agreed within their employment agreements that failure to perform any obligation under the agreements will cause immediate and irreparable damage to Revlon for which there is no adequate remedy at law, and that Revlon shall be entitled to injunctive relief without posting a bond.

156.    Plaintiffs seek injunctive relief as a remedy for breach of the employment agreements, to the extent that there is no adequate remedy at law.

157.    Plaintiffs also seek compensatory damages as a remedy for breach of the employment agreements.  Plaintiffs have suffered actual damages in the tens of millions of dollars from these contractual breaches.

**COUNT IV**
**(Breach of the Duty of Loyalty Against All Defendants)**

158.    Plaintiffs repeat, reallege and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 157 as if fully set forth herein.

159.    Under New York law, the Revlon Employees owed Revlon a duty of good faith and loyalty.

160.    Employees are required to be loyal to their employers.  They are prohibited from acting in any manner inconsistent with the employer's agency or trust and are at all times bound to exercise the utmost good faith and loyalty in the performance of their duties.

161.    Employees may not conspire to compete with their employer when they are still employed.

162.    The duty of loyalty also precludes employees from misusing an employer's confidential or proprietary information, such as by sharing that information with a competitor.

163.    The Revlon Employees violated their duties of good faith and loyalty to Revlon. The Revlon Employees acted inconsistently with Revlon's agency and trust.

164.    The Revlon Employees wrongfully sabotaged the Britney Brands business.

165.    The Revlon Employees wrongfully assisted GBB in taking the Britney Brands fragrance business from Plaintiffs.

166.    The Revlon Employees wrongfully usurped a corporate opportunity, misappropriating the Britney Brands business.

167.    The Revlon Employees wrongfully disparaged Revlon to GBB.

168.    The Revlon Employees misused Revlon's Trade Secret information and shared that information with GBB.

169.    GBB aided and abetted the Revlon Employees' breach of their duty of loyalty to Revlon, inducing and encouraging the Revlon Employees to breach their duties.

170.    Plaintiffs have suffered actual damages in the tens of millions of dollars from these contractual breaches.

171.    Plaintiffs seek compensatory damages, restitution, disgorgement and punitive damages.

## COUNT V
### (Tortious Interference with Contract Against GBB)

172.    Plaintiffs repeat, reallege and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 171 as if fully set forth herein.

173.    Revlon had employment agreements with Defendants Kidd, Romeo and Fass.

174.    GBB was aware of those employment agreements.

175.    GBB intentionally induced Defendants Kidd, Romeo and Fass to breach those employment agreements.

176.    GBB encouraged Defendants Kidd, Romeo and Fass to disclose Plaintiffs' Trade Secrets in violation of their employment agreements.

177.    GBB encouraged Defendants Kidd, Romeo and Fass to misuse Plaintiffs' Trade Secrets to assist GBB in poaching business and other Revlon employees – including each other – from Plaintiffs, in violation of their employment agreements.

178.    GBB encouraged Defendants Kidd, Romeo and Fass to solicit their co-workers to join them at GBB, in violation of their employment agreements.

179.    GBB encouraged Defendants Kidd, Romeo and Fass to solicit Britney Brands to terminate its relationship with Plaintiffs, in violation of their employment agreements.

180.    GBB encouraged Defendant Kidd to disparage Revlon, in violation of her employment agreement.

181.    GBB's tortious interference with Revlon's employment contracts with Defendants Kidd, Romeo and Fass caused actual damages to Plaintiffs.

182.    Plaintiffs seek compensatory and punitive damages for GBB's tortious interference with contract.

## PRAYER FOR RELIEF

WHEREFORE, Revlon and Elizabeth Arden hereby demand judgment as follows:

i.    Imposing preliminary and permanent injunctions requiring Defendants' return of Plaintiffs' Trade Secret information;

ii.    Imposing preliminary and permanent injunctions enjoining the Revlon Employees from (a) breaching the terms of their employment agreements with Revlon; and (b) breaching their duties of loyalty to Revlon.

iii.    Imposing preliminary and permanent injunctions enjoining Defendants from making any use of Revlon's misappropriated Trade Secrets;

iv.    Awarding compensatory damages against Defendants;

     v.      Awarding unjust enrichment damages against Defendants;

     vi.      Awarding punitive damages against Defendants;

     vii.      Awarding Plaintiffs' attorneys' fees, costs and disbursements of this action;

     viii.      Awarding such other and further relief as the Court may deem just and proper.

Dated: August 26, 2024          STEPTOE LLP

By:  <u>/s/ *Elyse D. Echtman*</u>
      Elyse D. Echtman
      1114 Avenue of the Americas
      New York, NY 10036
      Telephone:  (212) 506-3900
      Email:  eechtman@steptoe.com

      Michael Dockterman (*pro hac vice* to be filed)
      227 West Monroe Street, Suite 4700
      Chicago, IL 60606
      Telephone:  (312) 577-1300

      *Attorneys for Plaintiffs Revlon Consumer*
      *Products LLC and Elizabeth Arden, Inc.*