UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REVLON CONSUMER PRODUCTS LLC and ELIZABETH ARDEN, INC.<br><br>Plaintiffs,<br><br>-against-<br><br>GIVE BACK BEAUTY S.A., et al.,<br><br>Defendants. | Case No. 1:24-cv-06438-ER-RWL |

## DECLARATION OF WILL CORNOCK

I, WILL CORNOCK, declare and state as follows:

1. I am the Chief Strategy and Transformation Officer at Plaintiff Revlon Consumer Products LLC ("Revlon"). I have worked at Revlon since 2023. I make this declaration based on personal knowledge, the books and records of Plaintiffs Revlon and Elizabeth Arden, Inc. ("Elizabeth Arden"), information reported to me in the ordinary course of business by individuals with a business duty to accurately report that information, and on information and belief.

2. As part of my job responsibilities at Revlon, I oversee the development and execution of strategic initiatives to drive enterprise growth and transformation.

3. Prior to working at Revlon, I worked for Boston Consulting Group ("BCG") from 2015 to 2023. During my time at BCG I designed and executed growth and transformation programs for consumer-products companies.

I.  **Plaintiffs Revlon and Elizabeth Arden**

4. Revlon is a well-known beauty company founded in 1932. Its consumer products include cosmetics, skin-care products, nail polish, hair color and fragrances. In 2016, Revlon acquired Elizabeth Arden, another beauty company that was founded in 1910, maintaining it as a

1

Revlon subsidiary. Following the acquisition, Revlon combined its fragrance business with the Elizabeth Arden fragrance business, which operate in a single business segment devoted to fragrance. The Revlon fragrances include its own name brand products, such as Elizabeth Arden "Red Door," as well as fragrances manufactured and marketed under brand partnerships that include Britney Spears, Juicy Couture, Elizabeth Taylor, John Varvatos and others. Revlon sells prestige, celebrity and mass fragrance products.

## II.     Revlon's Former Employees

5.      Defendants Vanessa Kidd ("Kidd"), Dominick Romeo ("Romeo"), Reid Mulvihill ("Mulvihill") and Ashley Fass ("Fass") - the Revlon Employees - were integral to Revlon's fragrance business. They were employed by Revlon and/or Elizabeth Arden in that business for a combined 32 ½ years.

6.      Kidd was the most senior member of the fragrance team. She held the title of Senior Vice President, Global Marketing, for Revlon's Fragrance Portfolio. Defendants Fass, Romeo and Mulvihill all reported directly to Kidd. Kidd reported to Revlon's Chief Marketing Officer, Martine Williamson. Kidd held a position of significant trust and responsibility at Revlon. She has extensive knowledge of the sourcing, manufacturing, supply and distribution chains for the fragrances, inclusive of the key retailers and geographies for each fragrance brand.

7.      Kidd began working in the fragrance business at Elizabeth Arden in August 2012. She transitioned to Revlon in 2016. Kidd's job responsibilities included management of all aspects of Revlon's fragrance portfolio. She was charged with leading and driving the fragrance business, with responsibility for financial performance, brand strategy, innovation, advertising campaign management, media planning and all marketing channels. In my role as Revlon's Chief Strategy

and Transformation Officer, I met directly with Kidd to discuss, refine and develop the strategy for the fragrance business.

8. Kidd tendered her resignation on April 9, 2024. A copy of that resignation letter is attached hereto as Exhibit 1. She informed Revlon that she had been offered an attractive job opportunity elsewhere. However, when asked to name that opportunity, she refused to do so.

9. Kidd's last day at Revlon was May 3, 2024. Revlon allowed Kidd continued access to its computer systems for purposes of fulfilling her job responsibilities through the close of business on her last day of work. Revlon generally expects its employees to keep working while they are on the Revlon payroll, up until the last day of employment.

10. Fass held the title of Global Marketing Director of Juicy Couture Fragrances. She had primary day-to-day responsibility for the Juicy Couture fragrance products, an extremely successful Revlon fragrance brand. Fass began working at Revlon in May 2018. Fass tendered her resignation on May 9, 2024. A copy of her resignation letter is attached hereto as Exhibit 2. Like Kidd, Fass refused to disclose where she would be working after she left Revlon's employ. Her last day at Revlon was May 23, 2024.

11. Romeo began working at Revlon in April 2019. He was employed by Revlon as a Director of Marketing, Global Fragrance Team. Romeo's job responsibilities were focused on the Britney Brands, Inc. ("Britney Brands") account for Britney Spears fragrance products. He had primary day-to-day responsibility for managing that account. Romeo tendered his resignation on May 9, 2024. A copy of his resignation letter is attached hereto as Exhibit 3. Like Kidd and Fass, he refused to divulge where he would be working next. Romeo's last day at Revlon was May 29, 2024.

12. Mulvihill began working as an employee in the fragrance business at Elizabeth Arden in August 2014 and transitioned to Revlon in 2016, when Revlon acquired Elizabeth Arden. His title was Director of Global Fragrance Marketing. Mulvihill tendered his resignation on May 20, 2024. A copy of his resignation letter is attached hereto as Exhibit 4. Like Kidd, Fass and Romeo, he refused to divulge where he would be working next. Mulvihill's last day at Revlon was May 31, 2024.

### III.     Revlon's Confidential and Proprietary Information

13. Revlon has developed a significant trove of confidential and proprietary information concerning its fragrance business. That information includes but is not limited to its (i) detailed business plans for the fragrance business on an annual and on an ongoing basis; (ii) contracts with licensors, suppliers and distributors for each fragrance; (iii) financial statements, including profit and loss statements, for each line and for the fragrance business as a whole; (iv) financial constructs and models for each line and for the fragrance business as a whole; (v) manufacturing resources for each line and for the fragrance business as a whole; (vi) packaging vendors for each line and for the fragrance business as a whole; (vii) marketing plans for each line and for the fragrance business as a whole; and (viii) distribution plans for each line and for the fragrance business as a whole.

14. Revlon invests substantial resources into creating and developing this confidential and proprietary information. For example, Revlon's fragrance business employees are compensated to devote their time to Revlon's strategic game plans, creating marketing strategies, cultivating relationships, performing market research, engaging in financial modeling, tracking income and expenses, and managing supply chain and distribution in order to control costs and maximize sales. Revlon has contracts with suppliers that reflect its market position and negotiating

power. It invests time and effort into negotiating those contracts, and keeps those contracts, with its proprietary pricing structures, confidential. Revlon has relationships with licensors for fragrances. With the benefit of those licenses, the terms of which are confidential, Revlon creates fragrance products, brands those products, markets the products, and creates a demand for the products, inventing successful fragrance brands virtually from scratch. The way that Revlon goes about its work in the fragrance field represents its valuable intellectual property.

15. Revlon's confidential and proprietary information derives independent economic value from not being generally known, nor available, to its competitors. There is a great deal of competition in the fragrance business. Each company's business plans, marketing strategy, financial constructs and contractual relationships are held close to the vest. Those materials are the crown jewels.

16. I was provided with a collection of files located on Revlon's systems by Revlon Information Technology ("IT") personnel that we understand from a forensic computer analysis that Vanessa Kidd accessed after the close of business on her last day at Revlon. Those files contain proprietary and confidential information that is valuable to Revlon's fragrance business. They include presentations to the Board of Directors, as well as presentations to me and to Revlon's Chief Executive Officer, Elizabeth (Liz) Smith. These documents concern fragrance business strategy, key financial details, licensing relationships, royalty payments and profit and loss reports.

17. Those files include:

   a. A document titled "Situation Analysis October 2023\Juicy Couture US Deep Dive.pdf," which is attached hereto as Exhibit 5.

5

    b. A document titled "Key Working Files\Copy of Global 2024B PLs_01112024_VAL.xlsx," which is attached hereto as Exhibit 6.

    c. A document titled "Liz Licensing Meeting 8.15.23\Copy of Britney Q4 2022 Royalty Report.xlsx," which is attached hereto as Exhibit 7.

    d. A document titled "Liz Licensing Meeting 8.15.23\Celebrity Mass YTD 2023.pptx," which is attached hereto as Exhibit 8.

    e. A document titled "Liz Licensing Meeting 8.15.23\Revlon Fragrance Licensee Rpt - Rd 5 -June 13, 2023.pptx," which is attached hereto as Exhibit 9.

    f. A document titled "Liz Status Meeting\12 Month Global Launches Volume.pptx," which is attached hereto as Exhibit 10.

    g. A document titled "Liz Status Meeting\Fragrance Strategy Overview and Alignment 11.28.23.pptx," which is attached hereto as Exhibit 11.

    h. A document titled "Liz Status Meeting\Britney Spears 2025 Strategy Deck.pdf," which is attached hereto as Exhibit 12.

18. I am informed that a forensic computer analysis has uncovered that Ashley Fass transferred file folders from Revlon's servers to an external hard drive that was attached to her Revlon computer. Revlon's IT personnel located an electronic file folder on Revlon's systems that matches the name of one of the folders on that external hard drive. That folder titled "REVLON\Contracts" contains Revlon's highly confidential and proprietary license agreements for the Juicy Couture fragrances. These license agreements are extremely valuable to Revlon. Ms. Fass had no legitimate reason whatsoever to take copies of the agreements.

19. Revlon takes reasonable measures to maintain the secrecy of its confidential and proprietary information. It regularly includes confidentiality provisions in its most important

contracts. It educates its employees on their confidentiality obligations, requires them to take ethics training, and asks them to sign written agreements committing to keep Revlon's information confidential. It also limits access to electronically stored information to those employees with a need to know the information in order to perform their business duties.

20. Revlon's proprietary contracts contain confidentiality provisions. Revlon's licensing agreement with Britney Brands, the licensing entity for Britney Spears, for example, contains a confidentiality provision that prohibits disclosure of its terms to third parties. Revlon has similar agreements for its other licensed and endorsed fragrance lines. Revlon's proprietary contract with the fragrance house ▮▮▮▮ which manufactures fragrances, likewise contains confidentiality provisions. A copy of the ▮▮▮▮ agreement is attached hereto as Exhibit 13.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21. Revlon takes extensive measures to ensure that its employees understand their confidentiality obligations. The employees are required to participate in ethics training. The employees also receive a code of conduct that details their basic confidentiality obligations. The employees also are required to acknowledge and accept a code of conduct that details their basic confidentiality obligations. A copy of the code of conduct is attached hereto as Exhibit 14. Defendants Kidd, Fass, Romeo and Mulvihill each acknowledged the code of conduct. A copy of their acknowledgements are attached hereto as Exhibit 15.

22. In addition, Revlon asks its employees to subscribe to written employment agreements. Those employment agreements reiterate their confidentiality obligations and prohibit

7

employees from retaining confidential information upon termination of employment. A copy of Vanessa Kidd's employment agreement is attached hereto as Exhibit 16. A copy of Ashley Fass's employment agreement is attached hereto as Exhibit 17. A copy of Dominick Romeo's employment agreement is attached hereto as Exhibit 18. Among other things, those employment agreements prohibit the employees from using Revlon's confidential information to compete with Revlon. The employment agreements also prohibit the employees from soliciting Revlon's business partners to terminate their business relationships with Revlon.

23. Revlon secures its confidential information. The disclosure of confidential information is limited to those individuals within Revlon's employ who have a business need to know the information. Revlon's electronic systems are designed to limit access to sensitive business information. Each employee utilizes his or her own individual OneDrive to store electronic documents. Business units and teams also save documents on shared drives maintained on Revlon's computer systems. Access to those shared drives is limited to those employees who have been granted specific permissions. You cannot find Revlon's confidential information in any generally-available repository.

24. The unauthorized disclosure of Revlon's confidential and proprietary information causes it irreparable harm that is difficult to quantify and that cannot be adequately compensated with money damages. Should a competitor gain access to Revlon's fragrance business plans, marketing strategy, financial constructs and/or contractual relationships, it risks grave harm to Revlon's competitive standing in the fragrance field, which is difficult to measure and quantify. Among other things, such a competitor that has improper access to Revlon's confidential and proprietary information would have the opportunity to duplicate Revlon's efficiencies, cost structures, and go-to market strategies. The competitor potentially would have the benefit of

Revlon's investment in market research, which it might harness for its own business prospects. That competitor also would have the opportunity to undercut and poach Revlon's most valuable relationships.

## IV.  Revlon's Contractual Relationship with Britney Brands

25.  For over twenty years, Elizabeth Arden has had an exclusive licensing relationship with Britney Brands to manufacture and distribute perfumes, fragrances, and related products for Britney Spears. Through this relationship, Elizabeth Arden developed scents in collaboration with fragrance houses to be marketed with the licensed Britney Spears marks, designed packaging for the fragrances, including bottling and boxes, sourced materials, designed artwork for the products, developed marketing and distribution plans, cultivated retail partners and executed on all of those plans. Elizabeth Arden and Revlon developed, manufactured, marketed, and sold over 40 fragrances using marks associated with Britney Spears. As a result of their extensive investment in the relationship, Revlon and Elizabeth Arden grew the Britney Brands fragrance business into a highly profitable venture generating tens of millions of dollars annually and delivering a lucrative long-term relationship to Britney Brands.

26.  In February 2004, Elizabeth Arden entered into its first worldwide licensing agreement with Britney Brands to manufacture, distribute, market, advertise and sell fragrance, cosmetic and skin preparation products. Over the course of the first five years, Elizabeth Arden launched eight fragrances with the licensed Britney Spears marks. In 2004, Elizabeth Arden launched the "Curious" fragrance. In 2005, Elizabeth Arden launched the "Fantasy" fragrance. In 2006, Elizabeth Arden added "Curious: In Control" and "Midnight Fantasy." In 2007 and 2008, Elizabeth Arden launched "Believe" and "Curious Heart." In 2009, Elizabeth Arden launched "Hidden Fantasy" and "Circus Fantasy."

9

27. In December 2009, Elizabeth Arden exercised its option to renew the licensing agreement with Britney Brands for an additional five-year term, through December 31, 2014. The agreement contained a confidentiality provision, requiring that the terms be kept strictly confidential and not disclosed to any third party.

28. As of January 1, 2010, Elizabeth Arden and Britney Brands entered into a restated license agreement (the "License Agreement" or the "Britney Brands License Agreement"). This License Agreement provided Elizabeth Arden with an exclusive worldwide license to fragrances and related ancillary products using "Licensed Marks" associated with Britney Spears through December 31, 2014. The exclusivity applies to rights to "manufacture, distribute, market, advertise and sell" the licensed Britney Spears fragrances throughout the world for the full term. The License Agreement contains a confidentiality provision in Section 14, requiring that the terms be kept strictly confidential and not disclosed to any third party. A copy of the License Agreement is attached hereto as Exhibit 19.

29. In December 2014, Elizabeth Arden exercised an option to renew the License Agreement for an additional five-year term, through December 31, 2019. A copy of the renewal is attached hereto as Exhibit 20.

30. In September 2019, Elizabeth Arden and Britney Brands entered into an "Extension and Amendment to License Agreement," which extended the term of the License Agreement to December 31, 2024. A copy of the Extension and Amendment to License Agreement is attached hereto as Exhibit 21.

31. Between 2010 and 2024, Elizabeth Arden launched an additional thirty-six fragrances using the Britney Spears marks.

32. Pursuant to the License Agreement, in the Additional Terms and Conditions addendum, Section 1(c), ███████████████████████████████████████████

███████████████████████████████████████████

33. There are no ████████████ in the License Agreement that would permit a ███████████████████████████████████████████

██████████████████

V. **Give Back Beauty**

34. On June 24, 2024, Britney Brands sent a "Letter of Appointment" to the ███████ fragrance house. That letter introduced Give Back Beauty SA, a company incorporated under the laws of Switzerland, as the new exclusive fragrance licensee for Britney Brands, pursuant to a worldwide licensing agreement effective as of January 1, 2025. A copy of the Letter of Appointment is attached hereto as Exhibit 22. The letter is generically addressed "To whom it may concern." Through this letter, Give Back Beauty sought to start taking action with Revlon's suppliers "before the start date of [its] licensing agreement" to transition the Britney Brands fragrance business. Based on the generic nature of the letter, it appears that the letter was sent out to numerous Revlon suppliers.

35. ████████ asked Revlon in July 2024 if it might ████████████████████████ ████████ with Give Back Beauty. Revlon reminded ████████ of its confidentiality obligations, and refused to allow ████████ to share its confidential information.

36. In August 2024, ████████ asked Revlon *again* if it might share confidential and proprietary information with Give Back Beauty. The reasonable inference from this repeat request is that Give Back Beauty is pressuring ████████ to provide it with Revlon's confidential and proprietary information. In the most recent request, ███████████████████████████████ ███████████████████████████████████████████

11

███████████████████████████████████████████████████████

███████████████████ In response, Revlon reiterated that ██████ may not share its confidential and proprietary information with Give Back Beauty.

37. Revlon has learned through its salesforce that Give Back Beauty is contacting Revlon's retailer customers for the Britney Spears fragrance products, both in the United States and internationally. Give Back Beauty has claimed to these customers that it will have fresh product available to sell to them as of January 1, 2025. Notably, GBB has no right ██████ ████████████████████████████████████████████████████ It should be impossible for GBB to have fresh product available for sale to retail customers on January 1, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, New York on September 12, 2024.

_____
Will Cornock