UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REVLON CONSUMER PRODUCTS LLC and ELIZABETH ARDEN, INC.,

Plaintiffs,

-against-

GIVE BACK BEAUTY S.A., GIVE BACK BEAUTY, LLC, GIVE BACK BEAUTY AMERICAS LLC, GIVE BACK BEAUTY INTERNATIONAL LLC, GIVE BACK BEAUTY HOLDING LTD., VANESSA KIDD, DOMINICK ROMEO, REID MULVIHILL and ASHLEY FASS,

Defendants.

Case No. 1:24-cv-06438-ER-RWL

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

STEPTOE LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900

*Counsel for Plaintiffs Revlon Consumer Products LLC and Elizabeth Arden, Inc.*

September 13, 2024

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 4

Revlon's Fragrance Business ........ 4

Give Back Beauty ........ 12

GBB's Misuse of Revlon's Trade Secrets to Obtain a Licensing Agreement with Britney Brands. ........ 13

GBB's Improper Contacts with Revlon's Suppliers and Distributors. ........ 15

Revlon's Trade Secrets ........ 16

Irreparable Harm ........ 19

Revlon's Efforts to Obtain the Return of its Confidential Information. ........ 20

PRELIMINARY INJUNCTION STANDARD ........ 21

ARGUMENT ........ 21

I. Revlon Is Likely To Prevail On The Merits. ........ 21

A. Count I: Trade Secret Misappropriation Against All Parties ........ 22

The Revlon Employees Stole Revlon's Trade Secret Documents ........ 23

Reasonable Precautions ........ 24

Independent Economic Value ........ 26

Defendants Misappropriated Revlon's Trade Secrets ........ 27

B. Count II: Breach of Contract ........ 29

II. Revlon Will Suffer Irreparable Harm Absent An Injunction ........ 30

A. Revlon is Irreparably Harmed By Defendants' Theft of Trade Secrets ........ 30

B. Revlon is Irreparably Harmed by Kidd, Fass and Romeo's Breach of Contract ........ 32

III. The Balance of Hardships Weighs In Plaintiffs' Favor ........ 33

IV. Injunctive Relief Serves The Public Interest ........ 34

V. Plaintiffs Should Not Be Required To Post A Bond ........ 34

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*34-06, LLC v. Seneca Ins. Co.*,
39 N.Y.3d 44 (2022) ....29

*Ad Lightning Inc. v. Clean.io, Inc.*,
No. 19-CV-7367 (JPO), 2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020) ....25

*AUA Private Equity Partners, LLC v. Soto*,
Case No. 1:17-cv-8035-GHW, 2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018) ....27

*B.U.S.A. Corp. v. Ecogloves, Inc.*,
No. 05 CIV. 9988 (SCR), 2006 WL 3302841 (S.D.N.Y. Jan. 31, 2006) ....26

*BaseCap Analytics Inc. v. Amenn*,
No. 1:23-CV-09370-MKV, 2023 WL 8113524 (S.D.N.Y. Nov. 22, 2023) ....34

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015) ....21

*Broker Genius, Inc. v. Zalta*,
280 F. Supp. 3d 495 (S.D.N.Y. 2017) ....22

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
602 F. Supp. 3d 663 (S.D.N.Y. 2022) ....25

*Citizens Secs., Inc. v. Bender*,
Case no. 1:19-cv-916, 2019 WL 3494397 (N.D.N.Y. Aug. 1, 2019) ....34

*Clarkson Co., Ltd. v. Shaheen*,
544 F.2d 624 (2d Cir. 1976) ....34

*Daka Research, Inc. v. Uiliko Storefront*,
1:22-cv-02957-ER (S.D.N.Y. May 18, 2022) ....32

*In re Dana Corp.*,
574 F.3d 129 (2d Cir. 2009) ....26

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
31 N.Y.3d 441 (2018) ....23

*Eng v. Smith*,
849 F.2d 80 (2d Cir. 1988) ....22

*eShares, Inc. v. Talton*,
No. 22-CV-10987, 2024 WL 3970847 (S.D.N.Y. Mar. 29, 2024) ........................................28

*Estee Lauder Companies, Inc. v. Batra*,
430 F. Supp. 2d 158 (S.D.N.Y. 2006)............................................................31, 32, 33

*ExpertConnect, L.L.C. v. Fowler*,
Case No. 18 CIV. 4828 (LGS), 2019 WL 3004161 (July 10, 2019) .....................................27

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
730 F.2d 61 (2d Cir. 1984)...............................................................................................31

*FuboTV Inc. v. Walt Disney Co.*,
No. 24-CV-01363, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024)
.........................................................................................................21, 22, 30, 33

*Helio Logistics, Inc. v. Mehta*,
No. 22-CV-10047 (NSR), 2023 WL 1517687 (S.D.N.Y. Feb. 3, 2023) ...............................21

*Iacovacci v. Brevet Holdings, LLC*,
437 F. Supp. 3d 367 (S.D.N.Y. 2020)................................................................................22

*Interlink Int'l Fin. Servs., Inc. v. Block*,
145 F. Supp. 2d 312 (S.D.N.Y. 2001)................................................................................34

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
443 F. Supp. 3d 303 (E.D.N.Y. 2020) ........................................................................30, 34

*KCG Holdings, Inc. v. Khandekar*,
No. 17-CV-3533 (AJN), 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020)..........................27, 31

*Kraus USA, Inc. v. Magarik*,
No. 17-CV-6541, 2020 WL 2415670 (S.D.N.Y. May 12, 2020) ..........................................24

*loanDepot.com, LLC v. CrossCountry Mortg., LLC*,
Case No. 22 CIV. 5971 (LGS), 2023 WL 3884032 (S.D.N.Y. June 8, 2023)........................28

*Lumenate Techs., LP v. Integrated Data Storage,*
LLC, Case No. 13-cv-3767, 2013 WL 5974731 (N.D. Ill. Nov, 11, 2013)............................28

*Mazak Optonics*
*Corp.*, Case No. 17 C 1023, 2017 WL 3394727....................................................................34

*Medtronic, Inc. v. Walland*,
No. 21 CIV. 2908 (ER), 2021 WL 4131657 (S.D.N.Y. Sept. 10, 2021) ................................32

*Mission Cap. Advisors LLC v. Romaka*,
Case No. 16 Civ 5878 (LLS), 2016 WL 11517104 (S.D.N.Y. July 29, 2016)........................33

*Nadel v. Play-by-Play Toys & Novelties, Inc.*,
208 F.3d 368 (2d Cir. 2000)....................24

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
Case No. 14-cv-8190 (RJS), 2017 WL 4402540 (S.D.N.Y. Sept. 30, 2017)....................24

*North Atlantic Instruments, Inc. v. Haber*,
188 F.3d 38 (2d Cir. 1999)....................29, 33

*Payment All. Int'l, Inc. v. Ferreira*,
530 F. Supp. 2d 477 (S.D.N.Y. 2007)....................31

*Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*,
No. 23-CV-9000, 2024 WL 3835264 (S.D.N.Y. Aug. 14, 2024)....................23, 27

*Starbucks Corp. v. McKinney*,
__ U.S. __, 144 S. Ct. 1570 (2024)....................21

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
68 F.4th 792 (2d Cir.), *cert. denied*, 144 S. Ct. 352 (2023)....................30

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*,
No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016)....................25

*Tesla Wall Sys., LLC v. Related Cos., L.P.*,
No. 17 Civ. 5966 (JSR), 2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017)....................24

*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)....................31, 33

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995)....................30, 31

*TransPerfect Global, Inc. v. Lionbridge Tech., Inc.*,
No. 19-CV-3283, 2020 WL 1322872 (S.D.N.Y. Mar. 20, 2020)....................25

*trueEX, LLC v. MarkitSERV Ltd.*,
266 F. Supp. 3d 705 (S.D.N.Y. 2017)....................30

*USI Ins. Servs. LLC v. Miner*,
801 F. Supp. 2d 175 (S.D.N.Y. 2011)....................29

*Velo-Bind, Inc. v. Scheck*,
485 F. Supp. 102 (S.D.N.Y. 1979)....................32

*Zabit v. Brandometry, LLC*,
540 F. Supp. 3d 412 (S.D.N.Y. 2021)....................24

**Statutes**

18 U.S.C. § 1836 ....................22

18 U.S.C. § 1836(b)(1) ....................22

18 U.S.C. § 1839(3) ....................23

18 U.S.C. § 1839(5) ....................22, 27

18 U.S.C. § 1839(6) ....................24

18 U.S.C. § 1839(6)(A) ....................22

**Rules**

Fed. R. Civ. P. 65(a) ....................21

Fed. R. Civ. P. 65(c) ....................34

Plaintiffs Revlon Consumer Products LLC ("Revlon") and Elizabeth Arden, Inc. ("Elizabeth Arden") (collectively, "Plaintiffs" or "Revlon"), respectfully submit this Memorandum of Law in support of their Motion for a Preliminary Injunction against defendants Give Back Beauty S.A., Give Back Beauty, LLC, Give Back Beauty Americas LLC, Give Back Beauty International LLC, Give Back Beauty Holding LTD. (collectively, "GBB"), Vanessa Kidd, Dominick Romeo, Reid Mulvihill and Ashley Fass (collectively, the "Revlon Employees" and with "GBB," the "Defendants").

## PRELIMINARY STATEMENT

The four Revlon Employees named as Defendants in this action comprised Revlon's core fragrance team, responsible for all aspects of marketing for Revlon's fragrance products. These Revlon Employees were allowed to see and know all of the valuable confidential and proprietary information that Revlon and Elizabeth Arden, a Revlon subsidiary, created, maintained, guarded and protected concerning sourcing, manufacturing, marketing, distribution, pricing and sale of fragrances. During the course of the month of May 2024, the Revlon Employees all departed Revlon's employ. Revlon learned in late June 2024 that all four Revlon Employees had gone to work for the GBB Defendants in their fragrance business. Revlon further discovered in August 2024, through an expert forensic computer examination, that when the former employees left for GBB, they took with them reams of Revlon's trade secret documents.

Defendant Vanessa Kidd ("Kidd"), a Revlon Senior Vice President, accessed more than 250 confidential documents after the close of business on her last day at Revlon. Over the course of hours, late into the night, she opened file after file containing Revlon's most valuable fragrance information. Those documents include Board of Directors presentations, profit and loss statements, royalty reports and strategic business plans. After she finished going through Revlon's documents, Kidd attempted to erase all of her internet browser activity.

Defendant Ashley Fass ("Fass"), for her part, transferred multiple electronic folders, containing gigabytes of data, from Revlon's server onto a personal external hard drive that she attached to her Revlon laptop. The folders that Fass moved to her hard drive likewise contained Revlon's most valuable fragrance information. Fass took, among other things, Revlon's Juicy Couture license agreements, quarterly business reviews and distribution plans. Defendants Dominick Romeo ("Romeo") and Reid Mulvihill ("Mulvihill") similarly engaged in suspicious electronic behavior in their final days at Revlon.

There is no reason for the Revlon Employees to take Revlon's documents with them, other than to actively use those documents after they've left. The Revlon Employees have now been working at GBB for three months or more. It is reasonable to infer that GBB has had full access to Revlon's trade secrets and is using them to compete with Revlon in the marketplace.

The GBB Defendants encouraged and participated in the theft of Revlon's trade secrets. In the course of recruiting the Revlon Employees, GBB required their prospective hires to keep their future employment with GBB a secret, attempting to hide from Revlon that they were departing for a competitor. Kidd informed a co-worker at Revlon that she had been required to sign a non-disclosure agreement with her new employer that prohibited her from disclosing its name. That is highly unusual for a company in the beauty business: GBB is not the CIA. GBB wanted its identity withheld from Revlon, because it wanted Kidd, Fass, Romeo and Mulvihill to act as its spies during their final weeks at the company. And, Kidd did effectively act as a double-agent. She assisted GBB with wresting a Britney Spears fragrance licensing relationship away from Revlon while she was still working at Revlon and was charged with cementing an extension of Revlon's 20-year highly-valuable Britney Spears fragrance business.

GBB, a fairly new company in the fragrance space, has taken numerous actions consistent with having unlawful access to Revlon's trade secret information. During the final stages of Revlon's negotiations with representatives for Britney Spears, after Revlon reasonably understood that it had finalized terms for a multi-year contract extension, it repeatedly heard that GBB was whispering in the ears of Ms. Spears' representatives, to sow doubts about Revlon and its commitment to its fragrance business. Immediately on the heels of Kidd joining GBB, GBB engineered a coup, signing an exclusive worldwide fragrance license deal with Britney Brands, Inc. that necessarily required a financial commitment [redacted]. GBB might only have closed on a licensing agreement of that scale at that fast pace with the benefit of Revlon's trade secret information for a fragrance brand that Revlon created and cultivated over the course of 20 years.

GBB is continuing to misuse Revlon's trade secrets to cause Revlon competitive damage. Revlon is informed that GBB has been making outreach to Revlon's primary retail and distribution contacts for the Britney Spears fragrances, claiming that it will have fresh product for them as of January 1, 2025. That is impossible. Among other rights, Revlon has exclusive manufacturing rights through December 31, 2024. GBB similarly contacted Revlon's fragrance manufacturers, known as fragrance houses, and has been pressuring them to divulge confidential information [redacted]. Revlon understands that GBB is systematically contacting Revlon's suppliers for purposes of piggy-backing on Revlon's confidential supply-chain contracts. In addition, Revlon reasonably expects that GBB is misusing Revlon's trade secrets to actively solicit Revlon's other licensing partners to leave Revlon for GBB, following the same game plan that it executed with Britney Brands. There is no other reason for Fass to have stolen the Juicy Couture license agreements.

This wrongful conduct must stop. Among other things, the Defendants have violated and are violating the Defense of Trade Secrets Act, 18 U.S.C. § 1836, as well as the New York common law on trade secret misappropriation. Defendants Kidd, Fass and Romeo furthermore are in breach of their employment agreements with Revlon,[1] which expressly prohibit them from (i) taking Revlon's confidential information; (ii) using Revlon's confidential information to compete with Revlon; and (iii) soliciting Revlon's business partners to sever ties with Revlon.[2] These wrongful acts have caused, and are continuing to cause, irreparable harm.

By this motion, Plaintiffs seek a preliminary injunction order that: (i) requires immediate return of all of Plaintiffs' confidential information within Defendants' possession custody or control; (ii) enjoins Defendants from using or relying upon any of Plaintiffs' trade secret information; (iii) enjoins the Revlon Employees from soliciting Revlon's business partners; and (iv) enjoins Defendants from disclosing Plaintiffs' confidential information.

## STATEMENT OF FACTS

### Revlon's Fragrance Business

Revlon is a well-known beauty company founded in 1932. Cornock Decl. ¶ 4. Its consumer products include cosmetics, skin-care products, nail polish, hair color and fragrances. *Id.* In 2016, Revlon acquired Elizabeth Arden, another beauty company that was founded in 1910, maintaining it as a Revlon subsidiary. *Id.* Following the acquisition, Revlon combined its fragrance business with the Elizabeth Arden fragrance business, which operate in a single

---

[1] Revlon does not have a record of a written employment agreement with Mulvihill.

[2] Plaintiffs commenced this action on August 26, 2024. The Complaint asserts claims for (1) misappropriation of trade secrets in violation of the Defense of Trade Secrets Act, 18 U.S.C. § 1836, as well as New York law; (2) tortious interference with prospective economic advantage; (3) breach of contract; (4) breach of the duty of loyalty; and (5) tortious interference with contract. This preliminary injunction motion relates to claims (1) and (3).

business segment devoted to fragrance. *Id*. The Revlon fragrances include its own name brand products, such as Elizabeth Arden "Red Door," as well as fragrances manufactured and marketed under brand partnerships that include Britney Spears, Juicy Couture, Elizabeth Taylor, John Varvatos and others. *Id*. Revlon sells prestige, celebrity and mass fragrance products. *Id*.

Defendants Kidd, Romeo, Mulvihill and Fass - the Revlon Employees - were integral to Revlon's fragrance business. They were employed by Revlon and/or Elizabeth Arden in that business for a combined 32 ½ years. *Id*. ¶ 5.

a. **Vanessa Kidd.** Kidd was the most senior member of the fragrance team. She held the title of Senior Vice President, Global Marketing, for Revlon's Fragrance Portfolio. Defendants Fass, Romeo and Mulvihill all reported directly to Kidd. Kidd reported to Revlon's Chief Marketing Officer, Martine Williamson. Kidd held a position of significant trust and responsibility at Revlon. *Id*. ¶ 6.

Kidd began working in the fragrance business at Elizabeth Arden in August 2012. She transitioned to Revlon in 2016. *Id*. ¶ 7. Kidd's job responsibilities included management of all aspects of Revlon's fragrance portfolio. *Id*. She was charged with leading and driving the fragrance business, with responsibility for financial performance, brand strategy, innovation, advertising campaign management, media planning and all marketing channels. *Id*. In her role at Revlon, Kidd also had extensive knowledge of the sourcing, manufacturing, supply and distribution chains for the fragrances, inclusive of the key retailers and geographies for each fragrance brand. *Id*. ¶ 6.

Kidd tendered her resignation on April 9, 2024. *Id*. ¶ 8. She informed her colleagues that she had been offered an attractive job opportunity. *Id*. However, when asked, she refused to identify that job opportunity. Kidd informed one Revlon colleague that her new employer had

required her to sign a non-disclosure agreement that forbade her from disclosing where she would be working. Shepard Decl. ¶ 13. Revlon learned in mid-April 2024 from Cade Hudson, the manager for Britney Spears, that GBB had hired Kidd. *Id.*

Kidd's last day at Revlon was May 3, 2024. Cornock Decl. ¶ 9. Revlon allowed Kidd continued access to its computer systems for purposes of fulfilling her job responsibilities through the close of business on her last day of work. This is standard operating procedure at Revlon. *Id.* It does not usher its executives out the door when they give notice.

After Revlon became suspicious of GBB's activities, its outside counsel had a forensic examination performed on Kidd's Revlon laptop. Revlon received the results of that examination in August 2024. Dockterman Decl. ¶ 2. That examination uncovered that, after the close of business on May 3, 2024, Kidd's last work day, Kidd accessed more than 250 confidential files residing on the Revlon systems. Between 9:45 p.m. on May 3, 2024 and 12:15 a.m. on May 4, 2024, after everyone else had left Revlon's offices for the night, Kidd studiously opened file after file from the Revlon server containing some of Revlon's most valuable confidential information concerning its fragrance business. Racich Decl. ¶ 11; Cornock Decl. ¶ 16. The documents include Board of Directors presentations, as well as presentations to Revlon's Chief Executive Officer, Elizabeth (Liz) Smith, and Revlon's Chief Transformation Officer, Will Cornock. Racich Decl. ¶ 11; Cornock Decl. ¶ 16. The documents concern fragrance business strategy, key financial details, licensing relationships, royalty payments and profit and loss reports. Cornock Decl. ¶ 16.

The file names include, for example: 1) "Will Strategy Meetings\Fragrance Strategy Overview and Alignment 1.25.24.pptx;" 2) "Situation Analysis October 2023\Juicy Couture US Deep Dive.pdf;" 3) "Key Working Files\Copy of Global 2024B PLs_01112024_VAL.xlsx;" 4)

"Liz Licensing Meeting 8.15.23\Copy of Britney Q4 2022 Royalty Report.xlsx;"[3] 5) "Liz Licensing Meeting 8.15.23\Celebrity Mass YTD 2023.pptx;" 6) "Liz Licensing Meeting 8.15.23\Revlon Fragrance Licensee Rpt - Rd 5 -June 13, 2023.pptx;" 7) "Liz Status Meeting\12 Month Global Launches Volume.pptx;" 8) "Liz Status Meeting\Fragrance Strategy Overview and Alignment 11.28.23.pptx;" and 9) "Liz Status Meeting\Britney Spears 2025 Strategy Deck.pdf." Racich Decl. ¶ 11. Earlier that same day, prior to her mass file upload, Kidd accessed a file with sales and pricing information titled: "Key Fragrance Brands Sales Rolling 12Mths June 2021 and Pricing.xlsx." *Id.*

In the opinion of Revlon's computer forensics expert, Kidd's access to all of these files is consistent with a user printing them on a network computer. The files and folders also could have been transferred to an internet-based file transfer site. *Id.*

Revlon located files with the same names. Its review of these files confirms that they contain sensitive confidential and proprietary financial data, inclusive of pricing, sales and royalties, marketing plans and strategy blueprints. Cornock Decl. ¶ 16.

After Kidd finished accessing highly confidential documents concerning Revlon's fragrance business, at 12:28 a.m. on May 4, 2023, she cleared the browser history for the Microsoft Edge internet application on her computer, for purposes of erasing evidence of her internet activity. Racich Decl. ¶ 12. Just minutes later, at 12:31 a.m. on May 4, 2023, Kidd cleared the browser history for the Google Chrome internet application, erasing evidence of her internet activity on that browser. *Id.* ¶ 13. Kidd was covering her tracks, attempting to delete computer information that would show her use of external websites. Among other things, those deletions could serve to hide any use of an internet-based file transfer site. *Id.* ¶¶ 12-13.

---

[3] "Liz" in the file names refers to Elizabeth Smith, Chief Executive Officer of Revlon.

Kidd is party to a written employment agreement with Revlon that details her confidentiality obligations. Cornock Decl. ¶ 22. That agreement recites, in the introductory paragraph, that:

> I acknowledge that in the course of performing services for the Company I will have access to, and be acquiring, confidential information and trade secrets concerning the Company's business affairs including, without limitation, information with respect to its financial results and prospects, future plans in research, advertising, product development, and/or marketing, and/or proprietary business processes. Accordingly, in consideration for my continued employment, compensation and benefits, and continued access to confidential information and trade secrets to be provided to me, I agree to comply fully with each and every provision of this Agreement[.]

Cornock Decl. Ex. 16. The agreement requires Kidd to safeguard Revlon's confidential information and prohibits her from retaining any of Revlon's confidential information when she leaves the company: "I will not copy or remove [confidential information] from the premises of the Company except for Company business upon proper authorization. I shall return to the Company all such documents and other materials, without keeping any copies or any portions thereof, upon termination of my employment." *Id.* at 6.

The agreement furthermore prohibits Kidd from using Revlon's confidential information to compete with Revlon: "I agree that during my employment with the Company and thereafter I will not use Confidential Information to compete against the Company." *Id.* at 7(a). It also prohibits Kidd from soliciting Revlon's business partners to terminate their relationships with Revlon: "I agree that I will not at any time during my employment with the Company, and for a period of twelve months following the termination thereof, solicit any customer to terminate its business relationship with the Company." *Id*. at 7(c).

b. **Ashley Fass.** Fass held the title of Global Marketing Director of Juicy Couture Fragrances. Cornock Decl. ¶ 10. She had primary day-to-day responsibility for the Juicy

Couture fragrance products, an extremely successful Revlon fragrance brand. *Id.* Fass began working at Revlon in May 2018. Fass tendered her resignation on May 9, 2024. *Id.* Like Kidd, she refused to disclose where she would be working after she left Revlon's employ. *Id.* Her last day at Revlon was May 23, 2024. *Id.* Revlon later learned, in or about late June 2024, that Fass went to work at GBB. Shepard Decl. ¶ 34.

Revlon's outside counsel had a forensic examination performed on Fass's Revlon laptop. It received the results of that examination in August 2024. Dockterman Decl. ¶ 2. That examination uncovered that, on May 8, 2024, the day prior to her resignation, Fass downloaded and opened a file with the title "Ashley Fass - GBB Offer Letter- VP Global Marketing." Racich Decl. ¶ 21. On that same date, Fass connected an external hard drive to the USB port of her Revlon laptop. *Id.* ¶ 17.

Between May 8 and May 23, 2024, Fass downloaded numerous electronic folders full of confidential Revlon documents onto that personal external hard drive. Racich Decl. ¶ 16-17; Cornock Decl. ¶ 18. Revlon's investigation has shown that Fass took many gigabytes of data. The materials include file folders labeled: 1) "REVLON\Contracts;" 2) "REVLON\JUICY COUTURE\LICENSOR\QUARTERLY BUSINESS REVIEW;" 3) "REVLON\JUICY COUTURE\DISTRIBUTION;" and 4) REVLON\JUICY COUTURE\LICENSOR\ROYALTY REPORT. Racich Decl. ¶¶ 16-17, Ex. D. In addition, between May 21 and May 23, 2024, Fass attempted to delete more than 500 files and folders residing on her laptop by moving them to the Windows Recycle Bin. Racich Decl. ¶ 18.

Revlon's IT personnel located a file folder on Revlon's system with the name "REVLON\Contracts." Cornock Decl. ¶ 18. That folder contains Revlon's highly confidential

and proprietary license agreements for Juicy Couture fragrances. *Id*. There is absolutely no justification for Fass downloading and retaining those license agreements.

The forensic examination of Fass's laptop also uncovered evidence of a "thank you" note that Fass wrote to Corrado Brondi at GBB on May 3, 2024. Racich Decl. ¶ 19. The last line of the note states "I am intrigued by the new business development aspect of the role *and the opportunity that it presents to continue to curate the portfolio*." *Id*., Ex. F. (emphasis added). The logical inference from that note, combined with Fass's theft of a vast quantity of Revlon's confidential material, is that Fass intends to take Revlon's fragrance portfolio with her to GBB.

Revlon and Fass are party to an employment agreement that is substantially similar to Revlon's agreement with Kidd. Fass's agreement addresses Revlon's confidential and proprietary information. It prohibits Fass from retaining any confidential information upon termination of her employment. Cornock Decl. ¶ 22. It prohibits use of Revlon's confidential information to compete with Revlon: "I agree that during my employment with the Company and thereafter I will not use Confidential Information to compete against the Company." *Id*., Ex. 17. And, it prohibits interference with Revlon's business relationships and solicitation of Revlon's business partners to terminate their relationships with Revlon:

> I agree that I will not at any time during my employment with the Company, and for a period of twelve months following the termination thereof, directly or indirectly solicit, induce, influence, or attempt to solicit, induce, or influence any customer, supplier, or vendor of the Company with whom I have had business-related contact during my employment with the Company, or concerning which I had access to Confidential Information, to divert his, her, or its business to any [competitor] or otherwise encourage such customer, supplier, or vendor to terminate its business relationship with the Company or otherwise interfere with any business or contractual relationship of the Company that may exist from time to time, including but not limited to with any supplier, customer, or vendor.

*Id*. at 7(c).

c. **Dominick Romeo.** Romeo began working at Revlon in April 2019. Cornock Decl. ¶ 11. He was employed by Revlon as a Director of Marketing, Global Fragrance Team. *Id*. Romeo's job responsibilities were focused on the Britney Brands account. He had primary day-to-day responsibility for managing that account. *Id*. Romeo tendered his resignation on May 9, 2024. *Id*. Like Kidd and Fass, he refused to divulge where he would be working next. *Id*. Romeo's last day at Revlon was May 29, 2024. *Id*. Revlon learned, in or about late June 2024, that Romeo went to work at GBB. Shepard Decl. ¶ 34.

Revlon's outside counsel had a forensic examination performed on Romeo's Revlon laptop. It received the results of that examination in August 2024. Dockterman Decl. ¶ 2. That examination uncovered that, on May 6, 2024, Romeo ran a Google search with the question "are non-competes enforceable in new York." Racich Decl. ¶ 28.

Romeo's employment contract with Revlon has the same terms as Fass's employment contract. Cornock Decl., Exs. 17 and 18.

d. **Reid Mulvihill.** Mulvihill began working as an employee in the fragrance business at Elizabeth Arden in August 2014 and transitioned to Revlon in 2016, when Revlon acquired Elizabeth Arden. Cornock Decl. ¶ 12. His title was Director of Global Fragrance Marketing. *Id*. Mulvihill tendered his resignation on May 20, 2024. Like Kidd, Fass and Romeo, he refused to divulge where he would be working next. *Id*. His last day at Revlon was May 31, 2024. *Id*. Revlon learned, in or about late June 2024, that Romeo went to work at GBB. Shepard Decl. ¶ 34. Mulvihill's LinkedIn account shows that he is employed by one or more of the GBB Defendants as a Vice President – Global Marketing – Fragrance. Dockterman Decl. ¶ 3, Ex. A.

Revlon's outside counsel had a forensic examination performed on Mulvihill's Revlon laptop. It received the results of that examination in August 2024. Dockterman Decl. ¶ 2. That examination uncovered, among other things, that Mulvihill deleted browsing history and accessed numerous Revlon documents in the final days of his employment at Revlon, providing the opportunity to print, copy or download Revlon's confidential documents. Racich Decl. ¶ 22. The examination also uncovered that Mulvihill used his Revlon computer to access a Google drive associated with a personal Google gmail account, rfmulvhill@gmail.com. *Id.* ¶ 23. At this time, Revlon does not know what information resides on that Google drive.

**Give Back Beauty**

GBB is relatively new to the fragrance business. Its operations began in 2021. Dockterman Decl. ¶ 4. The GBB entities are owned and controlled by an individual named Corrado Brondi, an Italian citizen who claims to be the Founder and CEO of Give Back Beauty Group. *Id.* ¶ 5. Among other things, Brondi previously worked at Bain & Company and Goldman Sachs, and has done business with Revlon in Europe. *Id.* ¶ 6.

GBB hired the former Revlon Employees because of their fragrance training and expertise that they developed at Revlon, as well as their extensive knowledge of Revlon's trade secrets. Kidd, Fass, Romeo and Mulvihill are not the only former Revlon personnel working at GBB. Fass's Microsoft Outlook data shows that, during her GBB interview process, Fass met with Jordi Agusti. Dockterman Decl. ¶ 7. Jordi Agusti previously worked in human relations at Revlon.

The only rationale for the Revlon Employees' theft of Revlon's confidential and proprietary information is for the purpose of using it in their future work for GBB. Now that the Revlon Employees have been actively working in GBB's fragrance business for three months or

more, GBB necessarily has had improper access to, and made improper use of, Revlon's highly confidential and proprietary information.

GBB not only hired Revlon's core fragrance team, it also improperly wrested away one of Revlon's most valuable licensing relationships.

**GBB's Misuse of Revlon's Trade Secrets to Obtain a Licensing Agreement with Britney Brands.**

GBB began recruiting Kidd in or about February or March 2024. *See* Shepard Decl. ¶ 11. At that time, Kidd was actively involved in Revlon's efforts to secure an extension to its 20-year fragrance deal with Britney Brands, the licensing entity for Britney Spears. The agreement between Britney Brands and Elizabeth Arden was scheduled to expire at the end of 2024. Shepard Decl. ¶ 2. By March 1, 2024, following months of negotiations, Revlon and Britney Brands had reached agreement on all material terms for a multi-year extension. *Id.* ¶ 8. They were working on the formalities of papering that extension. *See* Shepard Decl. ¶¶ 8, 14-21.

In April 2024, Britney Brands representatives, out of the blue, began raising concerns with Revlon related to GBB. Shepard Decl. ¶ 9. GBB appeared to be privy to the stage of Revlon's contract discussions, and was engaging in a whispering campaign, to sow doubts about Revlon, during the critical period that a contract extension was ready to be finalized. On April 5, 2024, Cade Hudson, Britney Spears' manager told Marni Shepard at Revlon that Britney Brands had heard that Revlon was considering a transaction with GBB relating to its fragrance business. *Id.* He said that Britney Brands was concerned about what it had heard, and that GBB was not a good look for Britney Brands. *Id.*

On April 16, 2024, Hudson again contacted Shepard about GBB. He said that he had been informed that GBB was hiring Revlon's core fragrance team. *Id.* ¶ 12. At this time, Revlon

knew that Kidd was leaving, but it did not know where she was going. And, none of the other fragrance employees had given notice. Cornock Decl. ¶¶ 8, 10-12.

On April 17, 2024, Revlon held a videoconference with Britney Brands to iron out the final details of a written contract extension. Shepard Decl. ¶ 15. Prior to the meeting, Shepard asked Kidd to reassure Hudson about Revlon's commitment to Britney Brands. *Id.* During the meeting, Kidd said to Hudson that, after Kidd left Revlon, Britney Brands would continue to be in good hands with Romeo. *Id.* ¶ 16. But, Kidd knew full well when she made that statement that Romeo soon would be following her to GBB. Kidd was helping GBB recruit Romeo. Instead of providing reassurance, she engaged in an act of sabotage.

On April 18, 2024, Britney Brands circulated a proposed final extension agreement to Revlon. Shepard Decl. ¶ 18. Revlon signed on April 24, 2024, sending the contract back to the Britney Brands team for countersignature by Britney Spears. *Id.* ¶ 20. But, that counter-signature never materialized. The Britney Brands team began equivocating with Revlon, saying that Ms. Spears was not prepared to sign. *Id.* ¶ 23. Revlon had previously been cautioned not to rush things with Britney Brands, because nothing happens quickly for them. *Id.* ¶ 7.

Kidd left Revlon on May 3. Less than one week later, on May 9, Fass and Romeo tendered their resignations. Mulvihill followed suit. All of the Revlon Employees left by May 31, 2024. Cornack Decl. ¶¶ 8-12.

On May 30, 2024, in a sudden about-face, Britney Brands informed Revlon that Britney Brands had closed a fragrance licensing agreement with a different entity effective January 1, 2025. Shepard Decl. ¶ 32. This change of course ended a mutually beneficial licensing relationship that had endured for more than twenty years. Cornock Decl. ¶¶ 26-30. Revlon did not know at that time that the new licensee was GBB. Shepard Decl. ¶ 33.

**GBB's Improper Contacts with Revlon's Suppliers and Distributors.**

In July 2024, Revlon learned that GBB, through Britney Brands, had made outreach to one of the fragrance houses that produces scents for Revlon bearing the Britney Brands marks in June 2024. The communication represented that a GBB entity in Geneva Switzerland had entered into a worldwide licensing agreement with Britney Brands for fragrance products, effective as of January 1, 2025. Cornock Decl. ¶ 34.

This was not a simple introduction. GBB communicated in June 2024 that it sought to start working immediately with Revlon's suppliers to transition Revlon's business. *Id.* However, Revlon's exclusive rights extended for another six months.

Revlon has learned that GBB is pressuring one of its fragrance houses to provide GBB with Revlon's [redacted] for the products bearing the Britney Spears marks. Cornock Decl. ¶ 36. Those [redacted] belong to Revlon, pursuant to Revlon's contracts with both Britney Brands and the fragrance house. *Id.* GBB not only [redacted]. Cornock Decl. ¶ 36. GBB further sought Revlon's [redacted]. *Id.*

GBB claimed it needed this confidential and proprietary information although it remains exclusive to Revlon through December 31, 2024. *Id.* Revlon instructed the fragrance house – twice – that it may not share Revlon's confidential and proprietary information with GBB. Cornock Decl. ¶¶ 35-36. GBB's actions with the fragrance house show that it has no compunction about brazenly seeking access to Revlon's trade secret information.

In August 2024, Revlon learned that GBB is contacting Revlon's retail customers for the Britney Spears products, both in the U.S. and internationally. Cornock Decl. ¶ 37. GBB

informed Revlon's customers that GBB would have new Britney Spears fragrance products to sell to them as of January 1, 2025. *Id*. However, GBB cannot manufacture any products prior to January 1, 2025 without violating Revlon's exclusive license rights.

**Revlon's Trade Secrets**

Revlon has developed a significant trove of confidential and proprietary information concerning its fragrance business. That information includes but is not limited to its (i) detailed business plans for the fragrance business on an annual and on an ongoing basis; (ii) contracts with licensors, suppliers and distributors for each fragrance; (iii) financial statements, including profit and loss statements, for each line and for the fragrance business as a whole; (iv) financial constructs and models for each line and for the fragrance business as a whole; (v) manufacturing resources for each line and for the fragrance business as a whole; (vi) packaging vendors for each line and for the fragrance business as a whole; (vii) marketing plans for each line and for the fragrance business as a whole; and (viii) distribution plans for each line and for the fragrance business as a whole. Cornock Decl. ¶ 13.

Revlon invests substantial resources into creating and developing this confidential and proprietary information. For example, Revlon's fragrance business employees are compensated to devote their time to Revlon's strategic game plans, creating marketing strategies, cultivating relationships, performing market research, engaging in financial modeling, tracking income and expenses, and managing supply chain and distribution in order to control costs and maximize sales. Revlon has contracts with suppliers that reflect its market position and negotiating power. It invests time and effort into negotiating those contracts, and keeps those contracts, with its proprietary pricing structures, confidential. Revlon has relationships with licensors for fragrances. With the benefit of those licenses, the terms of which are confidential, Revlon creates fragrance products, brands those products, markets the products, and creates a demand

for the products, inventing successful fragrance brands virtually from scratch. The way that Revlon goes about its work in the fragrance field represents its valuable intellectual property. *Id.* ¶ 14.

Revlon's confidential and proprietary information derives independent economic value from not being generally known, nor available, to its competitors. There is a great deal of competition in the fragrance business. Each company's business plans, marketing strategy, financial constructs and contractual relationships are held close to the vest. Those materials are the crown jewels. *Id.* ¶ 15.

Revlon takes reasonable measures to maintain the secrecy of its confidential and proprietary information. It regularly includes confidentiality provisions in its most important contracts. It educates its employees on their confidentiality obligations, requires them to take ethics training, and asks them to sign written agreements committing to keep Revlon's information confidential. It also limits access to electronically stored information to those employees with a need to know the information in order to perform their business duties. *Id.* ¶ 19.

Revlon's proprietary contracts contain confidentiality provisions. Revlon's licensing agreement with Britney Brands, the licensing entity for Britney Spears, for example, contains a confidentiality provision that prohibits disclosure of its terms to third parties. Revlon has similar agreements for its other licensed and endorsed fragrance lines. Revlon's proprietary contract with the fragrance house [redacted], which manufactures fragrances, likewise contains confidentiality provisions. *See* [redacted] Agreement, *id.* ¶ 20, Ex. 13. Among other things, the [redacted]

[redacted]. *Id.*

Revlon takes extensive measures to ensure that its employees understand their confidentiality obligations. The employees are required to participate in ethics training. The employees also receive a Code of Conduct that details their basic confidentiality obligations, which they are required to acknowledge and accept. *See* Revlon Code of Conduct, *id.* ¶ 21, Ex. 14. Each of the Revlon Employees acknowledged the Code of Conduct. *Id.*, Ex. 15.

The Code of Conduct provides, for example, that the employees "may not exchange any confidential information with a competitor. Confidential information includes any information that is non-public, including but not limited to planned product launches, new product development, costs, and pricing." *Id.*, Ex. 14 at 24. The Revlon Employees also acknowledged that they must avoid "conflicts of interest," including having an "interest in any competitor." *Id.* at 27. Further, the Revlon Employees agreed that:

> Revlon People may have access to the Company's confidential and proprietary information, including intellectual property (defined below), which is commercially sensitive and valuable. Revlon People may not improperly disclose or use any confidential or proprietary information learned as a result of their relationship with the Company to benefit themselves or others, even after their relationship with Revlon ends.

*Id.* at 33. Further the "Company's assets, including Revlon's IT network, should only be used "for appropriate business purposes and in a professional, ethical, respectful and lawful manner, as described in the Company's IT policies." *Id.* at 34.

In addition, as set forth above, Revlon asks its employees to subscribe to written employment agreements. Those employment agreements reiterate their confidentiality obligations. *See* Vanessa Kidd, Ashley Fass and Dominick Romeo's Employment Agreements, *id.* ¶ 22 Exs. 16-18. Among other things, those employment agreements prohibit the employees

from retaining Revlon's confidential information when their employment terminates and from using Revlon's confidential information to compete with Revlon. *Id.*

Revlon secures its confidential information. The disclosure of confidential information is limited to those individuals within Revlon's employ who have a business need to know the information. Revlon's electronic systems are designed to limit access to sensitive business information. Each employee utilizes his or her own individual OneDrive to store electronic documents. Business units and teams also save documents on shared drives maintained on Revlon's computer systems. Access to those shared drives is limited to those employees who have been granted specific permissions. Revlon's confidential information cannot be found in any generally-available repository. *Id.* ¶ 23.

**Irreparable Harm**

The unauthorized disclosure of Revlon's confidential and proprietary information causes Revlon irreparable harm that is difficult to quantify and that cannot be adequately compensated with money damages. Should a competitor gain access to Revlon's fragrance business plans, marketing strategy, financial constructs and/or contractual relationships, it risks grave injury to Revlon's competitive standing in the fragrance field, which is difficult to measure and quantify. Among other things, a competitor with improper access to Revlon's confidential and proprietary information would have the opportunity to duplicate Revlon's efficiencies, cost structures, and go-to market strategies. The competitor potentially would have the benefit of Revlon's investment in market research, which it might harness for its own business prospects. That competitor also would have the opportunity to undercut and poach Revlon's most valuable relationships. *Id.* ¶ 24.

The employment agreements between Revlon and Kidd, Fass and Romeo acknowledge this risk of irreparable harm related to the improper use of confidential information. They also

contain consent to the entry of injunctive relief. The employment agreements with Kidd, Fass and Romeo state: "I agree that my failure to perform any obligation under this Agreement will cause immediate and irreparable damage to the Company, that there is no adequate remedy at law for such failure, and that in the event of such failure the Company shall be entitled to injunctive relief without posting of any bond, and such other relief as may be just and proper." Cornock Decl., Exs. 16-18.

**Revlon's Efforts to Obtain the Return of its Confidential Information.**

Prior to filing this motion, Revlon's counsel engaged in multiple discussion with counsel for all Defendants (on September 3, 5 and 10) in which it requested that they (i) immediately return Revlon's confidential information, and agree to engage in expedited discovery to identify all of that stolen confidential information; (ii) agree not to use Revlon's confidential information in connection with GBB's business, including by "walling-off" the Revlon Employees from the Britney Brands business; and (iii) cease demanding Revlon's confidential information from Revlon's fragrance house. Dockterman Decl. ¶ 8. To date, Defendants have declined to agree. In a letter to the Court requesting an extension of time to respond to the Complaint, Defendants represented that they were compelled to reject Revlon's requests, because they considered those requests inconsistent with their contractual obligations to Britney Brands. *See* Doc. 28 ("The GBB Defendants are unable to meet Defendants' demands, including because expedited discovery and ceasing such communications would severely undermine their ability to meet their existing contractual obligations to Britney Brands.") That representation to the Court speaks volumes about the Defendants' intention to persist in their misappropriation of Revlon's trade secrets.

## PRELIMINARY INJUNCTION STANDARD

A party seeking a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) "must make a clear showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction is in the public interest." *FuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *15 (S.D.N.Y. Aug. 16, 2024) (citing *Starbucks Corp. v. McKinney*, __ U.S. __, 144 S. Ct. 1570, 1575 (2024)). *See also Helio Logistics, Inc. v. Mehta*, No. 22-CV-10047 (NSR), 2023 WL 1517687, at *5 (S.D.N.Y. Feb. 3, 2023) (quoting *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) ("temporarily and immediately restrain[ing] and enjoin[ing]" defendants from "employing" or "disposing of Plaintiff's trade secrets").

All of the relevant factors favor the grant of a preliminary injunction to Revlon that preserves the *status quo* by: (i) requiring immediate return of Revlon's confidential information; (ii) enjoining the Defendants from using or relying upon Revlon's trade secrets (which requires, *inter alia*, "walling-off" the Revlon Employees from the Britney Brands business); (iii) enjoining the Revlon Employees (and any other Defendant who has accessed relevant confidential information) from interfering with Revlon's business relationships, including but not limited to its Juicy Couture relationship; and (iv) enjoining Defendants from disclosing Plaintiffs' confidential information.

## ARGUMENT

### I. REVLON IS LIKELY TO PREVAIL ON THE MERITS.

The facts set forth above demonstrate that Revlon is likely to prevail on the merits of its claims that Defendants misappropriated trade secrets and that Defendants Kidd, Fass and Romeo violated their employment agreements with Revlon, which entitle Revlon to injunctive relief.

"To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. [It] need only make a showing that the probability of . . . prevailing is better than fifty percent." *FuboTV Inc,* 2024 WL 3842116, at *16 (quoting *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

**A. <u>Count I: Trade Secret Misappropriation Against All Parties</u>**

Defendants wrongful actions with respect to Revlon's confidential and propriety information violate both the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") and New York law.

The DTSA creates a private cause of action in favor of the owner of a trade secret that is misappropriated "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Under the DTSA, "misappropriation" includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances. 18 U.S.C. § 1839(5). The phrase "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6)(A). *See also Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (internal citations omitted) ("To state a claim for misappropriation under the DTSA, a plaintiff must allege that it possessed a trade secret that the defendant misappropriated.").

The elements for a misappropriation claim under New York law are fundamentally the same as those under the DTSA. "Under New York law, a plaintiff claiming misappropriation of

a trade secret must allege "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, No. 23-CV-9000, 2024 WL 3835264, at *3 (S.D.N.Y. Aug. 14, 2024) (quoting *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452-53 (2018)). "[C]ourts have found that a complaint sufficiently pleading a DTSA claim also states a claim for misappropriation of trade secrets under New York law." *Id.* (internal citations omitted).

**<u>The Revlon Employees Stole Revlon's Trade Secret Documents</u>**

The electronic files that the Revlon Employees unlawfully took and shared with GBB plainly qualify as trade secrets. The DTSA defines a trade secret to include:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
> (A) The owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).[4]

---

[4] New York courts consider the following factors:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be acquired or duplicated by others.

*Rocket Pharms., Inc.*, 2024 WL 3835264, at *3.

The documents at issue here satisfy these standards. The documents contain competitively sensitive information. *See Next Commc'ns, Inc. v. Viber Media, Inc.*, Case No. 14-cv-8190 (RJS), 2017 WL 4402540, at *4 (S.D.N.Y. Sept. 30, 2017) ("A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."); *see also Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 379 n.9 (2d Cir. 2000) ("Compilations of information, traditionally viewed and protected under trade secret law, are items like customer and supplier lists and pricing and cost information."); *see also Kraus USA, Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020) (pleading "several specific categories of information that were misappropriated, including technical product specifications, information on upcoming designs, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce knowledge" was sufficient to survive dismissal); *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17 Civ. 5966 (JSR), 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) ("Tesla's complaint . . . pleads numerous specific categories of [trade secret] information, such as 'technical data, internal pricing information, work product, research, engineering designs,' etc.").

**Reasonable Precautions**

Revlon took reasonable measures to keep the Trade Secret information confidential. "Plaintiffs must show only sufficient secrecy, not absolute secrecy, meaning that except by use of improper means, there would be difficulty in acquiring the information." *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 427 (S.D.N.Y. 2021) (quotations omitted); *see also* 18 U.S.C. § 1839(6) (defining "improper means" as including "misrepresentation [and] breach or inducement of a breach of a duty to maintain secrecy"). "Generally speaking, such measures can

include ‘the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality.’” *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 675 (S.D.N.Y. 2022); *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19-CV-7367 (JPO), 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) (finding allegations that “proprietary information was ‘accessible only to parties with permission to view such information, and only after they have agreed to contracts that include strict confidentiality provisions that require them not to use or disclose this information’ ... together with [plaintiff's] claim that the secrecy of its [proprietary] processes and software help it ‘maintain its competitive advantage in the market[,’] suffice to meet the first prong of the DTSA test”); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (crediting “confidentiality provisions” and “strictly controlled servers” as reasonable protective measures); *TransPerfect Global, Inc. v. Lionbridge Tech., Inc.*, No. 19-CV-3283, 2020 WL 1322872, at *4-5 (S.D.N.Y. Mar. 20, 2020) (finding that a plaintiff has made reasonable efforts to secure trade secrets where there was a confidentiality agreement limiting their disclosure and they could only be accessed via proprietary login).

As set forth above, Revlon took reasonable measures to safeguard and secure its trade secrets. It trained its employees on their confidentiality obligations, requiring them to acknowledge Revlon’s Code of Conduct. The Revlon Employees acknowledged that they may not “exchange confidential information with a competitor,” or use the confidential information to “benefit themselves or others, even after that their relationship with Revlon ends.” Cornock Decl., Ex. 14 at 24, 33. Revlon also entered into employment agreements that explicitly provide

for trade secret protections. Revlon's electronic documents are maintained in electronic folders on Revlon's servers with limited access. Only those employees with specific permissions may open those folders. Cornock Decl. ¶¶ 19-23.

**Independent Economic Value**

Revlon's confidential information derives independent economic value from not being generally known or ascertainable. *See, e.g., In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law."); *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988 (SCR), 2006 WL 3302841, at *3 (S.D.N.Y. Jan. 31, 2006) (finding plaintiffs' cost structure to be a protected trade secret when "it would be difficult for anyone other than Plaintiffs or specific employees of Plaintiffs to duplicate a particular cost structure or bidding information as a variety of factors are involved, many of which only Plaintiffs or specific employees of Plaintiffs would have access to.").

Revlon's confidential and proprietary information derives independent economic value from not being generally known, nor available, to its competitors. There is a great deal of competition in the fragrance business and each company's business plans, marketing strategy, financial constructs and contractual relationships are held close to the vest. Cornock Decl. ¶ 15. These are the company's crown jewels. *Id.* Moreover, Revlon invests substantial resources in creating its confidential and proprietary information. *Id.* ¶ 14.

The information stolen from Revlon qualifies as trade secret under the DTSA and New York law, because it is competitively sensitive, has been safeguarded, and derives independent economic value from being unavailable to Revlon's fragrance competitors.

**Defendants Misappropriated Revlon's Trade Secrets**

Defendants misappropriated Revlon's trade secrets in violation of the DTSA. *See* 18 U.S.C. § 1839(5) (misappropriation includes "disclosure or use of a trade secret … without express or implied consent") *Id*. at (6)(A). *See KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020) (defendant used improper means to acquire and use trade secrets when, in violation of his employer policy, he copied, reviewed, and organized files into his personal directory); *AUA Private Equity Partners, LLC v. Soto*, Case No. 1:17-cv-8035-GHW, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (misappropriation by acquisition plausibly alleged with allegations that defendant "uploaded [plaintiff's] trade secrets from her work laptop to her personal cloud-based storage without [plaintiff's] permission and in direct violation of the confidentiality agreements that she signed").

Any use of Revlon's trade secrets by the Revlon Employees on GBB's behalf to further GBB's business interests constitutes "use" of the trade secrets by GBB. *See Rocket Pharms.* 2024 WL 3835264, at *6 ("Any use of Rocket's trade secrets on [defendant corporation's] behalf by [defendant former employee] constitutes "use" of the trade secrets by [defendant corporation] as well as an independent basis for [former employee's] individual liability under the DTSA.").

The forensic examination of Kidd's and Fass's Revlon computers demonstrate that they knowingly took Revlon's fiercely guarded trade secret files. *See e.g., Rocket Pharms.*, 2024 WL 3835264, at *6 ("Law knew or had reason to know that he obtained the trade secrets through improper means by downloading them to his personal computer before he left Rocket's employee and maintaining possession of the personal computer with the trade secrets post-employment by Rocket."); Mem. in Supp. of Mot. for Preliminary Inj. at 5, 7-8, *ExpertConnect, L.L.C. v. Fowler*, Case No. 18 CIV. 4828 (LGS), 2019 WL 3004161, (July 10, 2019), ECF No. 12; Order re Preliminary Inj., ECF No. 43 (granting preliminary injunction and enjoining

defendant from erasing data downloaded from plaintiff—defendant's prior employer—just days before defendant's formation of a competing LLC); *eShares, Inc. v. Talton*, No. 22-CV-10987 (JGLC), 2024 WL 3970847, at *7, *8 (S.D.N.Y. Mar. 29, 2024) (employer's allegations that former employee downloaded certain documents containing employer's trade secrets a few minutes after receiving meeting invite from human resources sufficient to plead misappropriation); *loanDepot.com, LLC v. CrossCountry Mortg., LLC*, Case No. 22 CIV. 5971 (LGS), 2023 WL 3884032, at *7 (S.D.N.Y. June 8, 2023) (observing that "Defendants [ ] took the information with them when they left [plaintiff] -- even though that information purportedly could be replicated through independent means -- which strongly suggests a desire to avoid the potentially painstaking effort to research, compile and collate client contact information"); *Lumenate Techs., LP v. Integrated Data Storage, LLC*, Case No. 13-cv-3767, 2013 WL 5974731, at *5 (N.D. Ill. Nov, 11, 2013) (citations omitted) (determining that defendant had misappropriated his employer's trade secrets based in part on evidence that the defendant downloaded data two days before resigning and then deleted the information).

The facts set forth above demonstrate that Revlon is likely to prevail on the claim that Kidd and Fass took its trade secrets with them to GBB, for purposes of using them to benefit GBB's fragrance business. Discovery will show the full extent of the information that Kidd and Fass stole, but what we already know conclusively demonstrates that trade secrets were stolen. Discovery also will demonstrate whether the suspicious electronic behavior that Romeo and Mulvihill engaged in during their final days at Revlon likewise involved the theft of trade secrets. Finally, discovery will show the full extent to which GBB has misused Revlon's trade secrets in its fragrance business.

**B. Count II: Breach of Contract**

Defendants Kidd, Romeo and Fass breached their written agreements with Revlon that govern the use of confidential information. To state a claim for breach of contract under New York law, Plaintiffs must demonstrate that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (internal citations omitted).

Courts will grant a preliminary injunction where defendant employees breached contractual confidentiality provisions. In *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999), after defendant left plaintiff's employ for a competitor, he began calling Plaintiff's client contacts and asking them to leave Plaintiff to do business with defendant's new entity. Defendant's employment agreement with plaintiff contained a provision requiring him to "keep secret and retain in the strictest confidence all confidential matters which relate to [Plaintiff], including, without limitation, customer lists, trade secrets, pricing policies and other confidential business affairs of [Defendant]. . . and any affiliate." The employment agreement further prohibited defendant from "disclos[ing] any such confidential matter to anyone." *Id*. The district court granted injunctive relief, enjoining the defendant from soliciting contacts developed while in plaintiff's employ, and the Second Circuit affirmed. *Id*; *see also USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 190 (S.D.N.Y. 2011) (finding that where employment agreement contained provision instructing employee not to use or willfully disclose any employer confidential information, defendant's action of forwarding documents containing lists of client revenue to his personal email account "is protectable as a trade secret.").

As set forth above, the Kidd, Fass and Romeo employment agreements prohibit them from disclosing Revlon's confidential information, retaining or taking Revlon's confidential

information, and using Revlon's confidential information to compete with Revlon. The agreements further prohibit Kidd, Fass and Romeo from interfering with Revlon's business relationships after their employment has terminated. In violation of these contractual terms, Kidd, Fass and Romeo brought Revlon's confidential information with them to GBB, and are assisting GBB in using that information to interfere with Revlon's business relationships. Kidd, Fass and Romeo are in material breach of their contractual obligations.

## II. <u>REVLON WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION</u>

Absent prompt entry of injunctive relief, Revlon will continue to suffer immediate and irreparable injury.

To establish irreparable harm, a plaintiff must demonstrate an actual injury "that is not remote or speculative but actual and imminent, and "for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc*., 60 F.3d 27, 37 (2d Cir. 1995) (quotation marks omitted). "Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 328-29 (E.D.N.Y. 2020) (finding irreparable harm "where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss."). "All parties agree that '[i]rreparable harm is 'the sine qua non for preliminary injunctive relief.'" *FuboTV Inc.*, 2024 WL 3842116, at *23 (citing *trueEX, LLC v. MarkitSERV Ltd*., 266 F. Supp. 3d 705, 726 (S.D.N.Y. 2017)).

### A. <u>Revlon is Irreparably Harmed By Defendants' Theft of Trade Secrets</u>

The DTSA entitles Plaintiffs to an injunction. "[T]he DTSA empowers a federal court to grant an injunction to prevent actual or threatened misappropriation of trade secrets." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc*., 68 F.4th 792, 808 (2d Cir.), *cert. denied*, 144 S. Ct. 352 (2023) (internal citations omitted). In the Second Circuit, trade secret

dissemination gives rise to a presumption of irreparable harm: the "loss [of trade secrets] 'cannot be measured in money damages'" because "[a] trade secret once lost is, of course, lost forever." *See Estee Lauder Companies, Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (per curiam) (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co*., 730 F.2d 61, 63 (2d Cir. 1984).

The Second Circuit acknowledges that "even where a trade secret has not yet been disclosed, irreparable harm may be [established] based upon a finding that trade secrets will inevitably be disclosed." *Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 480-81 (S.D.N.Y. 2007) (quoting *Estee Lauder Cos*., 430 F. Supp. 2d at 174 (S.D.N.Y. 2006)). Once a trade secret is disseminated, it is virtually impossible to quantify the harm inflicted on the rightful holder of the trade secret, "given the difficulty in ascertaining empirically how much of a competitive advantage such information gives [competitors] and/or how much detriment it might cause to the future profitability of [the rightful holder]." *Estee Lauder Cos*., 430 F. Supp. 2d at 174; *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (finding irreparable harm where "it would be very difficult to calculate monetary damages" from loss of "an indeterminate amount of business in [the] years to come."); *Tom Doherty*, 60 F.3d 27 at 38 (finding that loss of prospective business that will be largely indeterminate constitutes irreparable harm).

Here, Plaintiffs are entitled to such a presumption because Defendants are "disseminat[ing] the trade secrets [they] improperly acquired to a wider audience—namely" the Revlon Employees new employer, GBB. *KCG Holdings*, 2020 WL 1189302, at *17. In light of the Revlon Employees active work in the fragrance business at GBB, a direct Revlon competitor,

in roles functionally identical to their previous positions with Plaintiffs, the dissemination of Revlon's trade secrets is more than a likelihood—it is a certainty.

Absent an injunction, Defendants will continue using for their own profit trade secret information that Plaintiffs expended years developing. Damages are impossible to quantify, given the "difficulty in ascertaining empirically how much of a competitive advantage" the trade secret information gives to Defendants. *See Estee Lauder Cos*., 430 F. Supp. 2d at 174.

GBB already is not only profiting from the trade secret information based on its new relationship with Britney Brands, but also through its improper contact with Revlon's suppliers, including the fragrance houses, pumping them for Revlon's fragrance formulas. *See Velo-Bind, Inc. v. Scheck*, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) ("What is at stake here is plaintiffs goodwill built up over the years . . . ."); *see also Daka Research, Inc. v. Uiliko Storefront*, Preliminary Inj. Mot. at 1-2, and Order, 1:22-cv-02957-ER (S.D.N.Y. May 18, 2022), ECF Nos. 20 & 24(entering order granting plaintiff's motion for a preliminary injunction where, plaintiff argued that "[a]side from financial losses, Defendant's infringing actions have caused, and will continue to cause, irreparable harm to Plaintiffs goodwill and reputation.").

### B. Revlon is Irreparably Harmed by Kidd, Fass and Romeo's Breach of Contract

Revlon Employees Kidd, Fass and Romeo explicitly acknowledged that their disclosure of Plaintiffs' trade secrets in breach of their contracts will irreparably harm Plaintiffs. "Although not dispositive, courts in this District have concluded that a contractual acknowledgement by the defendant that a violation of a non-compete clause would cause irreparable harm supports a finding of irreparable harm." *Medtronic, Inc. v. Walland*, No. 21 CIV. 2908 (ER), 2021 WL 4131657, at *9 (S.D.N.Y. Sept. 10, 2021) (concluding the "irreparable harm" factor favored plaintiff, but denying preliminary injunction on other grounds). In fact, such contractual

acknowledgements "might arguably be viewed as an admission by [the employee] that [the employer] will suffer irreparable harm were he to breach the contract's non-compete agreement." *Estee Lauder Cos.*, 430 F. Supp. 2d at 174 (citing *Ticor Title Ins. Co.*, 173 F.3d at 69) (granting motion for preliminary injunction where employment agreement between the parties "concedes that in the event of breach of the post-employment competition provision, [the employer] shall be entitled to injunctive relief, because it would cause irreparable injury."); *N. Atl. Instruments,* 188 F.3d at 49 (affirming district court's finding of irreparable harm, in part, due to defendant's acknowledgment of irreparable injury in employment agreement).

Kidd, Fass and Romeo each agreed that their: "failure to perform any obligation under this Agreement will cause immediate and irreparable damage to the Company, that there is no adequate remedy at law for such failure, and that in the event of such failure the Company shall be entitled to injunctive relief without posting of any bond, and such other relief as may be just and proper." *See* Cornock Decl., Ex. 18 (Romeo Employee Agreement) 10(a); Ex. 17 (Fass Employee Agreement) 10(a); Ex. 16 (Kidd Employee Agreement) § 10(a). Accordingly, absent an injunction, the Revlon Employees' breach will cause irreparable harm to Plaintiffs.

## III. <u>THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFFS' FAVOR</u>

The harm to Plaintiffs of denying their request for injunctive relief far outweighs any harm to Defendants interests. *See FuboTV Inc.*,(MMG) slip op. at 33 ("In assessing the balance of the equities factor, the Court must determine whether [plaintiff] would "suffer decidedly greater harm from an erroneous denial of an injunction than the defendants would suffer from an erroneous grant."). Simply put, Defendants have no "legitimate interest" in Revlon's trade secret information. *See Mission Cap. Advisors LLC v. Romaka*, Case No. 16 Civ 5878 (LLS), 2016 WL 11517104, at *2 (S.D.N.Y. July 29, 2016) ("Plaintiff avers that dissemination of the [trade secrets] would cause irreparable harm to Plaintiff, its business activities, and its market share,

which could cause loss of revenue and competitive advantage. Defendant has no legitimate interest in Plaintiff's Contact Lists."); *Citizens Secs., Inc. v. Bender*, Case no. 1:19-cv-916, 2019 WL 3494397, at *5 (N.D.N.Y. Aug. 1, 2019) ("Plaintiff will continue to suffer substantial harm absent an injunction through Defendant's use of proprietary information to . . . Defendant, however, will only suffer minimal harm if an injunction is granted.").

## IV. **INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST**

The public interest supports the entry of injunctive relief in favor of Plaintiffs. "Injunctive relief would serve the public interest by . . . protecting plaintiff's legitimate interests in maintaining . . . the secrecy of its trade secrets and confidential information." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020); *see also Mazak Optonics Corp.*, Case No. 17 C 1023, 2017 WL 3394727, at *3 (The "public interest is supported by upholding the sanctity of confidential information such as trade secrets and preventing others from the unauthorized use of such confidential information for their own benefit.").

## V. **PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A BOND**

Courts ordinarily may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, because the "amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond." *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (citations omitted). A district may do so "where parties sought to be enjoined or restrained 'have not shown that they will likely suffer harm absent the posting of a bond.'" *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 315 (S.D.N.Y. 2001) (citation omitted). *See also BaseCap Analytics Inc. v. Amenn*, No. 1:23-CV-09370-MKV, 2023 WL 8113524, at *3-4 (S.D.N.Y. Nov. 22, 2023)

(granting preliminary injunction where plaintiff made a "clear showing" on its trade secret and breach of contract claims, and declining to order a bond). Here, Defendants have no legitimate interest in the confidential information they misappropriated, and they therefore will not be harmed by the injunctive relief Plaintiffs request.

## CONCLUSION

For all of the reasons stated above, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 13, 2024

STEPTOE LLP

By: */s/ Michael Dockterman*

Michael Dockterman
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone: (312) 577-1300

Elyse D. Echtman
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 506-3900
Email: eechtman@steptoe.com

*Attorneys for Plaintiffs Revlon Consumer Products LLC and Elizabeth Arden, Inc.*