**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

REVLON CONSUMER PRODUCTS LLC and
ELIZABETH ARDEN, INC.

                Plaintiffs,

   -against-

GIVE BACK BEAUTY S.A., et al.,

                Defendants.

Case No. 1:24-cv-06438-ER-RWL

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

I.   BACKGROUND ............................................................................................ 1

II.   FACTS ........................................................................................................ 3

III.   LEGAL STANDARD ................................................................................. 9

IV.   THERE IS NO THREAT OF IMMINENT IRREPARABLE HARM TO REVLON ...... 10

V.   REVLON IS UNLIKELY TO SUCCEED ON THE MERITS ......................................... 14

      A.   Revlon Fails To Sufficiently Identify Its Trade Secrets .............................. 15

      B.   Revlon Fails to Show Independent Economic Value ................................... 18

      C.   Revlon Has Not Shown Adequate Measures to Protect Secrecy ................ 19

      D.   Revlon Fails To Show Misappropriation ...................................................... 20

      E.   Revlon Fails To Show Likelihood of Success On Its Remaining Claims.... 22

      F.   The Remaining Factors Do Not Favor A Preliminary Injunction ............... 23

      G.   There Is No Justification For Less Than A $5,000,000 Bond...................... 24

VI.   CONCLUSION............................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Broad. Co. v. Wolf*,
420 N.Y.2d 394 (1981) ...................................................................................................10

*Art & Cook, Inc. v. Haber*,
416 F. Supp. 3d 191 (E.D.N.Y. 2017) ......................................................................10, 18

*Baker's Aid, a Div. of M. Raubvogel Co. v. Haussmann Foodservice Co.*,
830 F.2d 13 (2d Cir. 1987)..............................................................................................11

*Baracuda Intern. Corp. v. F.N.D. Enterprises, Inc.*,
1982 WL 436 (S.D. Fl. May 19, 1982).............................................................................24

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014) ....................................................................15, 18, 19

*Bijan Designer for Men, Inc. v. Katzman*,
1997 WL 65617 (S.D.N.Y. Feb. 7, 1997).........................................................................13

*Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd.*,
437 Fed. App'x 57 (2d Cir. 2011).....................................................................................11

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011).......................................................................................10, 11

*Catalogue Serv. of Westchester, Inc. v. Henry*,
107 A.D.2d 783 (2d Dept. 1985) ......................................................................................21

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob., Inc.*,
602 F. Supp. 3d 663 (S.D.N.Y. 2022)...............................................................................16

*Dexter 345 Inc. v. Cuomo*,
663 F.3d 59 (2d Cir. 2011)........................................................................................14, 23

*Elsevier Inc. v. Doctor Evidence, LLC*,
No. 17-cv-5540 (KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018)................................20

*eShares Inc. v. Talton*,
--- F. Supp. 3d ---, 2024 WL 3970847 (S.D.N.Y. March 29, 2024).................................20

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)...........................................................................11, 12, 14, 21

*FCA US LLC v. Bullock,*
329 F.R.D. 563 (E.D. Mich. 2019) ........................................................................23

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
730 F.2d 61 (2d Cir. 1984)....................................................................................11

*Forest City Daly Hous., Inc. v. Town of N. Hempstead,*
175 F.3d 144 (2d Cir. 1999)..................................................................................15

*Hancock v. Essential Res., Inc.,*
792 F. Supp. 924 (E.D.N.Y. 1992) .......................................................................10

*Inspired Cap., LLC v. Conde Nast,*
803 F. App'x 436 (2d Cir. 2020) ..........................................................................20

*Ivy Mar Co. v. C.R. Seasons Ltd.,*
907 F. Supp. 547 (E.D.N.Y. 1995) .......................................................................21

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,*
596 F.2d 70 (2d Cir. 1979)....................................................................................14

*Jayraj v. Scappini,*
66 F.3d 36 (2d Cir. 1995)......................................................................................14

*Loveridge v. Pendleton Woolen Mills, Inc.,*
788 F.2d 914 (2d Cir. 1986)..................................................................................14

*Lynch v. City of New York,*
589 F. 3d 94 (2d Cir. 2009)...................................................................................15

*Mason v. Amtrust Fin. Servs., Inc.,*
848 F. App'x 447 (2d Cir. 2021) ..........................................................................19

*Mautner v. Hirsch,*
1991 WL 253330 (S.D.N.Y. Nov. 15, 1991) ........................................................13

*Mazurek v. Armstrong,*
520 U.S. 968 (1997)..............................................................................................10

*McKenna v. Wright,*
2002 WL 338375 (S.D.N.Y. Mar. 4, 2002) ..........................................................11

*In re Revlon, Inc. et al.,*
1:22-cv-10760, Dkt. 1. (Bankr. S.D.N.Y.)..............................................................4

*Rodriguez ex. rel. Rodriguez v. DeBuono,*
175 F.3d 227 (2d Cir. 1999)..................................................................................11

*Ruckleshaus v. Monsanto Co.*,
467 U.S. 986 (1984)................................................................................17

*Sapir v. Rosen*,
2021 WL 4482277 (S.D.N.Y. Sept. 30, 2021)..........................................16

*Sit-Up Ltd. v. IAC/Interactive Corp.*,
2008 WL 463884 (S.D.N.Y. Feb. 20, 2008).............................................18

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007)....................................................................10

*Tactica Intern., Inc. v. Atl. Horizon Intern., Inc.*,
154 F. Supp. 2d 586 (S.D.N.Y. 2001)......................................................10

*Uddin v. O'Brien Res. Holding Co., LLC*,
2017 WL 11674895 (S.D.N.Y. Aug. 23, 2017).........................................23

*UrthTech v. GOJO Indus.*,
2023 WL 4640995 (S.D.N.Y. July 20, 2023).............................................19

*USA Network v. Jones Intercable, Inc.*,
704 F. Supp. 488 (S.D.N.Y. 1989) ...........................................................13

*Vibraderm, Inc. v. Multiderm, LLC*,
2008 WL 11425397 (N.D. Tex. Mar. 26, 2008)........................................18

*Walter Karl, Inc. v. Wood*,
137 A.D.2d 22 (2d Dept. 1988) ...............................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...................................................................................3, 9

*Zirvi v. Flatley*,
433 F. Supp.3d 448 (S.D.N.Y. 2020)........................................................15

Statutes

18 U.S.C. § 1839(3)............................................................................15, 18

Defend Trade Secrets Act .........................................................................14

Fed. R. Civ. P. 65 .......................................................................................1

In accordance with Fed. R. Civ. P. 65 and the Court's Individual Rules, Defendants Give Back Beauty S.A., Give Back Beauty LLC, Give Back Beauty Americas LLC, Give Back Beauty International LLC and Give Back Beauty Holding LTD. (collectively, "GBB"), Vanessa Kidd, Dominick Romeo, Ashley Fass, and Reid Mulvihill (the "Individual Defendants," collectively with GBB, the "Defendants"), by and through undersigned counsel K&L Gates LLP, hereby submit this Memorandum of Law in opposition to Plaintiffs' September 13, 2024 Motion for a Preliminary Injunction.

## I.    BACKGROUND

Plaintiffs Revlon Consumer Products LLC and Elizabeth Arden LLC (collectively, "Revlon" or "Plaintiffs") seek to reverse the loss of their lucrative relationship to market Britney Spears-branded fragrances by advancing a false narrative of GBB's scheme to raid their employees and steal trade secrets. Revlon asks the Court to accept that tale as the only possible explanation for why Ms. Spears decided to reject Revlon in favor of GBB. But Revlon's narrative cannot be credited, so it reverts to claiming that unidentified proprietary confidential information and trade secrets were misappropriated, which, according to Revlon, is the only way it could have lost the Britney Spears relationship. Revlon's Motion is more accurately an anticompetitive ruse to damage a competitor because Revlon, weakened in the market by its recent bankruptcy, cannot compete fairly with GBB, and seeks to frustrate GBB's transition of Britney Brands, at the same time, sending a warning about future competition from an international rival that poses a growing threat to Revlon's market share.

Plaintiff's Motion can serve no other function, and therefore must fail, especially given that Revlon is not at risk of any imminent and irreparable harm. ***First***, Revlon waited more than five months after supposedly discovering what it contends to be the alleged misconduct at issue in this case, negating a claim of irreparable harm. The only alleged harm Revlon has identified is its own

failure to secure a Britney Brands license renewal, which had occurred by April 29, 2024, **before** the first allegation of any breach of trade secrets on May 3, 2024. Even if GBB is alleged to have gained an improper advantage through its employees' misappropriating trade secrets, any such harm (lost profits) is compensable by monetary damages, obviating the need for an injunction.

**Second**, Revlon has failed to identify the specific "confidential information" or "trade secrets" that were allegedly misappropriated with anything close to the necessary degree of particularity required by the law – and the information it claims as "trade secrets," like the identity of retailers and fragrance manufacturers (Mot., at 3 (complaining about "making outreach" to "fragrance houses")) are plainly not DTSA trade secrets.

**Third**, there is no evidence to support Revlon's baseless theory that GBB has acquired, used, or has ever been in possession of even a single byte of Plaintiffs' data. There is only conjecture that GBB could use such information by virtue of the former Revlon employees having access to it.

**Fourth**, notwithstanding Plaintiffs' misleadingly unqualified assertions that they *own* trade secrets in the Britney Brands fragrance formulas, GBB has done nothing to infringe any of Plaintiffs' rights under their expiring licensing agreement to *use* those formulas, GBB's conduct being consistent with industry norms and necessary to prevent damage to GBB from a disruption in fragrance production. And ***finally***, Plaintiffs have an alternative remedy; accept GBB's repeated assurances that it has not acquired, and has no intention of using, disclosing, or communicating any Revlon trade secret information – instead of overreaching in an attempt to prevent GBB from lawful and ordinary business activities.

The Court should not countenance Plaintiffs' thinly-veiled attempt to prevent GBB from safeguarding Ms. Spears' valuable fragrance brand. Revlon's Motion should be denied in its

entirety. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

## II.    FACTS

### GBB Is a Successful, Experienced Global Beauty Business

GBB is a globally-operated beauty group that partners with world-renowned brands, ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ to create, develop, and support their established and upcoming beauty brands. (Decl. of C. Brondi, ¶ 4; Decl. of P. Stella, ¶ 4.)  GBB works through global partnerships, licensing, and distribution agreements to engage with brands and celebrities to bring fragrances and other beauty products to consumers worldwide. (Stella Decl., ¶ 4.)

GBB operates as a best-in-class global beauty partner that offers innovative product, digital, and business models, combining the flexibility, focus, and long-term mindset of entrepreneurial companies with the best practices of large groups. (Brondi Decl., ¶ 5; Stella Decl., ¶ 4.) GBB was formed by Corrado Brondi, who has worked in the fragrance business for almost twenty-eight years. (Brondi Decl., ¶¶ 2-3.) GBB is a fast-growing beauty company with 350 employees and several hundred millions of dollars in fragrance revenues alone, comparable to Revlon's, and a management team with decades of experience in the global beauty industry. (Brondi Decl., ¶ 6; Stella Decl., ¶ 6, 9.) GBB secures partnership agreements with brands in the marketplace based upon its unique value proposition, which includes multi-product category offering, tailor-made and evolutionary partnership models with brands, state-of-the-art digital and social media capabilities, and a global distribution footprint, combined with strong ethical standards and financial strength. (Brondi Decl., ¶ 7.)

The fragrance industry is competitive, and GBB welcomes the opportunity to fairly compete with established and breakout beauty companies to deliver for its brand partners. (Stella Decl., ¶ 7.) GBB leverages its market expertise, digital and in-store promotional assets, strong financial position, and control of distribution across more than 25,000 retail stores and enjoys win-win relationships with global ecommerce retailers therefore competing for opportunities to innovate and partner with renowned brands and celebrities. (*Id.*, ¶ 8.) That is exactly what GBB did to earn the trust of Britney Brands.

**GBB & Britney Brands Reached Agreement Before Any Alleged Misappropriation**

Corrado Brondi first met representatives of Ms. Spears in 2019, and thereafter looked for opportunities to work with Britney Brands. (Brondi Decl., ¶¶ 9-10.) GBB approached Epic Rights, a merchandising and branding company acquired by Universal Music Group's Bravado in 2019, which works with a diverse group of iconic artists, including Ms. Spears, regarding partnering with Britney Brands. (*Id.*, ¶ 9.) On March, 29 2022, GBB contacted Epic Rights regarding partnering with Britney Brands. (*Id.,* ¶ 10.) Revlon declared bankruptcy less than a year later, on June 15, 2022. *In re Revlon, Inc. et al.*, 1:22-cv-10760, Dkt. 1. (Bankr. S.D.N.Y.). GBB contacted Epic Rights again to discuss a Britney Brands license upon learning of Revlon's bankruptcy. (Brondi Decl., ¶ 10.)

After further follow up by GBB, on November 8, 2023, Epic Rights indicated that Ms. Spears' team was reviewing their current fragrance and beauty partner strategy and asked GBB for a proposal. (*Id.*, ¶ 11.) Mr. Brondi continued negotiating with several Britney Brands representatives, culminating in GBB signing an agreement with Britney Brands on April 29, 2024. (*Id.*, ¶¶ 12-16.) None of the Individual Defendants were involved in, shared any Revlon trade secrets or confidential information for, or were even aware of GBB's pending negotiations with

Britney Brands. (*Id.*, ¶ 15; Decls. of V. Kidd, ¶¶ 17-18; D. Romeo, ¶ 9; A. Fass, ¶ 10; R. Mulvihill, ¶ 8.) Mr. Brondi did not possess or use any of Plaintiffs' trade secrets or confidential information to negotiate GBB's agreement with Britney Brands. (Brondi Decl., ¶ 15.)

### The Individual Defendants' Job Insecurity and Separate Plans to Leave Revlon

Meanwhile, Revlon's bankruptcy and subsequent reorganization caused the Individual Defendants to question their job security. (Kidd Decl., ¶ 6-8; Romeo Decl., ¶ 3; Fass Decl., ¶ 3.) The bankruptcy court confirmed Revlon's plan for reorganization on April 3, 2023, noting that Revlon had reached "a hard-fought multi-faceted settlement" that resolved a "series of enterprise-threatening" risks to the business, including "debilitating" litigation among its lenders.[1] Amidst fears about how Revlon's bankruptcy and reorganization would impact employees, the Individual Defendants each considered leaving Revlon. (Kidd Decl., ¶¶ 6-8; Romeo Decl., ¶ 4; Fass Decl., ¶ 3.)

GBB had been confidentially interviewing several candidates from many different companies in the fragrance industry through a recruiting company as part of the transfer of its Lifestyle fragrance division from Europe to New York. (Brondi Decl., ¶¶ 17-18.) On March 11 and 12, 2024, respectively, Vanessa Kidd and Reid Mulvihill were independently contacted by GBB's recruiting company. (Kidd Decl., ¶ 9; Mulvihill Decl., ¶ 3.) Ms. Kidd met with a recruiter about the opportunity, but did not know the identity of the prospective employer until she signed a non-disclosure agreement on or after March 15, 2024. (Kidd Decl., ¶ 10.) Although GBB's recruiter interviewed candidates from a variety of companies, Revlon's employees were the ones who expressed the highest interest in the opportunities offered by GBB. (Brondi Decl., ¶ 18.)

---

[1] *Revlon cleared to exit bankruptcy with $2.7 bln debt reduction deal*, REUTERS (April 3, 2023, 9:50 AM PDT), https://www.reuters.com/legal/revlon-cleared-exit-bankruptcy-under-its-lenders-control-later-this-month-2023-04-03/.



Morale was understandably low ████████████████████ ████████████████████ (*See, id.*, ¶¶ 6-9.) One employee stated that the corporate environment felt like "the Hunger Games." (*Id.*, ¶ 9.)

Following meetings with GBB on March 21, 2024, March 29, 2024, and April 1, 2024, Ms. Kidd received a GBB employment offer on April 4, 2024. (*Id.*, ¶¶ 12-14.) She negotiated and signed the offer on April 8, 2024, and gave notice to Revlon the next day. (*Id.*, ¶¶ 14-15.) During the interview and hiring process with GBB, Ms. Kidd was unaware that GBB was negotiating a deal with Britney Brands and had no involvement in negotiating the agreement. (*Id.*, ¶ 17.)

While still employed at Revlon, but unaware of any GBB-Britney Brands dialogue, Ms. Kidd participated in a call with Britney Brands' ███████████ and disclosed her departure, assuring Mr. Hudson that Britney Brands would be in good hands with Dominick Romeo after her departure from Revlon. (*Id.*, ¶ 23.) At that time, Ms. Kidd did not know that Mr. Romeo was seeking a new job. (*Id.*, ¶ 24.) Ms. Kidd did not learn that GBB had inked a deal with Britney Brands until April 30, 2024. (*Id.*, ¶ 25.)

Mr. Romeo and Ms. Fass were each contacted by GBB directly on April 18 and 19, 2024. (Romeo Decl., ¶ 4; Fass Decl., ¶ 4.) During the interview process, Mr. Romeo, Ms. Fass, and Mr. Mulvihill did not communicate with each other or with Ms. Kidd about their pursuit of positions with GBB. (Romeo Decl., ¶ 5; Fass Decl., ¶ 8; Mulvihill Decl., ¶ 7.) Each of the Individual Defendants continued to perform their job duties after giving notice to Revlon. (Kidd Decl., ¶¶ 19,

23; Romeo Decl., ¶ 6; Fass Decl., ¶ 7; Mulvihill Decl., ¶ 6.) Ms. Kidd informed GBB of her non-solicitation agreement with Revlon. (Kidd Decl., ¶ 34.) Ms. Kidd never solicited Mr. Romeo, Ms. Fass, or Mr. Mulvihill to join GBB. (*Id.*, ¶ 36.)

### <u>Defendants Did Not Misappropriate Revlon Trade Secrets / Confidential Information</u>

On Ms. Kidd's last day at Revlon, four days after Revlon lost the Britney Brands contract renewal, she stayed late to ensure that Revlon's sensitive information housed on her company laptop was not available to the next employee to whom the machine would be re-assigned. (*Id.*, ¶¶ 27-31.) Because it held information not available to all Revlon employees, including employee performance reviews and compensation information, Ms. Kidd took time to upload the files to Revlon's system and then delete them from the laptop to protect the information from the next person assigned the computer. (*Id.*) Ms. Kidd also cleared her browsing history, as was her habit, since she occasionally used the laptop for personal purposes. (*Id.*, ¶¶ 32-33.) Ms. Kidd did not externally transfer any of the files on her Revlon computer. (*Id.*, ¶ 31.)

As part of his job duties overseeing and approving influencer postings involving Britney Brands, Mr. Romeo reviewed postings in Google documents, access to which required him to use his personal Gmail account. (Romeo Decl., ¶ 7.) Mr. Romeo did not use the information in the Google documents for any purpose other than to perform his duties at Revlon. (*Id.*) Mr. Romeo has not accessed any of those Google documents while working for GBB. (*Id.*) Mr. Romeo did not take Revlon trade secrets or confidential information or use any such information while at GBB. (*Id.*, ¶ 10.)

Over the course of her career, Ms. Fass has occasionally utilized a personal external hard drive for work purposes. (Fass Decl., ¶ 11.) While Ms. Fass, of course, does not recall every instance when she plugged her hard drive into her computer, whether at Revlon or otherwise, she

does recall that she plugged her drive into her Revlon laptop and her GBB laptop. (*Id.*) She also recalls that, on occasion, she downloaded files onto her personal hard drive. (*Id.*) Ms. Fass is aware of and takes seriously her obligations to protect the confidentiality of trade secrets belonging to her employer: she has never downloaded or saved any Revlon trade secrets or confidential information from her external hard drive to her GBB laptop, and confirms that she would never do so. (*Id.*)

Since joining GBB, Ms. Fass has plugged her hard drive into her GBB laptop to view various documents, but, contrary to Revlon's suppositions, has never knowingly and improperly shared any Revlon trade secrets or confidential information with anyone outside of Revlon, including anyone at GBB. (Fass Decl., ¶ 12.) Ms. Fass further confirms that no one at GBB has ever asked her for any trade secrets or confidential information belonging to Revlon. (*Id.*)

Mr. Mulvihill often used his Revlon computer to access his personal Gmail account, but did not send or receive any Revlon trade secrets or confidential information to or from that account. (Mulvihill Decl., ¶ 11.) He may have accessed a file called "Master File – Fragrance," which contained a list of all his company passwords. (*Id.*, ¶ 12.) Mr. Mulvihill never used a personal laptop to access Revlon files. (*Id.*, ¶13.) Mr. Mulvihill did not download, transfer, print, copy, or take any documents containing Revlon trade secrets or confidential information. (*Id.*, ¶ 14.)

### **Work At GBB Does Not Compromise Revlon Trade Secrets or Confidential Information**

Since the Individual Defendants started at GBB, only Ms. Kidd and Mr. Romeo have worked on matters related to Britney Brands, and neither has used Revlon trade secrets or confidential information to perform their duties.  (Stella Decl., ¶¶ 15-17; Kidd Decl., ¶¶ 37, 39; Romeo Decl., ¶¶ 9-10; Fass Decl., ¶ 15; Mulvihill Decl., ¶ 10.) When Ms. Kidd began working on

Britney Brands, she informed GBB that she preferred not to be involved with the brand suppliers, and has not been involved in making arrangements with them on behalf of Britney Brands. (Kidd Decl., ¶ 38.) No one at GBB has asked Mr. Romeo to reveal Revlon trade secrets or confidential information, and he has never used such information to perform his job duties at GBB. (Romeo Decl., ¶¶ 9-10.) Ms. Fass does not have day-to-day responsibilities for GBB on any matters related to brands that partner with Revlon, including Juicy Couture. (Fass Decl., ¶ 15.)

### GBB's Transition of Britney Brands Does Not Infringe Any Rights Held By Revlon

As part of GBB's work to transition Britney Brands fragrance products, Patrizio Stella contacted ███████ to plan for the production of new products. (Stella Decl., ¶¶ 10-13.) Notwithstanding that it is industry practice to begin contacting suppliers and other vendors before the commencement of a fragrance license, GBB nevertheless waited to receive a written authorization letter from Britney Brands before engaging in any substantive information exchanges. (Brondi Decl., ¶¶ 19-20.) GBB requested samples of fragrance oils to conduct stability and compatibility testing, quotations for what it would cost GBB to produce fragrances, and anticipated lead times on production. (Stella Decl., ¶¶ 10-12.) This is a necessary and customary industry practice for an incoming licensee to undertake in transitions between licensees, a common occurrence in the fragrance industry. (Brondi Decl., ¶ 19; Stella Decl., ¶ 10.)  Similarly, GBB contacted vendors to discuss purchasing fragrance bottles and caps so that GBB and its suppliers would be ready to begin production on January 1, 2025. (Stella Decl., ¶ 14.) Although Revlon does not own the formulas, GBB did not request, receive, or intend to obtain the Britney Brands fragrance formulas, or information about the ingredients. (*Id.*, ¶ 10.)

## III.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.  It is a "drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007). Such relief "cannot rest on mere hypotheticals" concerning a former employee's misconduct. *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (E.D.N.Y. 1992). It can only be granted if "the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Instead, to obtain a preliminary injunction in a trade secret case, a moving party must "put forth sufficient evidentiary proof to show what specific data the individual defendants misappropriated" (*e.g.*, *Tactica Intern., Inc. v. Atl. Horizon Intern., Inc.*, 154 F. Supp. 2d 586, 607 (S.D.N.Y. 2001)) and otherwise make a showing of (1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief. *Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 195 (E.D.N.Y. 2017) (denying preliminary injunction in action under DTSA). Mandatory preliminary injunctions, requiring affirmative acts, require even higher standards, because they "alter[] the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011).

Given all of these factors, and New York's "general judicial disfavor of anticompetitive covenants contained in employment contracts" (*e.g.*, *Am. Broad. Co. v. Wolf*, 420 N.Y.2d 394, 404 (1981)), the instant Motion fails to meet any of these elements.

## IV.    THERE IS NO THREAT OF IMMINENT IRREPARABLE HARM TO REVLON

Revlon's Motion fails, first, because it has been ***months*** since Ms. Spears made the decision to appoint GBB as the stewards of her fragrance brand, ***before*** the timeframe when Plaintiffs allege the Individual Defendants misappropriated Revlon's information. Revlon has not shown – and cannot show – irreparable harm, which "is the single most important prerequisite

for the issuance of a preliminary injunction." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011).  Revlon must make a showing that the irreparable harm is both "actual and imminent" and that it "cannot be remedied by an award of monetary damages." *Rodriguez ex. rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). A mandatory injunction requires even more on this factor – requiring that "extreme or very serious" damage will result from the denial of injunctive relief.  *Cacchillo*, 638 F.3d at 406.

Revlon waves away this requirement and asks this Court, on the basis of *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984), to "presum[e]" the existence of irreparable harm because of conduct it claims is theft of its trade secrets. Dkt. 51, at 30-31. But the Second Circuit has held Revlon's reading of *FMC Corp.* – as entitling it to a presumption of irreparable harm because it has alleged trade secret misappropriation – is "not correct." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  A plaintiff is not automatically entitled to a preliminary injunction because it makes an allegation of theft of its trade secrets.  *Id.*  A court "cannot rest a finding of irreparable harm solely on past conduct" (*McKenna v. Wright*, 2002 WL 338375, at *4 (S.D.N.Y. Mar. 4, 2002)), and there is no evidence before the Court that GBB now has or has ever had any Revlon trade secret information – let alone that it would ever disseminate such information. *Faiveley*, 559 F.3d at 118 (no irreparable harm where no danger that a misappropriator will disseminate proprietary information); *accord Baker's Aid, a Div. of M. Raubvogel Co. v. Haussmann Foodservice Co.*, 830 F.2d 13, 15-16 (2d Cir. 1987) (affirming denial of preliminary injunction where no showing of irreparable harm other than conclusory statements).

The only harm Revlon can meaningfully articulate over the span of its 35-page Motion and hundreds of pages of supporting exhibits, is failure to secure a renewal of the Britney Brands

contract, which has already occurred and in fact occurred before any alleged breach of trade secrets. (Brondi, ¶__.) Plaintiffs further complain that GBB is *trying* to obtain their confidential information to perform on the Britney Brands contract, but GBB has already represented to Plaintiffs that it is not, in fact, interested in Revlon's confidential information, but rather is moving forward with its own plans to sell Britney Brands fragrances. It is not a legally cognizable harm to compete in the marketplace. *Faiveley*, 559 F.3d at 119, citing *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) (preliminary injunctions must be "narrowly drawn … to avoid unnecessary burdens on lawful commercial activity."). The Complaint omits any factual allegations about loss of other business from the use of confidential information. (Dkt. 1, *passim*.)

More importantly, GBB's transition activities cannot cause Plaintiffs irreparable harm since they cannot assert that they



This absolutely critical license passage clarifies that Britney Brands ███████████ ███████████████████████████████ is therefore within its rights to authorize GBB to act on its behalf to exploit the formulas. GBB violated no intellectual property rights of Revlon.

Furthermore, the agreement between Revlon and ███████████████████████████

██████████████████████████████████



Dkt. 43-16.

     Thus, even if GBB asked ███████ for the Britney Brands formulas – which it did not do and does not need to do (Stella Decl., ¶10) – ████████████████████████████████ ████████ There is no excuse for Plaintiffs' continued misrepresentation to Defendants and this Court about: (1) the scope of Revlon's ████████ rights in the fragrance formula (none); (2) the extent to which the formulas have any value to Plaintiffs when the License Agreement expires in less than four months; and (3) GBB's purported misappropriation of Revlon's confidential information.

     Mere speculation, as Revlon offers, that GBB may one day come into possession of and then, once in possession, choose to disseminate Revlon's information is the kind of rank conjecture that is plainly insufficient to establish that irreparable harm is likely to occur. *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) (no preliminary injunction can issue upon moving party's "imaginative, worst case scenario of the consequences"); *Bijan Designer for Men, Inc. v. Katzman*, 1997 WL 65617, at *7 (S.D.N.Y. Feb. 7, 1997) (denying preliminary injunction and finding no irreparable harm where no evidence beyond conclusory, self-serving statements suggesting use of information threatened "any possibility, let alone an imminent one, of loss of customers or other irreparable harm"); *Mautner v. Hirsch*, 1991 WL 253330, at *2 (S.D.N.Y. Nov. 15, 1991) (denying injunction where "evidence as to irreparable injury [was] scant

at best, amounting to little more than a plea to this Court not to take the 'chance' that plaintiffs may be correct in their generalized assertions that irreparable harm will occur.").

Revlon cannot establish irreparable harm for the additional and independent reason that any injury it claims to have suffered – the ***past*** alleged loss of a licensing relationship – can be remedied by an award of monetary damages. This is because "[i]rreparable injury means injury for which a monetary award cannot be adequate compensation." *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72, (2d Cir. 1979) (vacating injunction because "[c]learly, money would be adequate compensation for loss of … business"). Here, Revlon has already identified the relationship that it alleges to have lost – even if the Court concludes some information mischief occurred when the Individual Defendants departed, Revlon's profit loss, if any, is easily quantifiable and remedied through monetary damages. *Faiveley*, 559 F.3d at 119 (reversing injunction because "the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product…[which] should be fully compensable by money damages"); *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (injunction denied where records would enable calculation of lost profits).

For this reason alone, Revlon's Motion should be denied.

## V.    REVLON IS UNLIKELY TO SUCCEED ON THE MERITS

Revlon's failure "to establish that [it] would suffer irreparable harm in the absence of an injunction" renders it unnecessary to "reach the second portion of the preliminary injunction analysis." *See Jayraj v. Scappini*, 66 F.3d 36, 38-39 (2d Cir. 1995). Even if the Court addresses the merits, it is also the case that Revlon fails on that count as well.

The thrust of all of Revlon's claims is that GBB has misappropriated what Revlon alleges to be trade secrets. A Defend Trade Secrets Act claim requires that Revlon show that "(1) it possessed a trade secret, and the defendant misappropriated the trade secret." New York law

requires that a plaintiff demonstrate that it "possessed a trade secret" and the defendant "used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257 (S.D.N.Y. 2014).

As a threshold matter, the standard Revlon must meet to show a likelihood of success on the merits also is higher because of the mandatory nature of the relief it seeks – here, among other things, the return of documents that it claims belongs to it – and because this relief "cannot be undone even if [GBB] prevails at a trial on the merits" (*Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 150 (2d Cir. 1999)), requiring that Revlon make a "clear or substantial showing" of likelihood of success on the merits." *See Forest City Daly Hous. Inc. v. Town of N. Hempstead*, 175 F. 3d 144, 150 (2d Cir. 1999). And even if the requested injunction is not mandatory, Revlon still must show "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of the claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Lynch v. City of New York*, 589 F. 3d 94, 98 (2d Cir. 2009).

### A.    Revlon Fails To Sufficiently Identify Its Trade Secrets

In an exercise in misdirection, Plaintiffs litter their Motion with conclusory statements about "documents" containing "competitively sensitive information" (*e.g.*, Mot., at 24), but have failed to establish, as a threshold matter, that they own any information that meets the legal definition of a trade secret. Definitionally, trade secrets consist of information that derives "independent economic value" by virtue of its not being generally known or disclosed. 18 U.S.C. § 1839(3). A threshold requirement for a preliminary injunction is thus that a plaintiff identify its trade secrets with specificity, so that its claims of misappropriation may be properly assessed. *See Zirvi v. Flatley*, 433 F. Supp.3d 448, 465 (S.D.N.Y. 2020) ("[d]istrict courts in this circuit routinely

require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated."); *see also Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob., Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022) (similar); *accord Vendavo, Inc. v. Price f(x) AG,* 2018 WL 1456697, at \*4 (N.D. Cal. Mar. 23, 2018) ("[P]laintiff must describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the general boundaries within which the trade secret lies."); *see also Sapir v. Rosen*, 2021 WL 4482277, at \*5 (S.D.N.Y. Sept. 30, 2021) ("Alleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue, does not give rise to a plausible allegation of a trade secret's existence.") (citing *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at \*6 (S.D.N.Y. Jan. 23, 2018).

The Complaint neglects to identify a single discernable and specific trade secret that has been secreted by any Defendants. (Compl., Dkt. 1, *passim*.)  Plaintiffs have not met this standard. The injunction Plaintiffs ask the Court to order provides no guidance as to what Revlon does and does not consider to be its "confidential information" and "trade secrets." *See* Dkt. 42. Plaintiffs allude to unspecified "sensitive confidential and proprietary financial data, inclusive of pricing, sales and royalties, marketing plans and strategy blueprints" (Dkt. 51, at 7) and "highly confidential and proprietary license agreements for Juicy Couture fragrances" (*id.*, at 10), but say nothing more. Plaintiffs rely on documents that include information copied from competitors or disclosed to the market when they were a public company: they are ***not*** trade secrets.  *See, e.g.*, Dkt. 43-9, at 4 (noting Dkt. 43-12, at 3 (providing Revlon Global net sales and P&L); Dkt. 43-14, at 7 (providing banal observation, beside cut and pasted copies of competitor advertisements, that

"90s nostalgia is ruling pop culture whether it's through fashion, music or TikTok trends."); *id.*, at 10 (copying MTV logo). On that misleading basis alone, no injunction should issue.

Further, the Complaint only cites as "trade secrets" broad categories of information "concerning sourcing, manufacture, marketing, distribution and sale of fragrances generally and the Britney Fragrances in particular." (Compl., Dkt. 1, ¶ 3.)  Despite Plaintiff's alleged forensic examination, there is nothing pointing to a specific document.  Plaintiffs claim they treat the terms of their former license with Britney Brands as trade secrets, "inclusive of the License Agreement's expiration date," (Compl. ¶¶ 4, 44) as well as the "financial aspects of the relationship" with Britney Brands, including "sales volume, sales outlets, sales geographies, production and distribution costs and profit margins" (Compl., ¶ 46), and on the manufacturing side, Plaintiffs allege their trade secrets include the identity of "vendors supplying ingredients, fragrances and packing." (Compl. ¶ 47.)

Such treatement does not provide a sufficiently particularized description of ***what*** is a trade secret.  For example, information like the identities of vendors and other third parties in the global fragrance industry are public knowledge and are not proprietary to Revlon.  They are certainly not protectable trade secrets.  *Ruckleshaus v. Monsanto Co.,* 467 U.S. 986, 1002 (1984).  In fact, there is a limited universe of international fragrance manufacturers that are capable of performing high-volume manufacturing of fragrances and perfumes. This includes ████████, whose identity Plaintiffs have bizarrely chosen to redact in their pleadings (obligating counsel to do the same here) as if it were not a well-known fragrance house, whose association with Revlon was disclosed in the bankruptcy proceedings. There are even websites (such as Fragrantica and Olfastory) that name the "nose" (*i.e.*, the master perfumer) that developed each specific fragrance, and the Britney Spears fragrances are mentioned on ████████ website.

Nor is Revlon's geographical information regarding fragrance markets protectable as a trade secret. Where Revlon sells its products is readily apparent – just walk into any drug or department store. Courts in this Circuit regularly reject trade secret claims premised on publicly available market information, even if that information is considered "valuable" to the owner or is the product of considerable effort. *See Art & Cook*, 416 F. Supp. 3d at 196 (collecting cases); *accord Vibraderm, Inc. v. Multiderm, LLC*, 2008 WL 11425397 (N.D. Tex. Mar. 26, 2008).

Plaintiffs do not own the TikTok trademark, they do not own the MTV logo, and there is no proprietary interest in the notion of ████████████████████████████████ ██████████████████████████████ Dkt. 43-14, at 5. It is Plaintiffs who bear the burden of demonstrating that they possess protectable trade secrets, and that requires identifying its trade secrets with some minimal level of specificity. *See e.g., Big Vision*, 1 F. Supp. 3d at 258; *Sit-Up Ltd. v. IAC/Interactive Corp.*, 2008 WL 463884, at *10–12 (S.D.N.Y. Feb. 20, 2008) (dismissing claims under NY law, noting plaintiff bears burden of "describing the alleged trade secret with adequate specificity to inform the defendants what it is alleged to have misappropriated.").

## B.    Revlon Fails to Show Independent Economic Value

Plaintiffs also fail to show independent economic value arising from the information's secrecy. *See* 18 U.S.C. § 1839(3) (defining trade secrets as information that *inter alia* "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.").

To qualify for DTSA protection, information must have independent value *because it is a secret*. Here, Revlon has identified no information with any inherent value, much less value derived from secrecy. The value of the information is tied to its association with Britney Brands and the

Britney Brands marks, and its (expiring) exclusive license to make use of those marks to sell fragrances. That license ends December 31, 2024. Plaintiffs cannot demonstrate a likelihood of success for their DTSA trade secret claim because the secrecy of information about how to make and market Britney Brands fragrances will have no value for Revlon.

### C.    Revlon Has Not Shown Adequate Measures to Protect Secrecy

Even assuming Plaintiffs have demonstrated trade secrets, their misappropriation claim still fails because they have not adequately alleged measures to protect the secrecy of such information. "To succeed on a claim of misappropriation of trade secrets under the DTSA and New York common law, the owner of the trade secret must take reasonable measures to keep the proprietary information secret." *Mason v. Amtrust Fin. Servs., Inc.*, 848 F. App'x 447, 450 (2d Cir. 2021) (summary order); *see also Big Vision*, 1 F.Supp.3d at 267-68 (trade secret plaintiffs must show "substantial measures to protect the secret nature of its information.")

Plaintiffs pay lip service to these requirements by citing slideshows from Revlon employee onboarding materials and "mandatory ethics training." For example, Revlon cites portions of employment agreements of certain of the Individual Defendants, with provisions that "specif[y] that information concerning Revlon's business affairs should be treated as confidential unless it is within the public domain," and that such "Confidential Information" includes *inter alia* "vendor information," "marketing and development plans," "price and cost data," "marketing techniques" and other intangibles such as "future plans and potential strategies." ¶ 50. However, the mere existence of a confidentiality agreement, without more, is insufficient to allege reasonable measures. *See UrthTech v. GOJO Indus.*, 2023 WL 4640995, at *12-13 (S.D.N.Y. July 20, 2023) (dismissing DTSA claim, noting existence of a confidentiality agreement "does not, on its own, suggest the existence of a bona fide trade secrets"); quoting *Elsevier*, 2018 WL 557906, at *6.

Overall, these allegations are insufficient under the DTSA and New York common law; as a result, Plaintiffs cannot demonstrate a reasonable likelihood of success on the merits of these claims. *Turret Labs*, 2022 WL 701161 at *3 ("In the absence of nonconclusory allegations that it took reasonable measures to keep its information secret, [plaintiff] has not plausibly alleged that [defendants] misappropriated a "trade secret" under the DTSA […] [and its] common-law misappropriation claim is inadequately pled for the same reason.") (internal citations omitted).

### D.    Revlon Fails To Show Misappropriation

Perhaps Plaintiffs' most glaring failure is the absence of evidence of misappropriation – **both** by the Individual Defendants and especially by the GBB Defendants. Trade secret claims under New York common law require a showing not only that a trade secret exists, but that Defendant "is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Inspired Cap., LLC v. Conde Nast*, 803 F. App'x 436, 440 (2d Cir. 2020);  *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018) (noting under NY law requirement that Defendant "***used*** th[e] trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means") (citing *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117-118 (2d Cir. 2009). Actual ***use*** of the trade secret is required to state a claim – mere possession of trade secret information is not sufficient under New York law. *See eShares Inc. v. Talton*, --- F. Supp. 3d ---, 2024 WL 3970847 (S.D.N.Y. March 29, 2024).

Revlon utterly fails on this count.  Its forensic expert found that the Individual Defendants did nothing other than *access* Revlon documents that they had access to as part of their employment.  *See* Dkt. 48. Plaintiffs provide no evidence that any Individual Defendant did

anything with any Revlon trade secrets or confidential information to transmit it to GBB – such evidence could not possibly exist, because it did not happen.[2]

Defendants previously offered to undertake a good faith search for any purportedly confidential information and return it. Specifically, Defendants' counsel proposed 1) the "walling off" of GBB employees (including Defendants Kidd, Romeo, Fass, and Mulvihill) to varying degrees, depending on their responsibilities; 2) that counsel for Defendants would, in good faith, undertake a thorough search for any potential Revlon trade secret or confidential information, further agreeing that such information would not be used for any purpose by GBB or any of its employees, and instead that such information would be quarantined, returned to Revlon, or otherwise deleted by means agreed to by the parties that would also ensure its preservation (as applicable) as evidence for use in this litigation; and 3) an agreement that GBB would not obtain or attempt to obtain the formulas or information about the fragrance oil of Britney Brands fragrances as sold by Revlon, while reserving the rights to communicate with fragrance houses to enable GBB to perform its obligations under its license with Britney Brands (which goes into effect January 1, 2025). (Cotter Decl., ¶ 11.).

---

[2] Furthermore, to the extent that any of Revlon's purported trade secrets regarding marketing strategies could simply be recalled from memory by any of the Individual Defendants, there is considerable authority in the Second Circuit that such information would not be protectable as a trade secret. *See Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 558 (E.D.N.Y. 1995), disapproved of on other grounds by *Faiveley*, 559 F.3d 110 (collecting cases and noting that "information concerning customer preferences and ordering patterns could easily be recalled by [Defendant employee] or obtained by contacting those customers directly. Accordingly, that information cannot be deemed a trade secret."); *see also  Walter Karl, Inc. v. Wood*, 137 A.D.2d 22, 28 (2d Dept. 1988) (under NY law, where information sought to be protected consists of customer's needs and desires as recalled by the employee, use of such information will not be enjoined); *Catalogue Serv. of Westchester, Inc. v. Henry*, 107 A.D.2d 783, 784 (2d Dept. 1985) (similar).

Revlon made the inexplicable decision to reject that proposal and to plow forward with its misguided Motions. (Cotter Decl., ¶¶ 7, 12.) But that does not change the fact that Defendants did not and would not use any allegedly pilfered proprietary data, which would not only have given Plaintiffs the primary relief that they seek here, but is further evidence that Plaintiffs cannot support their claims for trade secret misappropriation. For that reason alone, Revlon cannot demonstrate a likelihood of success on the merits of their misappropriation claims.

It is again worth noting that all of the alleged theft of trade secrets upon which Plaintiffs' case and this request for preliminary injunction are based occurred *after* GBB and Britney Brands signed their binding agreement. Plaintiffs do not make a single allegation about any theft, let alone use, of trade secrets until May 3, 2024, four days after GBB signed an agreement with Britney Brands. There are no other factual allegations about the use of Plaintiffs' confidential information. Rather, the allegations describe information Plaintiffs think – mostly pled on information and belief and rooted in rumor and speculation – that GBB is trying to obtain. That is not enough to demonstrate a likelihood of success on the merits.

### E.    Revlon Fails To Show Likelihood of Success On Its Remaining Claims

Revlon also overreaches on the breach of contract claims against the Individual Defendants, claims which they mostly ignore in the instant Motion. Revlon provided copies of employee manuals and signatures from Individual Defendants acknowledging their agreement to Revlon's confidentiality provisions and little else. But Revlon failed to allege facts supporting an actual breach of any of those provisions, and for that reason it has not demonstrated a likelihood of success on the merits with respect to those claims.

Revlon must show that the Individual Defendants are using confidential information to compete, in breach of their contracts. But they have asserted no facts regarding whether or how any Individual Defendant has used confidential information to compete – other than as relates to

the Britney Brands agreement. GBB has already represented to Plaintiffs that two of the four employees are not even working on Britney Brands, and further that none of the Defendants will make use of any confidential information. If Plaintiffs had wanted to prevent their employees from competing with them at all, they could have paid them for non-compete agreements. But they did not do that – they only bargained that the employees would not use *confidential information* to compete, and they have alleged no facts suggesting that any of them have done so.

### F.    The Remaining Factors Do Not Favor A Preliminary Injunction

Where "sufficiently serious questions" are raised "going to the merits of [a moving party's] claims," a moving party must also show "a balance of the hardships tipping decidedly in favor" of an injunction and that "a preliminary injunction is in the public interest." *Cuomo*, 645 F.3d at 164. These factors alone can be sufficient grounds for denial.

For instance, Revlon's request that an injunction issue compelling the identification and return of unspecified information that it deems to be confidential – buttressed by the demand for forensic inspection in its equally meritless Motion for expedited discovery – is exactly the kind of unjustified relief that tips the balance of hardships heavily toward GBB. That Revlon purports to "assert[] a trade secrets claim does not give it free reign [sic] to examine all of [GBB's] electronic devices." *FCA US LLC v. Bullock*, 329 F.R.D. 563, 568 (E.D. Mich. 2019); *accord Uddin v. O'Brien Res. Holding Co., LLC*, 2017 WL 11674895, at *2 (S.D.N.Y. Aug. 23, 2017) (collecting cases holding that electronic inspection requests "granted only under limited circumstances" such as "when there is reason to believe that a litigant has tampered with the computer or hidden relevant materials despite demand for them in the course of the lawsuit").

Nor is the public interest served by an injunction that would, as here, effectively serve Revlon's real, entirely vindictive and anticompetitive aim of thwarting Ms. Spears' decision to hire GBB to safeguard her brand and, by making it impossible for GBB to manufacture fragrance,

keeping the option for the public to buy Britney Spears-branded fragrances off of the market so long as Revlon is not the distributor. *See Baracuda Intern. Corp. v. F.N.D. Enterprises, Inc.*, 1982 WL 436, at *2 (S.D. Fl. May 19, 1982) (where injunction would "deprive the public of at least one choice," injunction properly denied as against public interest).

### G.    There Is No Justification For Less Than A $5,000,000 Bond

There is no basis for Revlon's request that an injunction issue without a bond.  Contrary to Plaintiffs' conclusory statements, it is *Defendants* who will be harmed in the event a bond does not issue in ***at least*** the amount of the damage that will result if an injunction is granted: here, more than $5,000,000. (Brondi Decl., ¶¶ 21-23.) In this case, an injunction serves no public interest, only Revlon's anti-competitive purposes. Revlon has alternative means to protect its interests, including the confidentiality provisions in its contracts with third parties, and GBB's proposal, which it rejected. An injunction here would merely prevent GBB from doing business, delay the delivery of Britney Brands products to market in 2025, and generally chill the business of licensors and licensees when they want to transition their business.

## VI.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court (1) deny Plaintiffs' Motion for a preliminary injunction; or in the alternative (2) require a bond of at least $5,000,000 before any grand of injunctive relief.

Dated:       New York, New York
             September 20, 2024

                                        Respectfully submitted,

                                        K&L GATES LLP

                                        By: /s/ Ronie M Schmelz
                                        Ronie M. Schmelz
                                        John J. Cotter
                                        Ryan Q. Keech (*pro hac vice forthcoming*)

                                        10100 Santa Monica Blvd., 8th Floor
                                        Los Angeles, California 90067
                                        Telephone: (310) 552-5000
                                        Email: ronie.schmelz@klgates.com
                                        ryan.keech@klgates.com

                                        1 Congress Street, Suite 2900
                                        Boston, MA 02114
                                        Telephone: (617) 261-3100
                                        Email: john.cotter@klgates.com

                                        *Counsel for Defendants*