UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REVLON CONSUMER PRODUCTS LLC and ELIZABETH ARDEN, INC.<br><br>                        Plaintiffs,<br><br>    -against-<br><br>GIVE BACK BEAUTY S.A., et al.,<br><br>                        Defendants. | Case No. 1:24-cv-06438-ER-RWL |

       I, Vanessa Kidd, under penalty of perjury, hereby declare as follows:

       1.      I am over the age of 18 years of age and competent to testify. I submit this Declaration in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction and Defendants' Opposition to Plaintiffs' Motion for Expedited Discovery. I have personal knowledge of the subject matter set forth herein.

       2.      I was employed by Elizabeth Arden in the fragrance department from August 2012 until Revlon acquired Elizabeth Arden in September 2016. I then worked at Revlon as Senior Vice President, Global Marketing for the Fragrance Portfolio until I resigned on April 9, 2024 and my last day at Revlon was May 3, 2024. I was responsible for managing Revlon's fragrance portfolio, including marketing plans and advertising creative development, brand strategy, licensor relationship management and new product development.

       3.      As part of that role, I oversaw the Britney Brands.

       4.      While I attended meetings between Revlon and Britney Brands regarding the negotiation of the license agreement, Marni Shepard, the Global Vice President Talent Partnerships at Revlon, handled the negotiations and the back-and-forth with Britney Brands and its agents.

1

5. I understand that Revlon challenges why I accessed financial compensation information of Revlon employees on February 16, 2024. I accessed this information to prepare for performance reviews and determine salary raises and bonuses for my direct reports—as was required in my role as Senior Vice President. I had no knowledge of the job opportunity at Give Back Beauty ("GBB") until after March 15, 2024.

Future at Revlon Becomes Uncertain



9. The following day, I met with the members of the fragrance team, which I supervised. The team included Dominick Romeo, Ashley Fass, and Reid Mulvihill.

Give Back Beauty Interview Process

9. On March 11, 2024, True Search, a recruitment firm, sent me a direct message through LinkedIn. I responded to the message on March 13, 2024, and we set up a call.

10. On March 15, 2024, I had an initial call with two recruiters at True Search, who shared information about a company who may be interested in hiring me. I learned the company involved in the search was GBB. The recruiters said they could not share additional information until I signed a Non-Disclosure Agreement ("NDA"). I signed the NDA in the days after that call.

11. I was intrigued by the position at GBB because it would allow me the opportunity to work on fragrances with a global focus, work on the ▇▇▇▇▇▇▇▇ brand, help drive strategy and the growth of GBB, and lead the Lifestyle Division.

12. On March 21, 2024, I had my first meeting with Corrado Brondi and two other executives from GBB.

13. After the meeting, True Search informed me that GBB was interested in moving forward with my candidacy, and on March 29, 2024, I met with additional GBB executives. On April 1, 2024, I had my final interview, with Patrizio Stella.

14. On April 4, 2024, GBB sent me a draft offer letter for the role of CEO of the Lifestyle Division. Over the next few days, we negotiated my offer. On April 8, 2024, I signed a revised offer.

15. On April 9, 2024, I submitted my resignation to Revlon, effective May 3, 2024.

16. On April 11, 2024, GBB sent me the offer with its signature.

17. During my interview and hiring process with GBB, I was unaware that GBB was negotiating a deal with Britney Brands. I had no involvement in negotiating the GBB deal with Britney Brands.

18. On April 30, 2024, Mr. Brondi informed me that GBB had entered into a deal with Britney Brands. I congratulated him but did not otherwise discuss the deal. I informed Mr. Brondi that I could not discuss anything related to the Britney Brands license.

<u>My Efforts to Ensure a Smooth Transition from Revlon</u>

19. After my resignation notice, I continued to attend the meetings between Revlon and Britney Brands, but just as before, I was not the one who handled negotiations.

20. On April 16, 2024, Ms. Shepard sent me a text message that stated that ▮▮▮ from Britney Brands, knew I was leaving Revlon.

21. Ms. Shepard and I then met in person and Ms. Shepard reiterated that ▮▮▮ knew I was leaving Revlon. I informed Ms. Shepard that I had not wanted to share GBB's name or the information regarding the new role because I had signed an NDA. I told her I had not told anyone where I was going. Ms. Shepard responded that the company I was going to had informed ▮▮▮ of my employment.

22. I understand that Ms. Shepard claims that she ran into me in the hallway and that I "turned pale" when she informed me that ▮▮▮ knew I was leaving. Ms. Shepard had already informed me of this via text message, so I was not shocked when she reiterated this in person.

23. Shortly after this, I attended a meeting with ▮▮▮. As Ms. Shepard had asked, I informed ▮▮▮ that I would be leaving Britney Brands in good hands with Revlon, and especially with Mr. Romeo who already managed the relationship.

24. At the time, I was unaware that Mr. Mulvihill, Ms. Fass, and Mr. Romeo were applying to GBB.

25. I was not informed that GBB had made a deal with Britney Brands until April 30, 2024. Even at that time, I had no actual knowledge that Britney Brands had signed an agreement with GBB. On or about May 1, 2024, a member of the Britney Brands team at CAA, ▮▮▮ said something to the effect that Britney Brands could not make a commitment to Revlon. During the meeting, Ms. Shepard mentioned to ▮▮▮ that I would be leaving Revlon. ▮

4

███ asked me where I was going. I said I could not tell him. I do not recall saying anything else during this meeting.

Final Day at Revlon and My Efforts to Protect Revlon's Sensitive Information

26. Prior to leaving Revlon, I downloaded my Revlon employment agreements and a screenshot acknowledging my signature of a revised agreement.

27. I understand that Revlon claims I accessed and printed, photographed, videoed, or transferred electronic files after work hours on May 3, 2024. I did not print, photograph, or video any documents, nor did I transfer any documents to an external site.

28. To the contrary, I accessed these files to protect Revlon's confidential information.

29. During my employment at Revlon, for convenience, I often worked with documents saved on my desktop rather than accessing those documents via Revlon's network files because Revlon's system was cumbersome and time consuming to use. The desktop allowed me for immediate access to the files, and I would at times clean my desktop and upload a complete copy of my desktop files to the network.

30. Because of my role as Senior Vice President, these local files included sensitive and confidential information of Revlon. I was concerned that if Revlon provided my laptop to another employee to use, that employee would be able to access those confidential documents on my desktop.

31. I uploaded all of my locally saved documents to Revlon's network. I then deleted all of the files from my desktop. I did not transfer any of the files externally.

32. I understand that Revlon claims I cleared my web browser history prior to leaving to cover for having transferred files externally. This is incorrect.

33. During my employment at Revlon, I regularly cleared my history to remove personal information because I sometimes used my browser for personal banking and non-work family matters.

<u>GBB's Hiring of the Other Former Revlon Employees</u>

34. During the hiring process, I informed GBB that I had signed a non-solicitation agreement at Revlon.

35. I also informed my Revlon team, including Mr. Romeo, Mr. Mulvihill, and Ms. Fass, that I had a non-solicitation agreement and could not assist any of them with moving to my new employer. Almost everyone I informed that I was leaving Revlon said something to the effect of, "please take me with you," "I am also looking," or "you are so lucky to get out."

36. I did not solicit Mr. Romeo, Mr. Mulvihill, or Ms. Fass at any point to join GBB.

<u>Beginning Employment at Give Back Beauty</u>

37. I am currently the CEO of GBB's Lifestyle Division. I began working at GBB on May 13, 2024. My responsibilities include managing various brands, including ████████ ██ ███████████, and Britney Brands.

38. My responsibilities with regard to Britney Brands include preparing future development plans so that on January 1, 2025, when the licensing agreement takes effect, GBB will be ready to begin production. When I began working on Britney Brands, I told GBB that I preferred not to be involved with the brand suppliers and have not been involved in making arrangements with them on behalf of Britney Brands.

39. I did not take any Revlon trade secrets or confidential information or proprietary documents, in any format, from Revlon. I have never used any of Revlon's trade secrets or

confidential information while at GBB, and I have never provided anyone at GBB with Revlon's trade secrets or confidential information.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration is executed in New York, New York on this 20th day of September 2024.

By: *Vanessa Kidd*
—77741595FFFF456
Vanessa Kidd