**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

REVLON CONSUMER PRODUCTS LLC and
ELIZABETH ARDEN, INC.

                              Plaintiffs,

      -against-

GIVE BACK BEAUTY S.A., et al.,

                              Defendants.

Case No. 1:24-cv-06438-ER-RWL

**EVIDENTIARY OBJECTIONS IN OPPOSITION TO PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

1

Defendants Give Back Beauty S.A., Give Back Beauty LLC, Give Back Beauty Americas LLC, Give Back Beauty International LLC and Give Back Beauty Holding LTD., Vanessa Kidd, Dominick Romeo, Ashley Fass, and Reid Mulvihill (collectively, "Defendants"), by and through undersigned counsel K&L Gates LLP hereby submit the following evidentiary objections in opposition to Plaintiffs' Motion for a Preliminary Injunction and Plaintiffs' Motion for Expedited Discovery.

## DEFENDANTS' EVIDENTIARY OBJECTIONS

| | Evidence | Objection |
|---|---|---|
| | **Declaration of Will Cornock** | |
| 1. | "13. Revlon has developed a significant trove of confidential and proprietary information concerning its fragrance business. That information includes but is not limited to its (i) detailed business plans for the fragrance business on an annual and on an ongoing basis; (ii) contracts with licensors, suppliers and distributors for each fragrance; (iii) financial statements, including profit and loss statements, for each line and for the fragrance business as a whole; (iv) financial constructs and models for each line and for the fragrance business as a whole; (v) manufacturing resources for each line and for the fragrance | Argumentative (Fed. R. Evid. 403), Irrelevant (Fed. R. Evid. 401, 402), Improper legal conclusion (Fed. R. Evid. 602). |

| | | |
|---|---|---|
| | business as a whole; (vi) packaging vendors for each line and for the fragrance business as a whole; (vii) marketing plans for each line and for the fragrance business as a whole; and (viii) distribution plans for each line and for the fragrance business as a whole." Cornock Decl. ¶ 13. | |
| 2. | "14. Revlon invests substantial resources into creating and developing this confidential and proprietary information. For example, Revlon's fragrance business employees are compensated to devote their time to Revlon's strategic game plans, creating marketing strategies, cultivating relationships, performing market research, engaging in financial modeling, tracking income and expenses, and managing supply chain and distribution in order to control costs and maximize sales. Revlon has contracts with suppliers that reflect its market position and negotiating power. It invests time and effort into negotiating those contracts, and keeps those contracts, with its proprietary pricing | Argumentative (Fed. R. Evid. 403), Irrelevant in that there is no allegation that Defendants misappropriated any "confidential and proprietary and information" related to these items or that these items otherwise qualify as trade secrets, which Revlon has not identified. (Fed. R. Evid. 401, 402). |

| | | |
|---|---|---|
| | structures, confidential. Revlon has relationships with licensors for fragrances. With the benefit of those licenses, the terms of which are confidential, Revlon creates fragrance products, brands those products, markets the products, and creates a demand for the products, inventing successful fragrance brands virtually from scratch. The way that Revlon goes about its work in the fragrance field represents its valuable intellectual property." Cornock Decl. ¶ 14. | |
| 3. | "15. Revlon's confidential and proprietary information derives independent economic value from not being generally known, nor available, to its competitors. There is a great deal of competition in the fragrance business. Each company's business plans, marketing strategy, financial constructs and contractual relationships are held close to the vest. Those materials are the crown jewels." Cornock Decl. ¶ 15. | Argumentative (Fed. R. Evid. 403), Improper legal conclusion (Fed. R. Evid. 602). States other items as purported trade secrets, amounts to a conclusory recitation of an element of misappropriation of trade secrets. |
| 4. | "16. I was provided with a collection of files located on Revlon's systems by Revlon | Lacks foundation and personal knowledge (Fed. R. Evid. 701), Vague |

| | | |
|---|---|---|
| | Information Technology ("IT") personnel that we understand from a forensic computer analysis that Vanessa Kidd accessed after the close of business on her last day at Revlon. Those files contain proprietary and confidential information that is valuable to Revlon's fragrance business. They include presentations to the Board of Directors, as well as presentations to me and to Revlon's Chief Executive Officer, Elizabeth (Liz) Smith. These documents concern fragrance business strategy, key financial details, licensing relationships, royalty payments and profit and loss reports." Cornock Decl. ¶ 16. | and ambiguous (Fed. R. Evid. 403). Mr. Cornock does not explain how he has personal knowledge of the results of the forensic computer analysis. Mr. Cornock states that "we understand for a forensic computer analysis," but it is unclear on whose behalf he is speaking and whether he has the foundation to do so. |
| 5. | "18. I am informed that a forensic computer analysis has uncovered that Ashley Fass transferred file folders from Revlon's servers to an external hard drive that was attached to her Revlon computer. Revlon's IT personnel located an electronic file folder on Revlon's systems that matches the name of one of the folders on that external hard drive. That folder titled "REVLON\Contracts" contains | Lacks foundation and personal knowledge (Fed. R. Evid. 701), Inadmissible hearsay (Fed. R. Evid. 801, 802), Best evidence rule (Fed. R. Evid. 1002). Mr. Cornock does not explain how he has personal knowledge of the results of the forensic computer analysis. |

| | | |
|---|---|---|
| | Revlon's highly confidential and proprietary license agreements for the Juicy Couture fragrances. These license agreements are extremely valuable to Revlon. Ms. Fass had no legitimate reason whatsoever to take copies of the agreements." Cornock Decl. ¶ 18. | |
| 6. | "20. Revlon's proprietary contracts contain confidentiality provisions. Revlon's licensing agreement with Britney Brands, the licensing entity for Britney Spears, for example, contains a confidentiality provision that prohibits disclosure of its terms to third parties. Revlon has similar agreements for its other licensed and endorsed fragrance lines. Revlon's proprietary contract with the fragrance house ████, which manufactures fragrances, likewise contains confidentiality provisions. A copy of the ████ agreement is attached hereto as Exhibit 13. ████████ ████████ ████████ | Mischaracterizes evidence, Best evidence rule (Fed. R. Evid. 1002). Plaintiffs misstate and mischaracterize the terms of the agreement with the fragrance house. |



Cornock Decl. ¶ 20.

| 7. | "22. In addition, Revlon asks its employees to subscribe to written employment agreements. Those employment agreements reiterate their confidentiality obligations and prohibit employees from retaining confidential information upon termination of employment. A copy of Vanessa Kidd's employment agreement is attached hereto as Exhibit 16. A copy of Ashley Fass's employment agreement is attached hereto as Exhibit 17. A copy of Dominick Romeo's employment agreement is attached hereto as Exhibit 18. Among other things, those employment agreements prohibit the employees from using Revlon's confidential information to compete with Revlon. The employment agreements also prohibit the employees from soliciting | Mischaracterizes evidence, Best evidence rule (Fed. R. Evid. 1002). Plaintiffs misstate and mischaracterize the terms of the employment agreements. |
|----|----|----|

| | | |
|---|---|---|
| | Revlon's business partners to terminate their business relationships with Revlon." Cornock Decl. ¶ 22. | |
| 8. | "32. Pursuant to the License Agreement, in the Additional Terms and Conditions addendum, Section 1(c), ███████ ████████████████████████ ████████████████████████ ████████████████████████ ██████████ Cornock Decl. ¶ 32. | Mischaracterizes evidence, Best evidence rule (Fed. R. Evid. 1002). Plaintiffs misstate and mischaracterize the terms of the agreement with the fragrance house. |
| 9. | "33. There are no ████████████ in the License Agreement that would permit ████ ████████████████████████ ████████████████████████ ██████████████ Cornock Decl. ¶ 33. | Mischaracterizes evidence, Improper legal conclusion (Fed. R. Evid. 602), Best evidence rule (Fed. R. Evid. 1002). Plaintiffs misstate and mischaracterize the terms of the agreement with the fragrance house and any obligations on new licensees thereunder. There is nothing in the license agreement prohibiting GBB from preparing so that GBB and its suppliers will be ready to begin manufacturing when GBB's license |

| | | ███ with Britney Brands takes effect. |
|---|---|---|
| 10. | "34. On June 24, 2024, Britney Brands sent a "Letter of Appointment" to the ███ fragrance house. That letter introduced Give Back Beauty SA, a company incorporated under the laws of Switzerland, as the new exclusive fragrance licensee for Britney Brands, pursuant to a worldwide licensing agreement effective as of January 1, 2025. A copy of the Letter of Appointment is attached hereto as Exhibit 22. The letter is generically addressed "To whom it may concern." Through this letter, Give Back Beauty sought to start taking action with Revlon's suppliers "before the start date of [its] licensing agreement" to transition the Britney Brands fragrance business. Based on the generic nature of the letter, it appears that the letter was sent out to numerous Revlon suppliers." Cornock Decl. ¶ 34. | Mischaracterizes evidence, Argumentative (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701), Best evidence rule (Fed. R. Evid. 1002), Improper opinion to the extent it calls for expert testimony (Fed. R. Evid. 701, 702), Improper legal conclusion (Fed. R. Evid. 602). GBB has not sought to take any impermissible action, and in fact, acted in accordance with Revlon's agreement with the fragrance house. Moreover, Mr. Cornock impermissibly speculates, with no basis, that the letter was sent out to numerous Revlon suppliers. |

| 11. | "35. ███████ asked Revlon in July 2024 if it might ████████████████████ ████████ with Give Back Beauty. Revlon reminded ████████ of its confidentiality obligations, and refused to allow ████████ to share its confidential information." Cornock Decl. ¶ 35. | Inadmissible hearsay not subject to any exception (Fed. R. Evid. 801, 802). |
| 12. | "36. In August 2024, ████████ asked Revlon again if it might share confidential and proprietary information with Give Back Beauty. The reasonable inference from this repeat request is that Give Back Beauty is pressuring ████████ to provide it with Revlon's confidential and proprietary information. In the most recent request, ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ In response, Revlon reiterated that ████████ may not share its confidential and proprietary | Inadmissible hearsay (Fed. R. Evid. 801, 802), Argumentative (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). Mr. Cornock lacks foundation and personal knowledge to speculate as to GBB's actions. Indeed, a "reasonable inference" is improper in a declaration. |

| | | |
|---|---|---|
| | information with Give Back Beauty." Cornock Decl. ¶ 36. | |
| 13. | "37. Revlon has learned through its salesforce that Give Back Beauty is contacting Revlon's retailer customers for the Britney Spears fragrance products, both in the United States and internationally. Give Back Beauty has claimed to these customers that it will have fresh product available to sell to them as of January 1, 2025. Notably, GBB has no right ██ ████ █ ████ █ ████ ████ ██████████████ ██████████████ ██████████████ ████████████ Cornock Decl. ¶ 37. | Argumentative (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). Mr. Cornock lacks personal knowledge as to GBB's purported actions. Improper opinion to the extent it calls for expert testimony (Fed. R. Evid. 701, 702), Improper legal conclusion to the extent Mr. Cornock attempts to attests as to what GBB's rights and obligations are pursuant to an agreement (Fed. R. Evid. 602). |
| 14. Declaration of Marni Shepard | | |
| 15. | "4. The Britney Brands relationship is extremely valuable to Revlon. The fragrances are very popular in certain markets. It is an account worth tens of millions of dollars. Because of the importance of the relationship, we made outreach to the Britney Brands team | Inadmissible hearsay (Fed. R. Evid. 801, 802). |

| | | |
|---|---|---|
| | in 2023 for purposes of communicating that Revlon was eager to extend the parties' licensing agreement. We wanted to get a head start on negotiating the specific terms for an extension." Shepard Decl. ¶ 4. | |
| 16. | "9. On April 5, 2024, I had a telephone conversation with ████ He relayed to me in that conversation that questions had been raised by someone from associated with Britney Brands and that he had heard, among other things, that Revlon was considering a transaction with Give Back Beauty ("GBB") - either acquiring GBB or selling to GBB - that would potentially negatively impact his client. ████ asked me about the accuracy of that information and whether Revlon was having any such discussions with GBB, telling me that this person told him that GBB was not a particularly good look for Britney Brands and that they would have real concerns if Revlon were considering a transaction with GBB concerning the Elizabeth Arden fragrance business. ████ | Inadmissible hearsay (Fed. R. Evid. 801, 802). |

| | | |
|---|---|---|
| | did not provide the source of his information." Shepard Decl. ¶ 9. | |
| 17. | "10. I promptly took ███████ concerns to Revlon's Chief Marketing Officer, Martine Williamson. She informed me that she had not heard anything about this and that she would check with Will Cornock to confirm. Within the hour she confirmed with Cornock that none of this information about Revlon transacting with GBB or selling the fragrance business was accurate. I immediately contacted ██████ to assure him that Revlon was not considering a transaction with GBB or transferring or discontinuing the fragrance business. I reaffirmed to ██████ that Revlon was fully committed to the fragrance business on a going-forward basis, that fragrance is a priority for Revlon and that Revlon is investing in the fragrance business." Shepard Decl. ¶ 10. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 18. | "11. On April 15, Kidd told me during a phone call that she had tendered her resignation. She informed me that her new job opportunity had | |

| | | |
|---|---|---|
| | moved very quickly, over the course of only a few weeks. She did not tell me where she was going." Shepard Decl. ¶ 11. | |
| 19. | "12. On April 16, 2024, ███ again reached out to me directly. He told me in that conversation that he had been informed that GBB was supposedly taking the head of Revlon's fragrance business – Vanessa Kidd – and the core Revlon fragrance team." Shepard Decl. ¶ 12. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 20. | "13. After my call with ███ I ran into Kidd in the office hallway. I told Kidd that ███ knew that Kidd was going to GBB. Kidd turned pale. She stared at me in apparent shock. She said, "How? They made me sign an NDA." I understood Kidd's statement to convey that she had signed a non-disclosure agreement with GBB that prohibited her from disclosing the identity of her new employer." Shepard Decl. ¶ 13. | Mischaracterizes evidence in that Ms. Kidd signed an NDA with True Search, a recruitment firm, and not GBB. Similarly lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 21. | "14. At this time, in mid-April 2024, it was my understanding that the extension with Britney Brands was virtually complete. I had | Ms. Shepard's subjective understanding regarding the status of the extension is irrelevant to the issues |

| | | |
|---|---|---|
| | no concerns about Kidd continuing to participate in the final stage of the negotiations over the contract language. It was standard operating procedure at Revlon for employees to continue to work on their pending projects until their final departure dates." Shepard Decl. ¶ 14. | before the Court (Fed. R. Evid. 401, 402). |
| 22. | "17. From my perspective, I thought that the call had gone well and things were moving in the right direction. ███ at CAA wrote an encouraging note following the call. He said: "Let's get this done everyone."" Shepard Decl. ¶ 17. | Ms. Shepard's subjective understanding regarding the status of the extension is irrelevant to the issues before the Court (Fed. R. Evid. 401, 402). Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 23. | "18. The next day, on April 18, 2024, CAA's ███ distributed an updated version of the written amendment. ███ wrote, "Please let us know if any questions or comments remain. If not, we can circulate for signature."" Shepard Decl. ¶ 18. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 24. | "19. On April 23, 2024, we informed the Britney Brands team that Revlon fully accepted the written amendment that ███ had circulated on April 18, 2024. I was out of | Inadmissible hearsay (Fed. R. Evid. 801, 802). |

| | | |
|---|---|---|
| | the office that day. In my absence, in order to avoid any delay, my colleague Isabelle Andre sent the email message to Britney Brands. She wrote: "We are circulating the attached clean version for signature on our end and will send through for countersignature as soon as possible."" Shepard Decl. ¶ 19. | |
| 25. | "20. On April 24, 2024, Andre circulated a signed copy of the written amendment, which was executed on behalf of Elizabeth Arden by Revlon's Chief Financial Officer. Andre asked that the Britney Brands team "Please have Britney sign and send back to us."" Shepard Decl. ¶ 20. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 26. | "21. As of April 24, 2024, we considered the extension completed. Elizabeth Arden had signed on the dotted line, agreeing to the writing that the Britney Brands team had circulated on April 18." Shepard Decl. ¶ 21. | Ms. Shepard's subjective understanding regarding the status of the extension is irrelevant to the issues before the Court (Fed. R. Evid. 401, 402), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). |

| 27. | "22. On April 26, 2024, ███ acknowledged receipt of the signed agreement." Shepard Decl. ¶ 22. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
|---|---|---|
| 28. | "23. However, ███ communicated that their client "does not want to proceed on the proposed terms." ███ asked to schedule a call." Shepard Decl. ¶ 23. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 29. | "24. At Revlon, we were shocked at this turn of events. The Britney Brands business team had represented that they had authorization and approval from their client on all terms. They had sent us a writing that was ready for signature, and Revlon executed that writing." Shepard Decl. ¶ 24. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 30. | "25. ███ did not identify any issues with the contract they had sent on April 18 and that we had signed on April 24, 2024. We assumed that the delay must be due to Ms. Spears being focused on other matters. We expected that the contract would be signed, in time, when Ms. Spears was ready." Shepard Decl. ¶ 25. | Irrelevant (Fed. R. Evid. 401, 402), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). |
| 31. | "26. I attempted to get on the phone with the Britney Brands team immediately. They | Argumentative regarding the suggestion that Britney Brands |

| | | |
|---|---|---|
| | delayed scheduling a call." Shepard Decl. ¶ 26. | purposefully delayed scheduling a call (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation as to the same (Fed. R. Evid. 701). |
| 32. | "27. On May 1, 2024, we finally spoke with ███ ████ informed us that Britney Brands was not in a position to make a commitment at that time. During the discussion, ████ repeatedly expressed concerns about Revlon's stability in the fragrance business. I was very surprised to hear those concerns at such a late date. I reiterated that Revlon is fully committed to the fragrance business." Shepard Decl. ¶ 27. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 33. | "29. On May 8, 2024, ████ sent us an email stating, "Britney has made the decision not to extend the licensing deal with Revlon beyond its current term."" Shepard Decl. ¶ 29. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |
| 34. | "30.  Notwithstanding this message, I continued to communicate with the Britney Brands team. I asked whether there were any new deal points that they wanted, but they raised no new requests. At this time, I still | Inadmissible hearsay (Fed. R. Evid. 801, 802). |

| | | |
|---|---|---|
| | hoped that there was an opportunity for Britney Spears to sign the written extension, once she had an opportunity to focus on the matter and let recent current events pass." Shepard Decl. ¶ 30. | |
| 35. | "31. I am informed and believe that Dominick Romeo tendered his resignation on May 9, 2024. Only a few weeks prior, when I asked Kidd to reassure ███ about the Revlon relationship during our April 17, 2024 videoconference, she had stated to ███ that Britney Brands would continue to be in good hands with Dominick at Revlon. I subsequently learned that Dominick Romeo followed Kidd to GBB." Shepard Decl. ¶ 31. | Mischaracterizes evidence, Argumentative (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). Ms. Shepard lacks personal knowledge to speculate that Mr. Romeo "followed Kidd" to GBB. In fact, Mr. Romeo was not aware that Ms. Kidd left to work at GBB until Mr. Romeo received his GBB offer letter. Declaration of Dominick Romeo, ¶ 5. |
| 36. | "32. On May 30, 2024, ███ sent me an email message stating: "Britney has closed a licensing agreement with another partner in the beauty and fragrance space that takes effect January 1, 2025."" Shepard Decl. ¶ 32. | Inadmissible hearsay (Fed. R. Evid. 801, 802). |

| 37. | "33. I spoke on the telephone with ▉▉▉ that afternoon after receiving his email message. In that conversation, ▉▉▉ questioned the stability of Revlon's fragrance business after recent reorganizations and told me, among other things, that Britney Brands was influenced to end the relationship with Revlon by the departure of Revlon's entire fragrance team, immediately on the heels of Kidd's departure. He did not tell me the name of the new partner." Shepard Decl. ¶ 33. | Mischaracterizes evidence, Inadmissible hearsay (Fed. R. Evid. 801, 802). |
|---|---|---|
| 38. | "34. I learned in late June 2024 that Romeo, Ashley Fass and Reid Mulvihill, all of whom had worked on the fragrance team at Revlon and reported to Kidd, had been hired by and were working at GBB." Shepard Decl. ¶ 34. | |
| **Declaration of J. Christopher Racich** | | |
| 39. | "9. On February 16, 2024 between 1:08 and 1:10 pm, eastern standard time, the Kidd Computer user downloaded what appears to be compensation files for the other three Revlon Employees from the | Mischaracterizes evidence in that Ms. Kidd accessed compensation files for all Revlon employees on her team, not just the three Revlon Employees. *See* Declaration of Vanessa Kidd, ¶ 5. |

| | | |
|---|---|---|
| | revlon.harvestcm.corn website." Racich Decl. ¶ 9. | |
| 40. | "11. Between May 3, 2024 at 9:45 pm and May 4, 2024 at 12:15 am, the Kidd Computer user accessed at least 259 electronic files and folders on both the Revlon network and the local computer's hard drive. The access to these files and folders is consistent with the user printing files on a network printer. The forensic data shows that the files were opened using the Kidd Computer. Those files could have been photographed while open on the computer screen. In my experience, users have taken pictures of individual files, taken videos of all files being reviewed or taken notes about the information being reviewed. The list of these opened files and folders can be found in the Kidd Spreadsheet, Exhibit C, tab Jump Lists, lines 2-260. With the exception of the files and folders on the C drive, these files and folder do not exist on the Kidd Computer, but I was able to find artifacts with the file and folder names. These files and | Irrelevant (Fed. R. Evid. 401, 402), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701), Improper expert opinion that is not based on sufficient facts or data and does not reflect an application of reliable principles and methods to the facts of the case (Fed. R. Evid. 702). Mr. Racich suggests, *without any evidence*, that Ms. Kidd printed, photographed, videotaped, and/or transferred files that she accessed. Whether or not Mr. Racich's experience is that users have taken photos or videos of files is irrelevant and entirely speculative as to what actually occurred. This "expert opinion" is not based on reliable principles or methods. |

| | | |
|---|---|---|
| | folders could have been transferred to a different site with a file transfer. While the documents opened from the Revlon network may never have been saved on a local computer, the Kidd Computer Jump List entries saves the file names and paths of documents that were opened." Racich Decl. ¶ 11. | |
| 41. | "12. On May 4, 2024 at 12:28 am, the Kidd Computer user went to the settings of Microsoft Edge and accessed the Clear Browsing Data section, See Exhibit C, tab Edge Chromium Current, Records 2-3 & Edge Chromium Last Tabs, Records 21-22. While there is some browsing data available for Microsoft Edge, due to the fact that recent browser cached data is not as prevalent as would be expected given the identified use of the Kidd Computer, it is consistent with the user clearing the web browsing history at this time. This activity has the potential to remove evidence of the Kidd Computer user moving | Lacks foundation and personal knowledge, speculation as to Ms. Kidd's actions (Fed. R. Evid. 701). Improper expert opinion that is not based on sufficient facts or data and does not reflect an application of reliable principles and methods to the facts of the case (Fed. R. Evid. 702). |

| | | |
|---|---|---|
| | files to Google Drive or any other cloud system." Racich Decl. ¶ 12. | |
| 42. | 13. On May 4, 2024 at 12:31 am, the Kidd Computer user went to the settings of Google Chrome and accessed the Clear Browsing Data section. See Exhibit C, tab Chrome Current Session, Records 4-5. While there is some browsing data available for Google Chrome, due to the fact that recent browser cached data is not as prevalent as would be expected, it is consistent with the user clearing the web browsing history at this time. This activity has the potential to remove evidence of the Kidd Computer user moving files to Google Drive or any other cloud system." Racich Decl. ¶ 13. | Lacks foundation and personal knowledge, speculation as to Ms. Kidd's actions (Fed. R. Evid. 701). Improper expert opinion that is not based on sufficient facts or data and does not reflect an application of reliable principles and methods to the facts of the case (Fed. R. Evid. 702). |
| 43. | "15. During these times that the Toshiba Hard Drive was attached to the Fass Computer at least two hundred files and folders were opened from Revlon systems and/or the Toshiba Hard Drive. Due to the fact that I do not have access to the Toshiba Hard Drive, I can only identify those folders and files | Vague and ambiguous (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701). Improper expert opinion that is not based on sufficient facts or data and does not reflect an application of |

| | | |
|---|---|---|
| | opened from the Toshiba Hard Drive using the Fass Computer and subsequently, I do not know the full extent of what's on that device. Based on the information currently available, I cannot determine if more folders and files were moved that were not opened on the Fass computer. In my experience, a user can move a folder or file without opening it. and in fact it is often typically done." Racich Decl. ¶ 15. | reliable principles and methods to the facts of the case (Fed. R. Evid. 702). |
| 44. | "17. Based on review of the Fass Computer "Event Logs," the Toshiba Hard Drive was attached to the Fass Computer on May 8, 2024, May 10-14, 2024, and May 21-23, 2024. See Exhibit D, tab Windows Event Logs - Storage. The Fass Computer user copied and/or created the following folders onto the Toshiba Hard Drive during the following times:<br><br>(a) On May 8, 2024, the Toshiba Hard Drive was attached to the Fass Computer for the first time at 6:04 p.m. and at least twelve folders were copied to the Toshiba | Best evidence rule (Fed. R. Evid. 1002); Inadmissible hearsay (Fed. R. Evid. 801, 802). |

Hard Drive. See Fass Spreadsheet, Exhibit D, (ExternalCreated Records 1-12). Based on file names these artifacts appear to be associated with Juicy Couture.

(b) On May 10, 2024 between 6: 15 and 6:29 pm, the Fass Computer user copied or created folders and subfolders in the path "D:\REVLON\JUICY COUTURE\VIVA\" on the Toshiba Hard Drive. See Exhibit D, ExternalCreated Records 13-15.

(c) On May 14, 2024 between 9:10 and 10:14 pm, the Fass Computer user copied or created subfolders in the path "D:\REVLON\IUICY COUTURE\ on the Toshiba Hard Drive. See Exhibit D, ExternalCreated Records 16-31.

(d) On May 21, 2024 between 10:11 am and 8:08 pm, the Fass Computer user copied or created subfolders in the path "D:\REVLON\ on the Toshiba Hard Drive. See Exhibit D, ExternalCreated Records 32-42.

| | | |
|---|---|---|
| | (c) On May 22, 2024 between 2:51 pm and 3:09 pm, the Fass Computer user copied or created subfolders in the path "D:\REVLON\Promo on the Toshiba Hard Drive. See Exhibit D, ExternalCreated Records 43-48." Racich Decl. ¶ 17. | |
| 45. | "18. Between May 21 and May 23, 2024, the Fass Computer user placed at least 574 files and folders in the Windows Recycle Bin. See Exhibit D, Recycle Bin Records 1-574. This is consistent with a person attempting to delete documents from their computer." Racich Decl. ¶ | Mischaracterizes evidence, Irrelevant (Fed. R. Evid. 401, 402), Vague and ambiguous (Fed. R. Evid. 403), Argumentative (Fed. R. Evid. 403), Lacks foundation and personal knowledge, speculation (Fed. R. Evid. 701); Improper expert opinion that is not based on sufficient facts or data and does not reflect an application of reliable principles and methods to the facts of the case (Fed. R. Evid. 702). Mr. Racich suggests, without any evidence, that Mr. Mulvihill accessed files to print or copy them. It is not surprising that Mr. Mulvihill would access Revlon documents while he |

| | | |
|---|---|---|
| | | was employed at Revlon to complete his job duties. Mr. Racich improperly couches this suggestion as an expert opinion, but it is not based on any facts or data and does not reflect an application of reliable principles and methods. |
| 46. | "26. On multiple occasions in April 2024, the Romeo Computer user accessed webpages that reference GBB. Ex. H, tab Chrome Last Tabs, Records 1-8; tab Chrome Web Visits, Records 1-40, tab Chrome Current Tabs, Records 1-5." Racich Decl. ¶ 26. | Best evidence rule (Fed. R. Evid. 1002), Inadmissible hearsay (Fed. R. Evid. 801, 802). |

Dated:        New York, New York
                    September 20, 2024

        Respectfully submitted,

        K&L GATES LLP

        By: /s/ Ronie M Schmelz
        Ronie M. Schmelz
        John J. Cotter
        Ryan Q. Keech (*pro hac vice forthcoming*)

        10100 Santa Monica Blvd., 8th Floor
        Los Angeles, California 90067
        Telephone: (310) 552-5000
        Email: ronie.schmelz@klgates.com
        ryan.keech@klgates.com

        1 Congress Street, Suite 2900
        Boston, MA 02114
        Telephone: (617) 261-3100
        Email: john.cotter@klgates.com

        *Counsel for Defendants*