UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REVLON CONSUMER PRODUCTS LLC and ELIZABETH ARDEN, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> GIVE BACK BEAUTY S.A., GIVE BACK BEAUTY, LLC, GIVE BACK BEAUTY AMERICAS LLC, GIVE BACK BEAUTY INTERNATIONAL LLC, GIVE BACK BEAUTY HOLDING LTD., VANESSA KIDD, DOMINICK ROMEO, REID MULVIHILL and ASHLEY FASS, <br><br> Defendants. | Case No. 1:24-cv-06438-ER-RWL |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
# OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

STEPTOE LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900

*Counsel for Plaintiffs Revlon Consumer Products LLC and Elizabeth Arden, Inc.*

September 24, 2024

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1
SUPPLEMENTAL STATEMENT OF FACTS ........................................................................... 1
ARGUMENT .................................................................................................................................. 7
   I.    PLAINTIFFS SEEK TO MAINTAIN THE STATUS QUO .............................................. 7
   II.   REVLON MEETS THE PRELIMINARY INJUNCTION STANDARD ....................... 8
      A.    Plaintiffs Demonstrated Irreparable Harm ................................................................. 8
      B.    Plaintiffs Promptly Filed the Preliminary Injunction Motion ..................................... 9
      C.    Plaintiffs Established a Likelihood of Success on The Merits ................................. 10
          1.    Revlon Identified Trade Secrets ................................................................. 10
          2.    Revlon Established Independent Economic Value for its Trade Secrets ... 11
          3.    Revlon Demonstrated Adequate Measures to Protect Secrecy ................... 11
          4.    Revlon Demonstrated Misappropriation ..................................................... 12
          5.    Revlon Established a Likelihood of Success on its Contract Claim ........... 13
          6.    A Preliminary Injunction Serves the Public Interest .................................. 14
   III.   DEFENDANTS' CONCLUSORY BOND DEMAND SHOULD BE REJECTED ..... 14
CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ayco Co., L.P. v. Frisch*,
   795 F. Supp. 2d 193 (N.D.N.Y. 2011) ................................................................................12, 13

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015) .......................................................................................................8

*Capstone Logistics Holdings, Inc. v. Navarrete*,
   No. 17-cv-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018), *aff'd
   and remanded in part*, 796 F. App'x 55 (2d Cir. 2020) ............................................................12

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob., Inc.*,
   602 F. Supp. 3d 663 (S.D.N.Y. 2022) .......................................................................................12

*Clifford Ross Co. Ltd. v. Nevlana Ltd.*,
   710 F.Supp. 517 (S.D.N.Y. 1989) ..............................................................................................9

*CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*,
   893 F. Supp. 508 (D. Md. 1995), *aff'd*, 92 F.3d 1203 (4th Cir. 1996) .....................................14

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
   96 F.4th 351 (2d Cir. 2024) .......................................................................................................7

*Empower Energies, Inc. v. SolarBlue, LLC*,
   No. 16-cv-3220 (DLC), 2016 WL 5338555 (S.D.N.Y. Sept. 23, 2016) ...................................14

*Estee Lauder Companies Inc. v. Batra*,
   430 F. Supp. 2d 158 (S.D.N.Y. 2006) ........................................................................................9

*Flatiron Health, Inc. v. Carson*,
   No. 19-cv-8999 (VM), 2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020) ......................................8

*Forest City Daly Housing, Inc. v. Town of North Hempstead*,
   175 F.3d 144 (2d Cir. 1999) .......................................................................................................7

*IDG USA, LLC v. Schupp*,
   416 F. App'x 86 (2d Cir. 2011) ..................................................................................................8

*IME Watchdog, Inc. v. Gelardi*,
   No. 22-cv-1032 (PKC) (JRC), 2022 WL 1525486 (E.D.N.Y. May 13, 2022),
   *reconsideration denied*, No. 22-cv-1032 (PKC) (JRC), 2022 WL 2316137
   (E.D.N.Y. June 28, 2022) ...........................................................................................................7

*Int'l Bus. Machs. Corp. v. Papermaster*,
  No. 08-cv-9078, 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) .................................................9

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*,
  441 F. Supp. 2d 552 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007) .........................14

*Interlink Int'l Fin. Servs., Inc. v. Block*,
  145 F. Supp. 2d 312 (S.D.N.Y. 2001) .....................................................................................14

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
  443 F. Supp. 3d 303 (E.D.N.Y. 2020) .....................................................................................11

*King v. Innovation Books, a Div. of Innovative Corp.*,
  976 F.2d 824 (2d Cir. 1992) .....................................................................................................9

*Marks Org., Inc. v. Joles*,
  784 F. Supp. 2d 322 (S.D.N.Y. 2011) .....................................................................................10

*N. Atl. Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999) .....................................................................................................13

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
  No. 14-cv-8190 (RJS), 2017 WL 4402540 (S.D.N.Y. Sept. 30, 2017) ....................................10

*Payment All. Int'l, Inc. v. Ferreira*,
  530 F. Supp. 2d 477 (S.D.N.Y. 2007) .......................................................................................9

*Spinal Dimensions, Inc. v. Chepenuk*,
  No. 07-cv-4805, 2007 WL 2296503 (N.Y.2007) ......................................................................9

*Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*,
  709 F. Supp. 3d 118 (S.D.N.Y. 2024), *appeal withdrawn*, No. 24-40, 2024
  WL 1494896 (2d Cir. Feb. 13, 2024) ........................................................................................7

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*,
  No. 15-cv-211 (LGS) (RLE), 2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016) .........................11

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) .........................................................................................................9

*Tough Traveler, Ltd. v. Outbound Products*,
  60 F.3d 964 (2d Cir. 1995) .....................................................................................................10

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*,
  73 F. Supp. 3d 209 (S.D.N.Y. 2014) .........................................................................................8

**PRELIMINARY STATEMENT**

Notwithstanding their emphatic denials, Defendants' opposition papers confirm that the former Revlon Employees stole Plaintiffs' trade secrets and took those trade secrets with them to GBB, a direct competitor in the fragrance business. Plaintiffs are faced with irreparable harm and entitled to a preliminary injunction that maintains the *status quo* by (i) ordering Defendants to return Revlon's confidential information; (ii) enjoining Defendants from using or relying upon Revlon's trade secrets (including by walling-off the Revlon Employees from working on Britney Brands fragrances or soliciting any of Revlon's licensing partners); and (iii) enjoining Defendants from disclosing Revlon's trade secrets or attempting to induce others to disclose Revlon's trade secrets.

**SUPPLEMENTAL STATEMENT OF FACTS**

The positions that Defendants take in their opposition papers belie the plain uncontroverted facts. The Revlon Employees affirmatively took Plaintiffs' trade secrets with them when they went to work at GBB and have been using Revlon's trade secrets while working at GBB. In addition to that misappropriation, GBB has been studiously trying to obtain even more Revlon trade secret information, repeatedly demanding Revlon's confidential fragrance formula information from one of Revlon's suppliers.

**A. Ashley Fass.** Fass admits that she downloaded Revlon's files onto a personal hard drive. Fass Decl. ¶ 11. The files Fass downloaded to that hard drive include Revlon's trade secret information. *See* Cornock Decl. ¶ 18 (Fass downloaded Revlon's Juicy Couture licensing agreement). Fass admits that she attached that same personal external hard drive to her GBB laptop. Fass Decl. ¶ 11. She further admits that, after she left Revlon, she opened and viewed documents resident on the external hard drive using her GBB computer. *Id.* ¶ 12. Fass actively used the hard drive until this action was filed on August 26, 2024. *Id.* ¶ 13. It was not until

1

September 19, 2024, six days after Revlon moved for a Preliminary Injunction, that Fass provided the hard drive to her attorneys. *Id.*

The Fass Declaration is quite remarkable for what it *does not* say. Defendants do not disclose the hard drive contents. While Fass asserts that she has "not *knowingly and improperly shared* any Revlon confidential or trade secret information with anyone outside of Revlon," (Fass Decl. ¶ 12 (emphasis added)), she does not deny *using* Revlon's trade secrets in her work at GBB. Fass claims that she did not download or save any files from the hard drive to her GBB laptop. *Id.*, ¶ 12. The lack of affirmative action to save or download data does not prevent copies from having been made on the GBB laptop. *See* Racich Supp. Decl. ¶ 12.

Fass claims that she downloaded materials to her external hard drive "over the course of" her career. Revlon's forensic investigation shows that this statement is not true. The very first time that Fass connected the Toshiba external hard drive to her Revlon laptop was on May 8, 2024, the same day that she accepted her offer from GBB. Racich Supp. Decl. ¶ 11; Fass Decl. ¶ 5. Fass also claims that her role at GBB is limited to ▓▓▓▓▓▓▓▓ fragrances. Fass Decl. ¶ 14. That statement contradicts her "thank you" note to Brondi, which represents that the role has a "business development aspect." Racich Decl. Ex. F.

**B. Vanessa Kidd**. Vanessa Kidd's Declaration confirms that the files that she opened between 9:45 p.m. on Friday May 3 and 12:15 a.m. on Saturday May 4, 2024 contain trade secret information. She states that the local files on her laptop, which she moved to the Revlon server on May 3 "included sensitive and confidential information of Revlon." Kidd Decl. ¶ 31.

Kidd represents that she opened the files in order to secure them for Revlon's benefit. But the relevant computer data shows otherwise. Revlon's systems evidence the creation of a folder on the server titled "V.Kidd\Desktop 5.3.24" at 4:25 p.m. on May 3, 2024, approximately

2

five hours earlier than the activity that Mr. Racich flagged. King Decl. ¶ 6. This server folder contains 45 subfolders. *Id.*

The artifacts that Revlon's computer forensics expert found on Kidd's laptop show that, between 9:45 p.m. and 12:15 a.m., Kidd *opened* 259 *specific* documents within the subfolders that she had previously loaded onto Revlon's servers. Racich Supp. Decl. ¶¶ 7-8. The only logical explanation for this behavior, which took place very late on a Friday night, is that Kidd was either printing or electronically transferring those targeted documents.

Kidd subsequently deleted all files on her laptop's desktop (Kidd Decl. ¶ 31) and admits to clearing her internet browser history. *Id.*, ¶ 33. She states that she was concerned that her laptop would be assigned to another Revlon employee without the Revlon IT team taking appropriate action to re-image the laptop. *Id.*, ¶ 31. The purported concern that Revlon's IT team would act irresponsibly with her laptop data is not credible. *See* King Decl., ¶ 9.

Kidd learned from Brondi on April 30, 2024 that GBB had inked a deal with Britney Brands.[1] Corrado Decl. ¶ 15; Kidd Decl. ¶ 18. The forensic examination of Kidd's laptop shows that Kidd accessed Revlon's existing agreement with Britney Brands the next day, on May 1. Racich Supp. Decl. ¶ 9. That access was not in furtherance of Revlon's contract negotiations, which Kidd states she wasn't handling. Kidd Decl. ¶ 4. Given Kidd's knowledge that Britney Brands had signed with GBB, that access must have been for GBB.

Kidd currently holds the title of "CEO of GBB's Lifestyle Division" with responsibilities that include managing various fragrance brands. Kidd Decl. ¶ 37. With respect to Britney

---

[1] Kidd breached her duty of loyalty to Revlon in keeping this information secret. Kidd participated on a conference call on May 1 with Chris Carino at CAA and Marni Shepard at Revlon concerning Revlon's efforts to finalize a Britney Brands extension. Kidd Decl. ¶ 25; Shepard Decl. ¶ 27. During that call, Carino said that Britney Brands was not in a position to make a commitment. Shepard Decl. ¶ 27; Kidd Decl. ¶ 25. Kidd knew that Britney Brands had already made a commitment to GBB. Kidd Decl. ¶¶ 18, 25. Yet, Kidd hid that material information from Revlon.

3

Brands, Kidd represents that she is charged with "preparing future development plans so that on January 1, 2025, when the licensing agreement takes effect, GBB will be ready to begin production." Kidd. Decl. ¶ 38. The files that Kidd opened late in the night on May 3, 2024 include, among other things, Revlon's proprietary and confidential 2023-2025 roadmap of plans for the Britney Spears fragrances. *See* Cornock Decl. Ex. 12. The files also include Revlon's Licensing Sales & Royalty Report for Britney Spears. Cornock Decl. Ex. 7. Kidd may not use Revlon's development plans or royalty data in her work at GBB.

Kidd knew before she left Revlon on May 3, 2024 that GBB would be taking over the Britney Brands fragrance license as of January 1, 2025, and that she would have responsibility for that account in her CEO role at GBB. That knowledge gave Kidd a strong motive to take Revlon's trade secret information concerning its Britney Brands business with her to GBB. Revlon's forensic evidence, coupled with Kidd's admissions, shows that Kidd did exactly that.

**C. Dominick Romeo.** Dominick Romeo admits that he retained Google Documents relating to influencer postings involving Britney Brands after he left Revlon. Romeo Decl. ¶ 7. He claims that he has not accessed any of these documents while at GBB. *Id.*

Romeo's current role at GBB involves business development. *Id.* ¶ 8. He also has responsibility for GBB's performance of its Britney Brands agreement. Those duties include supply chain for the fragrances, inclusive of bottling and fragrance house contact. *Id.* ¶ 9. Romeo states that he has been making outreach to bottle suppliers. *Id.* He necessarily learned the confidential identity and contact information for Revlon's bottle suppliers from his work at Revlon. *See* Cornock Decl. ¶ 11.

**D. Reid Mulvihill.** Revlon's forensic investigation shows Mulvihill's use of a Google Drive account associated with his personal gmail address from his Revlon computer in May

4

2024.  Racich Decl. ¶ 23.  Mulvihill does not provide any explanation of what documents he placed or viewed on that Google Drive repository.  *See generally* Mulvihill Decl.

**E. GBB.**  The evidence described above shows that Kidd and Fass took Revlon's trade secrets and have been using those trade secrets to further GBB's fragrance business, inclusive of its planning to commercialize Britney Spears fragrances.  The evidence further shows that Romeo and Mulvihill most likely have done the same.

In addition, GBB submitted evidence that confirms that it has been pressuring a fragrance house to disclose the confidential formulas used in the fragrances manufactured for Revlon, which belong to Revlon.  GBB made initial contact with the fragrance house in June 2024, with a generic letter to Revlon's suppliers for the Britney Spears fragrances.  Cornock Decl. ¶¶ 34-35, Ex. 22.  Revlon informed the fragrance house that it may not share Revlon's confidential information.  *Id.*  In August 2024, GBB tried again.  Brondi Decl. ¶ 20, Ex. 4.  This time, GBB had Britney Brands send a letter directly to the fragrance house that asked the fragrance house to "provide GBB with *all the requested information and details regarding the fragrance formulas* contained in the products bearing the 'Britney' / 'Britney Spears' trademarks, in order to enable GBB to proceed with the successful production and commercialization of the same products."  *Id.* (emphasis added).

Patrizio Stella claims in his declaration that GBB has not sought Revlon's fragrance formulas.  Stella Decl. ¶ 10 ("I never asked for . . . the fragrance formulations or specific ingredients for the fragrance oil. . . .  GBB has no intention or need to discover the formulas of any Britney Brands fragrances ever manufactured or sold by Revlon.").  Exhibit 4 to the Corrado Declaration shows otherwise.

5

Revlon's agreement with Britney Brands provides that Revlon owns ████████ ████████. Cornock Decl. Ex. 19, Additional Terms And Conditions, Section 1(c). Revlon's agreement with the fragrance house confirms that Revlon ████████████████████ ██████████████████████████████████████████. *Id.*, Ex. 13 at Section 5.02 ██████████████████████████████████████. The exploitation rights held by Britney Brands post-termination do not impact Revlon's ownership and rights to protect its confidential information. Yet, GBB persists in trying to obtain this trade secret information, and wrongly claims that it does not belong to Revlon.

Finally, GBB's assertion that it engaged in detailed contract negotiations with Britney Brands over the course of months (or years) that culminated in a Term Sheet dated April 29, 2024, defies credulity. ████████████████████████████████████████ ██████████████████████████████████.

**F. REVLON DID NOT DELAY.** Revlon acted promptly and reasonably in seeking a preliminary injunction. Revlon discovered in early August 2024, through a forensic computer analysis, that the Revlon Employees had surreptitiously and wrongfully taken trade secret documents with them at the time that they left Revlon. Revlon commenced this action just a few weeks after this discovery, on August 26, 2024. Following commencement of the action, Revlon engaged in meet and confer efforts with Defendants' attorneys for return of its trade secrets, as well as other protections. Dockterman Decl. ¶ 10. When those discussions failed, Revlon filed its motion for a Preliminary Injunction. *Id.*

6

# ARGUMENT

## I. PLAINTIFFS SEEK TO MAINTAIN THE STATUS QUO

Plaintiffs request a preliminary injunction that requires return of its trade secrets and provides protections against Defendants' use of those trade secrets. Defendants mischaracterize this injunction as mandatory, when it is plainly prohibitive.[2]

Preliminary injunctions seeking to restore the *status quo* are prohibitive, even if they require defendants to take positive acts. *Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 130 (S.D.N.Y. 2024), *appeal withdrawn*, No. 24-40, 2024 WL 1494896 (2d Cir. Feb. 13, 2024) ("When an injunction seeks to require a party who has recently disturbed the status quo to reverse its actions, it seeks to restore, rather than disturb, the status quo ante."). For example, in *IME Watchdog*, the court granted a preliminary injunction under the prohibitory standard that, among other things, directed defendants to return all confidential information and trade secrets, destroy information belonging to plaintiff in defendants' possession, and refrain from contacting plaintiff's clients. *IME Watchdog, Inc. v. Gelardi*, No. 22-cv-1032 (PKC) (JRC), 2022 WL 1525486, at *6, *10 (E.D.N.Y. May 13, 2022), *reconsideration denied*, No. 22-cv-1032 (PKC) (JRC), 2022 WL 2316137 (E.D.N.Y. June 28, 2022).

The requested relief here restores the *status quo* that existed prior to Defendants' misappropriation of Revlon's trade secrets. Defendants may not "seek[] shelter under a current 'status quo' precipitated by their [own] wrongdoing." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 357 n.5 (2d Cir. 2024).

---

[2] Defendants' assertion that plaintiffs' preliminary injunction "cannot be undone" and therefore must be subject to a heightened standard is facially false. Unlike the case law that Defendants cite, Revlon is not asking that buildings be demolished. *See Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 150 (2d Cir. 1999) ("allow[ing] the demolition of existing structures.").

## II.    REVLON MEETS THE PRELIMINARY INJUNCTION STANDARD

Plaintiffs made the required preliminary injunction showing of: (i) likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation; (ii) likelihood of irreparable harm; (iii) balance of hardships tipping in their favor; and (iv) that the public interest favors an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

### A.    Plaintiffs Demonstrated Irreparable Harm

In arguing that Revlon has not established irreparable harm, Defendants misrepresent the relevant injuries. This motion involves much more than GBB's wrongful interference with Revlon's Britney Brands license agreement extension, which arguably can be redressed with money damages. It addresses the irreparable injury caused by Defendants' theft of Revlon's trade secrets and use (or threatened use) of those trade secrets to inflict further and continuing competitive harm on Revlon's fragrance business. Defendants may not, *inter alia*, possess or use: (i) Revlon's fragrance marketing plans; (ii) Revlon's fragrance market research; (iii) Revlon's financial data; (iv) Revlon's confidential formulas; (v) Revlon's supply chain contacts; or (vi) Revlon's licensing agreements. These competitive harms are difficult to measure and cannot be adequately compensated with money damages. *See Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) ("infringing competition" in the fragrance industry is likely to cause the loss of "future sales, goodwill, and entire client accounts, and these are not so easily quantified.")

Moreover, "[t]hreatened dissemination of trade secrets generally creates a presumption of irreparable harm." *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011). Defendants have not rebutted this presumption. Irreparable harm is found in cases where "dissemination is inevitable," including through inadvertence. *Flatiron Health, Inc. v. Carson*, No. 19-cv-8999

8

(VM), 2020 WL 1320867, at *26 (S.D.N.Y. Mar. 20, 2020) (emphasis added) (quoting *Int'l Bus. Machs. Corp. v. Papermaster*, No. 08-cv-9078, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008).[3] Courts in this Circuit have repeatedly found irreparable harm based on the imminent threat of inevitable disclosure. *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (internal citation omitted) (granting preliminary injunction and finding that "trade secrets will inevitably be disclosed where, as here, 'the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning [ ] marketing strategies, or the like.'").

      B.      <u>Plaintiffs Promptly Filed the Preliminary Injunction Motion</u>

Revlon did not unreasonably delay in filing this motion. Defendants took steps to hide their illicit behavior which was only revealed through a forensic investigation. Revlon acted expediently after forensic analysis uncovered that electronic files were stolen. *See, e.g., Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39-40 (2d Cir. 1995) (finding four-month delay reasonable as the plaintiff was attempting to determine if there was actual infringement before filing suit); *King v. Innovation Books, a Div. of Innovative Corp.*, 976 F.2d 824, 831-32 (2d Cir. 1992) (finding author's eight-month delay reasonable where he spent that time trying to obtain a copy of the infringing screenplay and movie); *Clifford Ross Co. Ltd. v. Nevlana Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989) (finding seven-month delay reasonable where plaintiff was unaware of extent of the infringement).

---

[3] In evaluating whether dissemination is inevitable, courts consider: "(1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets." *Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (quoting *Spinal Dimensions, Inc. v. Chepenuk*, No. 07-cv-4805, 2007 WL 2296503, *6–7 (N.Y.2007)). All of these factors show a substantial threat of dissemination and irreparable harm.

9

Plaintiffs' timeline is entirely proper in the context of a preliminary injunction and does not preclude a finding of irreparable harm. *See e.g. Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (*quoting Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995)) (finding one of two "main justifications for delay that courts in this circuit accept" is "plaintiff's making good faith efforts to investigate alleged infringement").

  C. <u>Plaintiffs Established a Likelihood of Success on The Merits</u>

Plaintiffs have met their burden to show a likelihood of success on the merits for their trade secret misappropriation and breach of contract claims.

  1. Revlon Identified Trade Secrets

Plaintiffs sufficiently identified trade secrets in their motion papers. Plaintiffs identified specific categories of misappropriated information and documents that meet the definition of trade secrets. *See Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190 (RJS), 2017 WL 4402540, at *4 (S.D.N.Y. Sept. 30, 2017) (trade secrets include "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it.").

Revlon described the trade secret information (*see*, *e.g.*, Cornock Decl. ¶¶ 13, 14, 15) and also submitted samples of the trade secret documents to the Court under seal. Cornock Decl. Exs. 5-12. Kidd, for her part, acknowledges that the documents that she opened late in the night on May 3 and 4, 2024 are confidential and proprietary to Revlon. Kidd Decl. ¶¶ 28, 30. Demonstrating just how zealously fragrance companies guard their proprietary information, Defendants themselves claim confidentiality around the names of GBB's licensing partners, which they redacted from the public record. *See, e.g.*, Opp. at 3.

Defendants disingenuously assert that Revlon has not identified any genuine trade secrets. Opp. at 11 ("there is no evidence before the Court that GBB now has or ever had any

10

Revlon trade secret information"), 16-18. Defense counsel has possession of Fass's hard drive, which admittedly contains Revlon's documents, but steadfastly refuses to disclose those contents or return them. *See, e.g.,* Fass Decl. ¶¶ 11, 13. There are trade secrets on that hard drive, including Revlon's Juicy Couture license agreement. Revlon has made the required showing that this motion involves *bona fide* trade secrets.

          2.          Revlon Established Independent Economic Value for its Trade Secrets

Defendants disingenuously challenge whether Revlon has established independent economic value of its trade secrets. The record shows that Revlon has done so.

The Cornock declaration establishes that Revlon's business plans, marketing strategy, financial constructs and contractual relationships are prized and closely guarded. Opening Brief at 15-16, Cornock Decl. ¶¶ 14-15. *See, e.g., Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 341 (E.D.N.Y. 2020) (granting preliminary injunction and finding that plaintiff's "client and pricing information derives independent economic value from being kept secret . . . and because exposing such information could enable competitors to underprice or underbid plaintiff and divert customers[.]"). Among other things, Fass stole Revlon's confidential licensing agreement with Juicy Couture. And, Kidd took Revlon's marketing plans for Britney fragrances through 2025, as well as Revlon's targets for future fragrance licensing deals. Defendants cannot meaningfully dispute the competitive value of this information.

          3.          Revlon Demonstrated Adequate Measures to Protect Secrecy

In the face of substantial evidence that Revlon secured its trade secrets (*See* Cornock Decl. ¶¶ 19, 23; Opening Brief at 17, 19, 24-26), Defendants make a frivolous argument that Plaintiffs have not shown that they took adequate security measures. Courts in this district consistently find that electronic security measures, such as Revlon's, are sufficient to show reasonable protective measures. *See e.g. Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto*

*Grp., Inc.*, No. 15-cv-211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016). In addition, confidentiality agreements and training materials are sufficient to show reasonable measures, especially when, as here, they are combined with security measures. *See e.g. Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob., Inc.*, 602 F. Supp. 3d 663, 675-76 (S.D.N.Y. 2022).

    4.  Revlon Demonstrated Misappropriation

Plaintiffs have shown misappropriation by both the Revlon Employees and their employer, GBB. Misappropriation may consist of wrongful acquisition, disclosure or use. "The DTSA defines misappropriation [sic] as the 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent.'" *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819 (GBD), 2018 WL 6786338, at *30 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020) (on remand, lifting the preliminary injunction and entering a permanent injunction).

The Revlon Employees took trade secret documents with them after they left Revlon's employment. That suffices to make a showing of misappropriation. The record further shows usage of Plaintiffs' trade secrets. Fass admits that she opened and used documents from her hard drive on her GBB computer, after she was a GBB employee.

In *Ayco*, for example, the court granted plaintiff's preliminary injunction where plaintiff "allege[d] several instances of Defendants' misuse of proprietary and confidential information," despite defendants' "insistence that he took no confidential records or documents whatsoever." *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 206-07 (N.D.N.Y. 2011). The court explained that the evidence that defendants had contacted multiple clients (some of whom left with them), abruptly resigned from plaintiff and then started working at its competitor after having accessed

12

confidential files before they departed, "suggest[ed] a possibility" that they may have taken and used confidential information from their former employer sufficient to "support the conclusion that Plaintiff is likely to succeed on its misappropriation of trade secrets claims against both Defendants." *Id*. at 208.

Defendants' argument that any information in the independent memory of the Revlon Employees cannot be trade secrets mischaracterizes the case law, which expressly rejects such a bright-line rule. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999). Misuse of trade secrets is not limited to information physically stolen. Rather, it includes trade secrets that may be retained in a former employees' memory. *Id*. at 47 (finding materials that reflect information that is "not readily ascertainable" and gained "through the expenditure of considerable time and money, are protectable trade secrets."). The record shows misappropriation and a threat of use sufficient to entitle Plaintiffs to injunctive relief.

        5.      Revlon Established a Likelihood of Success on its Contract Claim

Defendants fail to meaningfully respond to Plaintiffs' breach of contract argument. They try to belittle the import of Revlon's "employee manuals and signatures." Opp. at 22. These enforceable employment agreements prohibit: (i) copying or removal of confidential information following departure; (ii) use of confidential information to compete with Revlon; and (iii) solicitation of Revlon's business partners to terminate their relationships with Revlon. Cornock Decl. ¶ 22 Exs. 16-18. The Conduct of Conduct, acknowledged by all the Revlon Employees, prohibits the disclosure or use of confidential and proprietary information to benefit themselves or others. Cornock Decl. ¶ 21, Ex. 14. The Revlon Employees have breached, or threaten to breach, all of these material terms. Plaintiffs are irreparably harmed by the Revlon Employees' breach. Accordingly, Revlon established likelihood of success on the breach of contract claim.

13

6. A Preliminary Injunction Serves the Public Interest

Finally, Defendants' public interest argument is misplaced. New York has a strong public interest in upholding the rule of law. *Empower Energies, Inc. v. SolarBlue, LLC*, No. 16-cv-3220 (DLC), 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016). And "depriv[ing]" Defendants "of the fruits of their improper conduct would be in the public interest." *Id*.

III. **DEFENDANTS' CONCLUSORY BOND DEMAND SHOULD BE REJECTED**

The party requesting a bond as security for injunctive relief has the burden "to establish a rational basis for the amount of the proposed bond." *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006), *aff'd*, 246 F. App'x 73 (2d Cir. 2007). Courts have wide discretion to forego a bond for a preliminary injunction where, as here, "there has been no proof of likelihood of harm." *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 315 (S.D.N.Y. 2001) (citation omitted). Because Defendants have no legitimate interest in Plaintiffs' trade secrets, there is no likelihood of harm from the requested injunction. Defendants fail to establish a rational basis for any bond.

Based on nothing more than his own say-so, Brondi "estimates" that GBB stands to suffer a loss of at least $5 million, "should it suffer a disruption in production of Britney Brands fragrances." Brondi Decl. ¶ 23. "[E]conomic damages that are speculative at best" do not constitute proof, and "[c]laims based upon speculation or conjecture, including claims for a business contemplated but not yet established, will not support an award of damages on the [Rule 65(c)] bond." *Id*. (*citing CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F. Supp. 508, 525 (D. Md. 1995), *aff'd*, 92 F.3d 1203 (4th Cir. 1996).

Brondi represents that GBB needs to prepare to commence manufacturing Britney Brands products starting on January 1, 2025 and expresses concern about disruption to those plans. Plaintiffs' requested injunction does nothing to prevent GBB from engaging in its own

14

*independent* preparation. It only serves to prohibit GBB from using Revlon's trade secrets to prepare for its performance. In any event, GBB claims that it does not want or need Revlon's trade secrets for its preparation, so an injunction will not cause any disruption. Stella Decl. ¶ 10.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully submit that this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 24, 2024                    STEPTOE LLP

                                By:  /s/ *Michael Dockterman*

                                    Michael Dockterman
                                    227 West Monroe Street, Suite 4700
                                    Chicago, IL 60606
                                    Telephone: (312) 577-1300
                                    Email: mdockterman@steptoe.com

                                    Elyse D. Echtman
                                    1114 Avenue of the Americas
                                    New York, NY 10036
                                    Telephone: (212) 506-3900
                                    Email: eechtman@steptoe.com

                                    *Attorneys for Plaintiffs Revlon Consumer Products LLC and Elizabeth Arden, Inc.*