O9PMREVH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    REVLON CONSUMER PRODUCTS LLC
     and ELIZABETH ARDEN, INC.,
4
                  Plaintiffs,
5
                  v.                          24 CV 6438 (ER)
6
     GIVE BACK BEAUTY S.A., et al.,
7
                  Defendants.                 Hearing
8    ------------------------------x
                                              New York, N.Y.
9                                             September 25, 2024
                                              2:30 p.m.
10
     Before:
11
                         HON. EDGARDO RAMOS,
12
                                              District Judge
13

14                         APPEARANCES

15   STEPTOE LLP
          Attorneys for Plaintiffs
16   BY:  ELYSE D. ECHTMAN
          GILANA KELLER
17
     K&L GATES LLP
18        Attorneys for Defendants
     BY:  RONIE M. SCHMELZ
19        AVRIL LOVE
          RYAN Q. KEECH
20        JOHN J. COTTER
          -and-
21   BLANK ROME LLP
     BY:  ANDREW T. HAMBLETON
22

23   Also Present:  David Schwartz

24

25

O9PMREVH

```
1                    (Case called)
2              MS. ECHTMAN:  Elyse Echtman of Steptoe for the
3    plaintiffs.  I have with me my colleague, Gilana Keller, who is
4    also at my firm and in-house counsel at Revlon, Revlon's
5    general counsel, David Schwartz.  Thank you, your Honor.
6              MS. SCHMELZ:  Good afternoon, your Honor.  My name is
7    Ronie Schmelz with K&L Gates.  I am joined this afternoon by my
8    colleagues, Ryan Keech and Avril Love, John Cotter, and Andrew
9    Hambleton of the Blank Rome firm.
10             THE COURT:  Good afternoon to you all.  This matter is
11   on for a hearing for preliminary injunction brought by
12   plaintiffs Revlon Consumer Products, LLC.
13             I understand from counsel, I forget which letter it
14   came in on, but that there may be some documents that counsel
15   will be referring to that have been designated attorney eyes
16   only.  It appears as though everyone at these two tables are
17   attorneys, although -- I'm forgetting your name
18             MR. SCHWARTZ:  Mr. Schwartz.
19             THE COURT:  Mr. Schwartz.  You are an in-house
20   attorney, correct?
21             MR. SCHWARTZ:  Correct.
22             THE COURT:  Under the terms of the agreement, are you
23   allowed to see attorney-eyes-only documents?
24             MS. ECHTMAN:  Your Honor, I believe that our
25   protective order provides for only outside counsel to see
```

O9PMREVH

1    attorneys'-eyes-only documents.  I think most of the

2    attorneys'-eyes-only documents that have been submitted on this

3    motion come from the plaintiffs.  But if there is something

4    that Ms. Schmelz would like to refer to in her argument, we can

5    ask Mr. Schwartz to step out.

6          We also have Will Cornock here, who is a Revlon

7    executive who submitted a declaration in this matter, and we

8    have our forensic expert, Christopher Racich, in the room.

9          THE COURT:  Again, we can do this a couple of ways.  I

10   think the easiest way would be for counsel to just speak very

11   generally about documents that have been designated attorneys'

12   eyes only and refer me to what the document is.  I believe I

13   have all of the documents that have been submitted by the

14   defendants.  I received at least courtesy copies of their

15   opposition papers.

16         Are the folks intending to use the technology in the

17   courtroom to show documents?

18         MS. SCHMELZ:  Your Honor, there is a few preliminary

19   matters, so we do have in our presentation decks specific

20   information that has been designated attorneys' eyes only.  We

21   will attempt to notify the Court and do ask that anybody who is

22   not outside counsel then be excused.  We can deal with that

23   when we get there.

24         The other preliminary matter, your Honor, we have two

25   oral motions for *pro hac vice*, my colleagues who will be making

O9PMREVH

1    the argument, Mr. Keech on the preliminary injunction and

2    Ms. Love on the expedited discovery.

3           THE COURT:  They will be allowed to make their

4    presentations.  I assume that their paperwork is in order.

5           You are in good standing in your respective

6    jurisdictions, so your applications will be granted.

7           MS. SCHMELZ:  Thank you, your Honor.

8           THE COURT:  I guess we will begin with Ms. Echtman, is

9    it?

10           MS. ECHTMAN:  Yes, it is.

11           THE COURT:  You can do it a couple of ways.  If you

12    want to use the podium, you can use the podium.  If you want to

13    stand at the table, you can do that, or you can sit, if you

14    wish, whatever makes you most comfortable, as long as you are

15    close to a microphone and keep your voice up.

16           MS. ECHTMAN:  I'm very comfortable standing.

17           I do want to connect to the system because I also have

18    a Power Point presentation, if the Court is so interested.  I

19    was going to start with the preliminary injunction motion.  But

20    if the Court has questions, I can jump in to answer questions.

21           THE COURT:  I do have a couple of preliminary

22    questions.

23           One is, if you could describe for me what the -- I

24    don't even know what to call it -- the chain of supply is or

25    how a perfume gets to market, who the players are between a

O9PMREVH

1    factory and the consumers, how it gets to stores.

2            Another question that I have preliminarily is, as I

3    understand it, the Britney Spears perfume line or fragrance

4    line will be transitioning over to defendants, XXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXX

7            Assuming you hold onto it, what's going to happen on

8    January 1?  Will the Britney perfumes smell differently?

9            MS. ECHTMAN:   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXX

11           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX   Britney Brands owns

17   the marks.  The trademarks, those all belong to that company.

18           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXX

24           So these are fragrances that over the course of 20

25   years Revlon developed with its suppliers, and I can only give

O9PMREVH

1    you my limited knowledge of how the supply chain works, but

2    there are fragrance houses that have the oils and all secret

3    sauce.  They work with the companies that market the fragrances

4    to develop fragrances specifically for them.  There are more

5    than, I think, 30 fragrances within the Britney Spears line.

6    Those fragrances get bottled.  They go into the distribution

7    chain.  They go to distributors and retailers until they make

8    it to the shelves.

9            All of the agreements along the way are confidential

10   and proprietary to Revlon, so Revlon's pricing is its own

11   pricing that it negotiates with its suppliers based on its

12   market power in terms of what it can obtain, and all the way

13   that they do business in the fragrance industry, which I think

14   both sides admit is a very competitive industry, is their own

15   secret sauce, their own confidential way that they go about the

16   commercialization process.

17           As of January 1, 2025, they can sell a Britney Spears

18   fragrance.  What they can't do is they can't piggyback and take

19   Revlon's plans, Revlon's marketing plans, their blueprints,

20   their financial data, all of that, they can't have Revlon's

21   pricing with Givaudan, they can't have Revlon's pricing.  XXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24           Does that answer your question?

25           THE COURT:  Yes.

O9PMREVH

1          MS. ECHTMAN:  What I am going to do here is, I just

2     need to connect to the Court's system, if you bear with me for

3     a moment.

4          What we need to show is a likelihood of success on the

5     merits, irreparable harm, that the balance of the equities

6     favors injunctive relief, and that the relief is in the public

7     interest.

8          This is an injunction to preserve the status quo.  I

9     know the defendants have argued that what we are asking for is

10    a mandatory injunction.  While we are asking for some

11    affirmative relief, including the return of Revlon's trade

12    secret documents, this is a motion to restore the status quo to

13    where it was before the defendants took Revlon's trade secret

14    documents.

15         We have to show likelihood of success on the merits.

16    We are primarily moving under the Defend Trade Secrets Act.

17    And a DTSA violation is established if you can show

18    misappropriation of a trade secret related to a product or

19    service used in interstate commerce.  I don't think that we

20    have any dispute over that.

21         The defendants do dispute whether we have shown any

22    misappropriation.  The evidence very clearly shows that there

23    was misappropriation by the former Revlon employees when they

24    were leaving the company before they went to GBB.

25         THE COURT:  I'm sorry.  I think they are also

O9PMREVH

1  disputing that assuming they took anything, they didn't take
2  any trade secrets.
3      MS. ECHTMAN:  Correct.  They are disputing that, but
4  they can't dispute that things were taken.
5      Specifically, we know that only acquisition is enough
6  under the Defend Trade Secrets Act.  They have also made some
7  arguments that under New York law you need to show use.  It's
8  enough to show that something was taken, even if it wasn't
9  used, and we have shown use as well.
10     Let's talk about what we know was taken.  We have got
11  Ashley Fass.  Ashley Fass worked at Revlon in its fragrance
12  business.  Revlon's forensics expert has shown, and Ms. Fast
13  admits, that, on May 8, she attached an external hard drive to
14  her Revlon company laptop, and she not only attached it, she
15  downloaded company folders onto that laptop.  We don't have a
16  laptop.  We don't have the hard drive.  The defendants have the
17  hard drive.  Ms. Fass says that, on September 19, she gave it
18  to her lawyers.  Neither Ms. Fass nor those lawyers have told
19  us what's on the hard drive, but we do have folder names.
20     So we took one folder name, for example, and that
21  folder name is Revlon/contracts.  And Revlon's IT found the
22  same folder with the same name on Revlon's shared servers that
23  are accessed by the fragrance group, and that contains a copy
24  of Revlon's licensing agreement with Juicy Couture.  That is a
25  confidential agreement that has confidential royalty and

O9PMREVH

1    licensing terms.

2          So we have every reason to believe that, among other

3    things that are on this hard drive, there is a confidential and

4    proprietary, highly valuable licensing agreement between Revlon

5    and Juicy Couture.

6          Not only did Ms. Fass take Revlon file folders with

7    Revlon information in it when she left the company, she also

8    admits in her declaration that after she went to GBB -- and she

9    went to GBB in -- I don't recall the exact date, but by June,

10   she was there actively working -- she plugged that same

11   external hard drive into her GBB computer, and she opened

12   documents.  She doesn't disclose what documents she opened.

13   She doesn't say anything about the specific contents of her

14   hard drive.  But she does say she attached it to her new work

15   computer and she opened it.

16         Now what we know from Revlon's computer forensics

17   expert, who is here in the room with us, is that when you open

18   something on a laptop, there is a possibility, that even if she

19   didn't affirmatively download or share information or email it,

20   that the laptop itself captured data, which is then on a

21   GBB-owned device which belongs to Revlon.

22         THE COURT:  I'm sorry.  So that I understand, just the

23   mere fact of opening the hard drive, attaching the hard drive

24   and opening it, is enough for the laptop to then take that

25   information and so it now also exists in the GBB laptop?

O9PMREVH

1          MS. ECHTMAN:  Yes.  The extent to which it may exist,

2     we don't know.  For example, what Mr. Racich found when he

3     looked at the departing employees' laptops, they left artifacts

4     behind of the documents they had opened, even though those

5     documents weren't there.

6          I can tell you, when I use my Steptoe laptop and I

7     open something from an external source, it automatically

8     creates a copy in my downloads folder even if I didn't do

9     anything to affirmatively download something.  It depends on

10    how the laptop is configured.

11         THE COURT:  We don't know that, presumably, or you

12    don't know that.

13         MS. ECHTMAN:  At this point, without discovery, which

14    is in our other motion, we don't know.

15         THE COURT:  So you don't know whether in fact, as we

16    sit here, the documents that Ms. Fass opened on her GBB

17    computer, or using her GBB computer, are currently on her GBB

18    computer.

19         MS. ECHTMAN:  That we don't know, but it's a distinct

20    possibility that it is and that's something that we need to

21    know.

22         Ms. Fass says she stopped using that hard drive when

23    we filed this action on August 26, and then just the day before

24    the defendants' opposition was due to the preliminary

25    injunction motion, she gave it to counsel.

O9PMREVH

1          And Ms. Fass and her attorneys are in the best

2    position to know what's on that laptop, but it's very hard for

3    them to say that nothing trade secret has been taken without

4    disclosing the contents of the hard drive.  In our meet and

5    confer that we had prior to filing the motion and after filing

6    the motion, we asked for an inventory of the hard drive

7    contents.  We have not gotten any of that information.  This is

8    what we know specifically that Ms. Fass did.

9          Then we have Vanessa Kidd.  Vanessa Kidd was the

10   senior vice-president at Revlon.  It's a very high position.

11   She was reporting right up into the C-suite.  Ms. Kidd was

12   involved in Revlon's very significant and sensitive

13   negotiations with Britney Brands over an extension to the

14   agreement that was scheduled to expire on December 31, 2024.

15         In the middle of that work she was doing, she started

16   interviewing with Give Back Beauty.

17         So, on March 20, Revlon sends a draft written

18   extension agreement over to the Britney Brands team and,

19   according to Ms. Kidd's declaration the next day, she had an

20   interview with the head of Give Back Beauty.  She was required

21   to sign a nondisclosure agreement before she started talking to

22   Give Back Beauty.

23         Very soon thereafter, Britney Spears' manager starts

24   raising concerns with Revlon specific to Give Back Beauty, says

25   we are concerned about Give Back Beauty.  That's on April 5.

O9PMREVH

| | |
|---|---|
| 1 | On April 8, Ms. Kidd accepts an offer to go work at |
| 2 | Give Back Beauty.  She is currently CEO of their lifestyle |
| 3 | division working in fragrances.  She gives notice on April 9. |
| 4 | She declines to tell anyone at Revlon where she is going.  She |
| 5 | won't say.  Soon after -- |
| 6 | THE COURT:  Should I infer anything nefarious about |
| 7 | that?  I don't know how these companies work.  They are all |
| 8 | very, very competitive, I imagine.  If you move from one |
| 9 | company to another, everyone wants to keep everything pretty |
| 10 | close to the vest. |
| 11 | MS. ECHTMAN:  What I understand, it's not unusual for |
| 12 | folks not to say where they are going, but to keep it so secret |
| 13 | and to actually have an NDA that prohibits you from telling |
| 14 | anyone where you are going to be working, this is not the CIA. |
| 15 | You are allowed to say, I'm working at a fragrance company. |
| 16 | This is the fragrance company that I'm going to be working at. |
| 17 | I think it is unusual to have that level of secrecy where you |
| 18 | are required to sign something that says, I won't tell anyone |
| 19 | that I'm talking to you, and I won't tell anyone the name of |
| 20 | the company that I'm going to.  I think there is something |
| 21 | nefarious about that that you can infer.  When I left my firm, |
| 22 | I said, I am going to Steptoe.  It's a competitor.  Why |
| 23 | wouldn't you disclose where you are going next. |
| 24 | THE COURT:  Exactly how many days before you went to |
| 25 | Steptoe did you tell them? |

O9PMREVH

1          MS. ECHTMAN:  I had a partnership agreement and a

2   notice provision, so it was at least 30.

3          April 16, Britney Spears' manager reaches out to

4   Revlon again, talks to Marni Shepard, and says:  I heard from

5   GBB.  They said they are taking the head of your fragrance

6   business and your whole core team is going with her.

7          This is while Ms. Kidd is still senior VP, has a duty

8   to Revlon.  She won't say anything.  But GBB is going around

9   her and getting word to the Britney Spears team that she is

10  leaving and they are taking her.  And this is in the middle of

11  the very critical time that Revlon is trying to close its

12  extension that it has spent months and months negotiating with

13  the Britney Brands team.

14          As you can see from this timeline, there are drafts

15  going back and forth.  On April 18, Alexandra Kopp at CAA sends

16  a provided final agreement for Revlon's signature.

17          April 24, Revlon's CFO signs the agreement and sends

18  it back.

19          Then on April 26, Britney's team starts equivocating.

20          Mr. Brondi and Ms. Kidd say that, on April 30, GBB

21  told Vanessa Kidd, who is still at Revlon, that they inked a

22  deal with Britney Brands, and they are picking up the license

23  on January 1, 2025.

24          The next day Ms. Kidd participates on a call with

25  Marni Shepard at Revlon and with Christian Carrino at CCA to

O9PMREVH

talk about getting Britney Spears' signature on the extension

agreement.  Mr. Carrino says the Britney Brands is not ready to

commit.  Ms. Kidd acknowledges she was on that conversation,

she was a party to it.  She said not a word.  She knew that GBB

had signed a deal with Britney Brands that picked up when the

Revlon deal expired.

          That same day, the forensic analysis shows Ms. Kidd

opened up Revlon's licensing agreement and reviewed it on the

Revlon system, the licensing agreement that she knew Revlon

wasn't renewing, but she knew that in her new job she would be

working on.

          THE COURT:  But she was still working for Revlon at

the time, correct?

          MS. ECHTMAN:  She was still working for Revlon.

          THE COURT:  Then looking at those types of license

agreements would be within her duties and responsibilities at

Revlon.

          MS. ECHTMAN:  She claims that she wasn't involved in

the extension negotiations.  She was a bystander.  They were

being handled by Ms. Shepard, and she was just along for the

ride.

          THE COURT:  But she was there on the phone with

Hudson, was it?

          MS. ECHTMAN:  Mr. Carrino, yes, she was there on the

phone.

1          THE COURT:  I suppose, you know, one could see a way

2    in which Ms. Kidd was trying to maneuver her clearly conflicted

3    position at the time in a way that she didn't betray either her

4    old employer or her upcoming employer.

5          MS. ECHTMAN:  But she did betray her old employer by

6    sitting in a meeting on May 1, 2024, and not telling her

7    colleagues that this is futile because Britney Brands has

8    signed with GBB.

9          THE COURT:  OK.

10         MS. ECHTMAN:  This is not a business opportunity that

11   you have an opportunity for anymore.  They have signed with

12   someone else.  That was material information to Revlon.  She

13   was a senior VP, and she did not disclose it.

14         THE COURT:  Maybe you have a faithless-servant claim

15   against Ms. Kidd.

16         MS. ECHTMAN:  We do have a faithless-servant claim

17   against Ms. Kidd, but it's also circumstantial evidence in our

18   misappropriation claim.

19         We don't have to show at this stage definitively

20   everything that was done.  I mean, the information is uniquely

21   in the hands of the defendants.  We need to show a likelihood

22   of success on the merits or sufficient questions going to the

23   merits that justify the relief.

24         THE COURT:  I suppose, and I am going to ask a

25   question here concerning the types of inferences that I can

O9PMREVH

1    make.

2            I have to say that wasn't until I received defendants'

3    motion papers that I learned that all of this was taking place

4    in the aftermath of Revlon having declared bankruptcy, coming

5    out of bankruptcy, having had a meeting at which they were told

6    there is going to be substantial changes.

7            And that sort of puts a different light on everything

8    that we are talking about here right now, correct?

9            MS. ECHTMAN:  Your Honor, they were free to go work at

10   another company.  They just couldn't take Revlon's stuff with

11   them.  We know for certain that Ms. Fass took Revlon's stuff

12   with her.  She has admitted it.  For Ms. Kidd we have

13   significant evidence that she most likely took Revlon's

14   confidential information with her.

15           So Revlon is not saying that these people can't work

16   at Give Back Beauty.  They can.  They just can't use Revlon's

17   trade secrets competitively against Revlon.  They can't take

18   Revlon's trade secrets and confidential information with them.

19   When they walk out the door, they have to leave everything

20   behind.

21           One thing that's not in the record that I know that

22   they don't disclose on the other side is there had been a

23   bankruptcy, there had been a reorganization, and they got

24   retention bonuses for staying at the company.  And I believe

25   that Mr. Racich's spreadsheets show that one of the documents

O9PMREVH

1    that Ms. Kidd looked at in March of 2024 was when those bonuses

2    would vest.

3        So it wasn't that these folks were living in a realm

4    of so much uncertainty.  They had stayed on post bankruptcy.

5    They got bonuses to do it.  They were free to talk to other

6    employers.  They were free to leave.  But they couldn't take

7    Revlon's confidential information with them.  They signed

8    employment agreements that said they can't do it.  They

9    acknowledged --

10        THE COURT:  I understood, and perhaps I'm just

11    misremembering, that Ms. Kidd was looking at that salary

12    information in February of 2024, not March.

13        MS. ECHTMAN:  She was looking at salary information in

14    February.  In March 2024, she pulled up the agreements that had

15    information on everyone's retention bonuses post bankruptcy.

16        THE COURT:  Can I ask you another general question.  I

17    don't know that you know the answer to this.  But I don't

18    believe I have a Revlon organizational chart.  But how closely

19    together on that chart are Ms. Kidd, Ms. Fass, Mr. Mulvihill,

20    and Mr. Romeo?

21        MS. ECHTMAN:  Ms. Kidd was a senior VP.  She was very

22    high up on the fragrance business.  And then the other three

23    individual defendants all reported up to her.

24        THE COURT:  All reported to her.

25        MS. ECHTMAN:  To Ms. Kidd, correct.

O9PMREVH

1       THE COURT:  They are part of what I understand to be

2   the fragrance group.

3       MS. ECHTMAN:  Yes.

4       THE COURT:  How large otherwise was the fragrance

5   group?

6       MS. ECHTMAN:  I know that there were other people in

7   the fragrance group.  I don't know how many.

8       THE COURT:  All of them worked in some way or fashion

9   on the Britney Spears account?

10      MS. ECHTMAN:  Ms. Kidd had responsibility for Britney

11  Spears as a senior VP, and Mr. Romeo had day-to-day

12  responsibility for Britney Spears.  Ms. Fass worked primarily

13  on Juicy, which is the contract she took with her, which is a

14  very significant and lucrative account, and Mr. Mulvihill, I

15  don't know the full extent of his responsibilities, but I

16  believe that as other members of the team were leaving, his

17  responsibilities were broadened.

18      THE COURT:  Just so that I understand, when you say

19  that Ms. Fass took the Juicy Couture contract with her, it was

20  just the contract itself, not the account.  The account is

21  still with Revlon.

22      MS. ECHTMAN:  The account is still with Revlon, but

23  one of the things we need to redress here is a significant risk

24  that Ms. Fass will try to take that account over to Give Back

25  Beauty.

O9PMREVH

1          Then what we have on Ms. Kidd's last day at Revlon is

2     very unusual and suspicious behavior.  On May 3, which was her

3     last day, it was a Friday, at 4:25 p.m., there was a folder

4     created on Revlon's servers titled V. Kidd desktop 5/3/24.

5          Ms. Kidd said that it was her practice to occasionally

6     move documents from her desktop to the server or that she was

7     doing this on her last day in order to secure very confidential

8     and sensitive information so it would continue to be available

9     to Revlon.  She says that after she did this, she deleted all

10    of the files on the desktop of her laptop because apparently

11    she didn't trust Revlon IP that it wouldn't clear the laptop

12    before giving it to someone else who might not have proper

13    access to that information.

14          THE COURT:  Do you know whether she did that at home

15    or in the office?

16          MS. ECHTMAN:  She was at home that day.

17          THE COURT:  At home.

18          MS. ECHTMAN:  Her last day in the office at 55 Water

19    Street was May 2, according to the swipe records, and that's in

20    Linda King's declaration, so she was working from home.  She

21    had her laptop at home on May 3.  She mailed it back by Fed Ex

22    on May 6.  So on May 3, she is at home.

23          And what our computer forensic expert found is that

24    from 9:45 p.m. on a Friday night until 12:15 a.m. on a Saturday

25    morning, she was going into files that were already resident on

O9PMREVH

1        the Revlon servers.  She opened about 259 files.

2              Now, Ms. Kidd says what she was doing was moving them

3        to the server, but she wasn't opening them from her C drive on

4        her laptop.  She was opening the server copies.  Those are the

5        artifacts that Mr. Racich found on her laptop.

6              Now, if she was trying to preserve information for

7        Revlon and make sure it was on the servers and was moving it,

8        there is no reason why she would wait until after 9:00 at night

9        to do it.  She would have done it during business hours to make

10       sure she still had access to the system, and then she went in

11       and she deleted all of her browser activity.  So she deleted

12       any evidence of what she had been doing over the Internet in

13       the time prior to returning her laptop.  She did this right up

14       until the very edge of when she lost access to the Revlon

15       system.

16             THE COURT:  When did she lose access?

17             MS. ECHTMAN:  1:39 a.m. on May 4.

18             THE COURT:  That's a curious time to take access away.

19             MS. ECHTMAN:  I don't know if it's automated or how

20       they did it, but that's the official time that she lost access.

21       Her last day was May 3.  Normally, your last day at work, close

22       of business, you close your laptop, you walk out the door.  But

23       9:45 until almost 12:30 in the morning she is on her Revlon

24       laptop, and she is opening files from the server, and she is

25       clearing and deleting things.

O9PMREVH

1          THE COURT:  I take your point that that all seems

2     curious, at least, but perhaps you could break down

3     Mr. Racich's report for me.  Did he definitively find that

4     Ms. Kidd maintained those documents that we are talking about

5     on her laptop?

6          MS. ECHTMAN:  He can't know because, as she admits,

7     she deleted everything on her laptop.  So when Mr. Racich first

8     got the laptop, his view is, I don't even know if she worked on

9     this laptop.  There is almost nothing here.  None of this

10    remained resident on her C drive.  As Ms. Kidd says in her

11    declaration, she deleted everything.  It wasn't in her

12    recycling bin.  It was fully deleted off of her laptop.

13         THE COURT:  What we have in Mr. Racich's conclusions,

14    therefore, is what he could determine by reference to Revlon's

15    servers?

16         MS. ECHTMAN:  So what he could determine was, looking

17    at the hard drive on the laptop, he could see artifacts that

18    show that documents with particular file paths were opened at a

19    particular time.  Those file paths match Revlon's servers.

20         And within those artifacts he can also see the date

21    and time that the folder, the master folder on Revlon's

22    servers, was created.  So he could see, and it's in his

23    spreadsheets, that the V. Kidd desktop folder was created

24    during work hours, at 4:25 p.m., but he could see that.

25         Ms. Kidd, after her employment with Revlon had

O9PMREVH

1    officially ended, was going into the Revlon servers and opening

2    up files that were at that time resident on those servers,

3    because those are the file paths he can see in the hard drive,

4    artifacts of what was done, but he can't see the documents.

5    The documents are on Revlon's servers.

6            THE COURT:  From your perspective, what was Ms. Kidd's

7    official last time at Revlon?

8            MS. ECHTMAN:  I think her employment ended at the

9    close of business on May 3, 2024.  It didn't end in the early

10   morning hours of May 4.  Her last day was May 3.

11           THE COURT:  5:00, 5 p.m.?

12           MS. ECHTMAN:  5 p.m., 5:30, whatever their business

13   practices are.  After that, technically she was no longer a

14   Revlon employee.

15           THE COURT:  But she still had the laptop.

16           MS. ECHTMAN:  She still had the laptop.  She was a

17   senior VP.  They trusted her to send it back.  They allowed her

18   to have it on her last day.

19           What we have here is highly suspicious activity, and

20   it's activity that's consistent with printing all these

21   documents, doing a mass print job, or transferring them to an

22   Internet repository.  They could have gone to a Google Drive.

23   They could have gone to a box site.  They could have gone to

24   some file transfer protocol online.

25           THE COURT:  A box site.

O9PMREVH

1              MS. ECHTMAN:  A box is an online document repository.

2              THE COURT:  Like Dropbox.

3              MS. ECHTMAN:  Yeah, yes.

4              That's the information we have about Ms. Kidd.  While

5     she put in a declaration, she does not explain at all why she

6     was doing this so late at night.

7              Then we have Mr. Romeo.  Mr. Romeo says that while

8     working at Revlon he has Google Documents in order to do his

9     work, that they included information from Britney Brands

10    influencers that he had to approve.  It appears that he

11    maintains access to these Google Documents because he accessed

12    them with his personal Gmail account.  He says he hasn't used

13    them, but this is also Revlon's information, Revlon's property.

14             THE COURT:  Explain that for me, if you would.  They

15    are called Google Documents.  Are they Revlon documents?  Are

16    they Revlon Google Documents?

17             MS. ECHTMAN:  They are documents from Revlon-hired

18    influencers that were provided to Mr. Romeo through a Google

19    documents application.  So if someone wants to share a Google

20    Document with you, you usually go into it with an email address

21    and that could be your Gmail address.  You have to get

22    permissions to it.

23             THE COURT:  So these are documents that Mr. Romeo

24    would receive from TikTok influencers?

25             MS. ECHTMAN:  Could be TikTok, could be Instagram.

O9PMREVH

1    Social media influencers, whatever media they might be using.

2             THE COURT:  I assume, I don't know, that these social

3    media influencers would not be subject to the same ethical

4    training onboarding as Revlon senior executives.

5             MS. ECHTMAN:  I expect they are independent

6    contractors.

7             THE COURT:  So there wouldn't as much security

8    surrounding these Google Documents as there would be licensing

9    agreements and contracts, etc.

10            MS. ECHTMAN:  I would expect so.

11            Then we have Mr. Mulvihill.

12            Now, the forensic examination of Mr. Mulvihill's

13   laptop shows that he was accessing a Google Drive.  This is

14   another Google-based medium where you can download documents.

15   So he was using a Google Drive from his Revlon computer.  He

16   doesn't explain what he was using this Google Drive for.  We

17   don't know what's resident on his Google Drive.

18            But in his final days at Revlon he was looking at a

19   lot of confidential Revlon information that he may have been

20   using in the ordinary course of business, or he may have been

21   downloading to his Google Drive.  His declaration doesn't say

22   anything about his use of the Google Drive, doesn't provide any

23   explanation for why he was using a Google Drive from his Revlon

24   computer.  So we need to know what is on that Google Drive.

25            THE COURT:  I guess the forensic examination could

O9PMREVH

1    determine what documents at all he may have put or not put on

2    that Google Drive.

3        MS. ECHTMAN:  The forensic examination, and you can

4    ask Mr. Racich, who is here in the courtroom, there is just so

5    much it can detect.  If there is an artifact left behind, it

6    can get some evidence, but what the forensic examination can

7    detect is really the tip of the iceberg.  It's only about the

8    fingerprints that are left behind on the hard drive of a

9    laptop.  It can't see all the documents.  It can't see all the

10    activity.  If someone clears data, it can't be seen.  We know a

11    lot, but we certainly don't know everything.

12        Now GBB says that we don't have evidence that it has

13    anything, that it took anything, that it used everything.

14    That's not accurate.  Ms. Fass admitted in her declaration that

15    she opened documents from her external hard drive while she was

16    working at GBB.  She doesn't say what she did with them.  She

17    says she didn't share them, she said she didn't download them,

18    but she doesn't say she doesn't use them.  In fact, by opening

19    them, she used them, and she very glaringly fails to tell us

20    which documents she opened.  The majority of documents on there

21    appear to be Revlon documents.  We don't know the whole

22    universe.  We don't know everything that was in those folders,

23    but we know that there are multiple folders that have Revlon in

24    the name.

25        We know that when Ms. Fass was working at GBB, she was

O9PMREVH

opening these Revlon documents, she was using them, and that is
attributable to GBB. She was using them and doing her work at
GBB.

We also know that Vanessa Kidd and Dominick Romeo have
responsibility at GBB for working on their upcoming Britney
Brands business. This is the very same business that they
worked on at Revlon. We know that the documents that Ms. Kidd
opened between May 3 and May 4, after the close of business,
include development blueprints for marketing Britney Spears
fragrances and coming up with additional Britney Spears
fragrances for Revlon up through 2025.

Now, these documents that we know she accessed include
presentations that she did for Liz. Liz is the name of the
Revlon CEO. So these are very highly confidential blueprints
and information about what Revlon was going to do to develop
its marketing -- for its marketing plans going forward for
Britney Spears. These are things that she accessed after the
close of business on her last day of work. She also accessed
sales and royalty data for the Britney Spears line.

Ms. Kidd acknowledges that these documents that were
on her desktop of her computer are confidential and sensitive
to Revlon. These are trade secrets she was going through, and
we think likely taking after she left the company. The law
does not allow Vanessa Kidd and Dominick Romeo to use Revlon's
trade secrets and confidential information concerning the

O9PMREVH

commercialization of Britney Fragrances for the benefit of GBB.
They can work at GBB in fragrances.  They can have jobs there.
But they can't take Revlon's confidential trade secret
marketing plans and implement them at GBB.  That's not allowed
under the law.  That's wrongful use of Revlon's trade secrets,
that it's prohibited under New York law and under the Defend
Trade Secrets Act.

We also know that GBB, for its part, has been going to
Revlon's fragrance supplier, it's called a fragrance house, and
asking for Revlon's formulas.

THE COURT:  What's wrong with that?

MS. ECHTMAN:  The fragrance house said no.  So they
went to them in June.  The fragrance house comes to Revlon.
Revlon says:  It's ours.  It's confidential proprietary.  You
can't give it to them.

They send another letter in August.  They have Britney
Brands send a letter in August, that's attached as Exhibit 4 to
Mr. Corrado's declaration, that says:  GBB is going to have our
worldwide exclusive rights come January 1.  We need to help get
them ready.  We are hereby telling you to share with them the
formulas for the Britney Brands fragrances.

THE COURT:  What does fragrance house do?

MS. ECHTMAN:  The fragrance house actually sends an
email to Revlon and says:  We are going to share all this
information unless you quickly tell us not to.  And Revlon

O9PMREVH

1    says:  You can't share it.

2                THE COURT:  And?

3                MS. ECHTMAN:  As far as we know, they didn't share it.

4                THE COURT:  What information that you have that it was

5    GBB that made the Britney people do this?

6                MS. ECHTMAN:  First they said -- it's a logical

7    inference.  That's what we have.  First, they sent out a

8    generic letter that's not directed to any particular suppliers

9    that seems to be going out to all the suppliers in the

10   marketplace saying GBB is going to have this license.  We want

11   you to work with them on the transition.  And we know that the

12   fragrance house said no because we told the fragrance house to

13   say no, you can't have our proprietary and confidential

14   information.

15              Then, two months later, another letter goes out

16   specifically to the fragrance house, and that says:  We hereby,

17   Britney Brands, are telling you to give GBB the fragrance

18   information.  They can talk to fragrance houses.  But they

19   can't try to induce the fragrance houses to give them

20   information that they have already been told is confidential

21   and proprietary to Revlon.  That's what's wrong there because

22   some supplier is going to make a mistake and is going to turn

23   it over, whether it's inadvertently or purposefully.  You can't

24   go out in the market and say to Revlon's vendors, give us

25   Revlon's confidential information and pricing.

O9PMREVH

1          So it's not just that they asked for the -- we know

2     that in the letter they asked for the formula.  They also asked

3     for Revlon's pricing information.  And they asked for

4     information about the ingredients and the formula and the

5     levels of the oils that are used.

6          As far as we know, of the fragrance house hasn't

7     turned it over.  They are not allowed to turn it over.

8          But we do know that GBB is going out in the

9     marketplace and doggedly trying to get a hold of Revlon's trade

10    secrets.  To the extent they tell you we are not using them, we

11    don't want them, that's not credible.  We know that they wanted

12    them, and they ever trying to get them, and they are doing

13    everything in their power to try to obtain information that

14    they are not allowed to have.

15          So the definition of trade secrets is broad.  I

16    understand that the defendants have said we have not shown

17    trade secret.  We have.  The Juicy Couture agreement is a trade

18    secret.  The documents that are attached to Mr. Cornock's

19    declaration are trade secrets.  There are sentencings of

20    financial reports.  There are marketing blueprints.  There is

21    marketing decks that are about future prospects for licensing

22    deals.  All of this information is closely guarded.  It's

23    confidential.

24          It's extremely harmful to Revlon, for example, for GBB

25    to have access to its pricing with Juicy Couture.  It makes it

O9PMREVH

1    incredibly difficult for Revlon to compete in the marketplace

2    and negotiate licensing agreements if a competitor knows its

3    royalty rates.

4            THE COURT:  Ms. Echtman, why don't you assume that I

5    agree with you, that to the extent that GBB has these types of

6    documents, licensing agreements, formulas for fragrances, etc.,

7    that would constitute trade secrets; in other words, maybe

8    streamline your presentation.

9            MS. ECHTMAN:  I'm happy to streamline my presentation.

10           We have shown trade secrets.  We have shown that the

11   information is competitively sensitive, which they say we have

12   not secured the information.  We have.  Revlon has done all the

13   standard things that a company does to secure its information,

14   so we don't have to go over that.

15           We have got the code of conduct.  This information has

16   value.  I think the Court understands that.  There is

17   competition in the fragrance business.  And we do have evidence

18   showing that the individual defendants took Revlon's trade

19   secrets on behalf of, for the benefit of GBB on the way out the

20   door as they were leaving to work for a competitor.

21           And there is also the risk.  They say there is no

22   irreparable harm.  There is immense irreparable harm.  This is

23   not about -- this is not just about the fact that it's our

24   position in our

25   tortious-interference-with-prospective-economic-advantage claim

O9PMREVH

1   that they wrongfully took the Britney Brands agreement.  That

2   is a separate claim.

3           This is about having now competitively sensitive data

4   that we are at risk that they are going to use to unfairly

5   compete with Revlon in the marketplace and that is very

6   difficult to quantify.  It's very difficult to know the extent

7   that they are using it, and based on the head-to-head

8   competition and the overlapping roles that these individuals

9   have between Revlon and GBB, there is a significant risk that

10  that information is being used and is being disseminated and

11  that is irreparable harm.

12          This is just a chart showing the overlap in the

13  responsibilities of the individual defendants between their

14  jobs at Revlon and their jobs at GBB.

15          There is also the breach of the employment agreements

16  which prohibit them from taking Revlon's trade secrets, using

17  Revlon's confidential information to compete with them, and

18  then they are also prohibited from soliciting Revlon's business

19  partners to cease doing business with Revlon for one year post

20  departure.

21          THE COURT:  So they can go to the fragrance house and

22  say, make Britney cologne for us now.

23          MS. ECHTMAN:  They can go to a fragrance house and

24  say, make us a new Britney cologne.  They can work with

25  fragrance houses.  They can't say to the fragrance house, don't

O9PMREVH

1    work with Revlon anymore.  The former employees can't do that.

2    They can't go to Juicy Couture and say, don't work with Revlon

3    anymore.  Bring your business over to GBB.  They can't go to

4    Revlon's bottling suppliers and say, don't work with Revlon

5    anymore.  They can work with folks, but they can't induce or

6    solicit anyone to stop working with Revlon.

7              THE COURT:  But other GBB executives can.

8              MS. ECHTMAN:  They can, as long as they are not using

9    Revlon's confidential information to do it.

10             This is the point that the quantification of damages

11   is elusive, given the difficulty in ascertaining how much of a

12   competitive advantage GBB would have based on Revlon's trade

13   secret information.

14             And the employment agreements themselves acknowledge

15   irreparable harm from a breach, and they consent to the entry

16   of an injunction without a bond.  The balance of equities favor

17   Revlon here because GBB and the individual defendants have no

18   legitimate interest in Revlon's trade secrets, and there is no

19   harm that would result from an injunction that prevents them

20   from using or maintaining Revlon's trade secrets.  The public

21   interest, overall, favors protecting trade secrets.  No bond is

22   needed here.

23             Mr. Brondi says, in a very conclusory fashion in his

24   declaration, that an injunction would disrupt his business and

25   that he would need $5 million of security, but they don't

O9PMREVH

1    articulate how return of Revlon's trade secrets, an injunction

2    enjoining them from using Revlon's confidential information to

3    compete with Revlon, harms them at all.  They say they don't

4    want to use Revlon's formula.  They are going to come up with

5    their own.  Great.  They should do that.  They say that they

6    are a very established business, and they have got lots of

7    phones and resources, so they don't need Revlon's confidential

8    information in order to do business.  There should be no

9    disruption to their business.  And if there would be, that's

10   not something that would need to be secured against because

11   it's wrongful.

12          THE COURT:  Let me ask you this.  Do you know how old

13   GBB is?

14          MS. ECHTMAN:  What we understand from the records at

15   the Delaware Secretary of State is that the different entities

16   were formed in 2022ish.  In the U.S. it's a new company.  I

17   don't know the dates that any of the European entities were

18   formed.

19          So the relief we specifically ask from the Court is

20   that we have an injunction that mandates return of all of

21   Revlon's confidential materials, that the defendants be

22   enjoined from disclosing or using the plaintiff's confidential

23   information, whether it's something that was affirmatively

24   taken or something that might have been committed to memory to

25   the individual defendants, that the former Revlon employees be

O9PMREVH

walled off from the Britney Brands account, and that they be
barred from soliciting Revlon's business partners.  We also ask
that GBB be enjoined from attempting to obtain Revlon's
confidential information from Revlon's suppliers or customers.

THE COURT:  Let me ask you a legal question.  I think
you said at the outset that misappropriation is sufficient to
establish a violation of the Defend Trade Secrets Act.  Is mere
appropriation enough to move the needle in favor of issuing an
injunction?

MS. ECHTMAN:  Yes.  The Defend Trade Secrets Act
specifically provides for an injunction as a form of relief.
So when we say misappropriation, under the Defend Trade Secrets
Act it can take three forms.  It can be wrongful acquisition,
wrongful disclosure, and wrongful use.  So we've shown all
three of those prongs, and they are all sufficient for
injunctive relief.

THE COURT:  I'm sorry.  How have you shown use?

MS. ECHTMAN:  Ms. Fass opened the folders on her
external hard drive while she was at GBB.

THE COURT:  I guess I'm not understanding how that
constitutes use.

MS. ECHTMAN:  She is an employee at GBB.  She is
sitting at her GBB laptop.  She plugs in a hard drive, an
external hard drive full of Revlon folders.  She opened them
up.  I think that's use.

O9PMREVH

1          The fact that they have refused to disclose what's on

2     that hard drive doesn't mean that stuff wasn't used.  We know

3     it's got Revlon folders.  We know they took it.  We know she

4     looked at it.  So if she is opening the documents after she has

5     left Revlon, she is using them.  This is also potential

6     disclosure if those got captured by the GBB system.

7          THE COURT:  Thank you.

8          MS. ECHTMAN:  Thank you.

9          THE COURT:  Ms. Schmelz.

10          MS. SCHMELZ:  Thank you, your Honor.

11          Mr. Keech, my colleague, is going to address the

12     motion for preliminary injunction.  I would like to hand out

13     our presentation so that Revlon's counsel has it.

14          THE COURT:  Do I have it?

15          MS. SCHMELZ:  We are about to show it to you.  If we

16     could approach to provide you with a copy as well.

17          THE COURT:  Provide one over there if you have one.

18          MR. KEECH:  Good afternoon, your Honor, may it please

19     the Court, Brian Keech from K&L Gates, and I have the pleasure

20     of representing the defendants in this matter.

21          A couple of administrative items, if I may.

22          Number one, I understand that the Court granted the

23     oral *pro hac vice* motions, is that correct?

24          THE COURT:  Correct.

25          MR. KEECH:  Thank you, your Honor.

O9PMREVH

1          Number two, during the course of my presentation, I do

2     intend to reference and, on occasion, display material that has

3     been designated by the parties as confidential and/or

4     attorneys' eyes only.  I don't want to run afoul of any

5     obligations under the protective order, but I don't think that

6     it's possible for me to be as general as the Court might have

7     expected in the initial comments.

8          THE COURT:  Fine.  I guess I would just ask you to

9     know, one, when you're coming up on one of those documents and,

10    two, I don't know, besides my staff, who in here should not be

11    in here.  You are going to have to tell me, both sides, who

12    should leave the courtroom.  I can't police that.

13         MS. SCHMELZ:  Your Honor, we have with us all counsel

14    that are present here, except we also have Mr. Corrado present

15    as well.  Most of the material is -- we are fine to do it in

16    open court and have Mr. Schwartz stay here.  I think, as

17    counsel indicated, most of the materials are there, so it's up

18    to them.

19         MS. ECHTMAN:  Your Honor, if they are going to be

20    using our materials that we filed as attorneys' eyes only,

21    Mr. Brondi cannot be in the courtroom.

22         THE COURT:  I'm sorry.

23         MS. SCHMELZ:  Mr. Schwartz as well is also outside the

24    purview of the attorneys' eyes only.

25         THE COURT:  In other words, only two people have to

O9PMREVH

1    leave the courtroom.

2            MS. SCHMELZ:  No, I don't believe so.  I believe they

3    indicated there is other individuals here from Revlon who are

4    not outside counsel at Steptoe.  Anybody other than attorneys

5    from K&L gates or from Steptoe are not included within the

6    attorneys' eyes only.

7            MS. ECHTMAN:  Of course, Mr. Schwartz can see Revlon's

8    own materials and so can Mr. Cornock.

9            To the extent it's Revlon's attorneys'-eyes-only

10   designation, our folks can stay, and if we can just get an

11   advanced warning about what's going to be used.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PMREV2

1          THE COURT:  Yes, my only direction to you is that
2    you're going to have to tell me.  Okay?
3          MS. SCHMELZ:  Fair enough.
4          MR. KEECH:  Thank you, your Honor.
5          Your Honor, plaintiffs brought this case with a
6    theory.  Their theory was having lost the Britney Brands
7    licensing relationship and having discovered that former Revlon
8    employees have gone to work for Give Back Beauty, the loss of
9    the Britney Spears licensing relationship *ipso facto* must have
10   been as a result of nefarious conduct and trade secret
11   misappropriation.
12         I want to do three things in my presentation today to
13   show why plaintiffs not met their burden.  Number one, I think
14   the Court was right in asking about the background.  Certainly,
15   when I was going through the papers to prepare, it was helpful
16   for me to understand who exactly these players were and what
17   exactly they did.  Because that's key to understanding what the
18   players own and what might have been misappropriated, if
19   anything.
20         Number two, I want to explain why it's the case that
21   Revlon has not met its burden to show irreparable harm.  It is,
22   contrary to the presentation we just heard, not enough to
23   simply show misappropriating or irreparable harm in the Second
24   Circuit.  There must be an imminent risk of disclosures of the
25   trade secrets, and they haven't shown this on this record.

O9PMREV2

1          Number three, and my colleague Ms. Love will address

2     this, they have not shown a need for discovery outside of the

3     normal course.  As we flagged for the Court in our papers they

4     asked for 72 document requests, seven forensic inspections

5     three 30(b)(6) depositions, four individual depositions, and an

6     extraordinary overall amount of discovery that we think is not

7     justified on an expedited basis.

8          First of all, with respect to the background, Give

9     Back Beauty is my client.  It is a globally operated beauty

10    group.  It operates with world renowned brand partners,

11    individual and corporate, to create, develop, and support

12    fragrance models.

13         The typical model of my client's business is as

14    follows, there is a band partnership, my client secures a

15    manufacturer and coordinates marketing and distribution and

16    then consumers purchase and use fragrances in stores.  It is

17    not a cosmetics or fragrance manufacturer and, this is key.

18         I also want to talk about the former Revlon employees

19    who we represent, Mr. Kidd, Ms. Fass, Mr. Romeo, and

20    Mr. Mulvihill.

21         Revlon purchases Elizabeth Arden, goes through

22    bankruptcy and experiences upheaval.  We know from what our

23    clients have said, there was a direction to move away from the

24    brand portfolio and our client's employees felt concerned about

25    their jobs.  They started looking elsewhere.  From May 13,

O9PMREV2

2024, through to June 10, 2024, the individual defendants all
joined GBB.  That's key, I think, to understanding exactly what
happened here.

        We also have Britney Brands and Britney Brands is not
quite how plaintiffs have described it.  What Britney Brands
does is it manages and licenses the global portfolio of Britney
Spears trademark, copyright and other rights.  That includes,
as relevant to this case, Britney Spears's branded fragrances.
Plaintiffs previously, Revlon previously has served as the
exclusive licensee to market and distribute Britney Spears's
branded fragrances.  Plaintiffs never manufactured and again
that's key, and I'm about to discuss something that is touching
on attorney's eyes only information.  I want to flag that for
the Court.

        THE COURT:  Okay.  So should the gentleman step out?

        MR. KEECH:  It's plaintiff's information.  So --

        THE COURT:  Okay.  So Corrado --

        MS. ECHTMAN:  Mr. Brondi, yes.

        THE COURT:  Mr. Brondi.

        (Mr. Brondi exits courtroom)

        THE COURT:  Will someone from your side remember to
call him back in.

        MR. KEECH:  Thank you, your Honor.

        To be clear, what I'm saying with respect to the
protective order, it is not a concession that any of this

O9PMREV2

1    information is properly subject to sealing.

2             THE COURT:  I understand.

3             MR. KEECH:  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10           XXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14           XXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXX

24           XXXXXXXXXX   XXXXXXXXXXXXXXXXXX

25           XXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV2

1      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13      XXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16      MR. KEECH:  Britney Brands sent a letter to the

17     fragrance house saying that GBB is the exclusive licensee as

18     January 1, 2005, please share with GBB the oils and the blends,

19     the ingredients for the fragrances so that they do their job.

20      THE COURT:  And that letter was sent to Givaudan?

21      MR. KEECH:  Yes, exactly.

22      THE COURT:  Why didn't Givaudan contact Revlon and

23     say, hey, can we give them this formula?

24      MR. KEECH:  That's a great question.  Givaudan,

25     unfortunately, is a nonparty to this action.  They can't

O9PMREV2

1    explain why it is they did that.  That would be a question that

2    I would certainly ask Givaudan's representatives at deposition

3    if I were --

4             THE COURT:  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXX

7             MR. KEECH:  Here's the thing, your Honor, here is a

8    possible explanation that makes sense, at least in my mind.

9    Until December 31, 2024, it is true that Revlon is the

10   exclusive licensee for these products, these marks, et cetera.

11   An overly cautious attorney at Givaudan, seeing these facts,

12   might think, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXX

19            And, in fact, I don't hear any suggestion from Revlon

20   that's what Givaudan has actually said to them.  What I think

21   they have said is that Givaudan, acting consistent with a party

22   that wants to insure they are not liable, they don't have any

23   exposure, respected Revlon's rights as to the exclusive

24   licensee until December 31, 2024, they went to Revlon and then

25   Revlon wanting to -- I don't know, I don't have the evidence in

O9PMREV2

1    the record -- but perhaps wanting to hold up the transition

2    said, no, you may not share anything with GBB.  That's an

3    explanation that makes sense.  But of course we don't have

4    evidence in the record from Givaudan as to their motivation

5    when they provided the response that they did.

6              THE COURT:  Okay.

7              MR. KEECH:  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15              So let's talk a little bit about the lawsuit here.  On

16   April 29, 2024, and we have that in the record, GBB was awarded

17   the Britney Spears license in the fragrance industry.  GBB then

18   did its job.  It did its job to prepare to transition.  Did its

19   job that Britney Spears asked it to do to ensure continued

20   availability of this fragrance on the market.  And then what

21   Revlon did, months later, was they brought this lawsuit.

22   Again, what they suspected was that these employees went over

23   to GBB, they must have taken trade secret information.  It's

24   the only way Britney Spears would have wanted to change horses.

25              THE COURT:  Why?

O9PMREV2

1          MR. KEECH:  Why did -- I'm sorry, your Honor clarify,

2     the question?

3          THE COURT:  I guess I'm asking why would you believe

4     that that's the thee Revlon's theory?

5          MR. KEECH:  I want to give it a little bit more

6     credit.  I think that's a fair question.  They do have a

7     legitimate concern that their confidential information that it

8     their trade secret may have been misappropriated.  That's a

9     fair point.  The industry is certainly competitive.  But the

10     issue with the motion is that they have not put forth evidence

11     to show that this misappropriation has actually happened or, as

12     key here, that irreparable harm is likely.

13          I want to directly take on the Racich declaration.

14     What Mr. Racich says is there was alleged suspicious access to

15     some of these very key files between May 3, 2024, at 9:45 and

16     May 4 at 12:15 a.m. and May 8th and May 23rd, May 8th, May 22,

17     and May 17.  The Britney Brands agreement was signed on

18     April 29, 2024.  This is in the record.  We have the signature

19     from Give Back Beauty.  We have Ms. Spears's signature as well.

20          So the timeline that they have advanced, and I think I

21     actually heard some kind of acknowledgment of this, it just

22     doesn't make sense anymore.  The truth is that Give Back Beauty

23     had negotiated for years trying to get the Britney deal.  They

24     were repeatedly rebuffed, time after time, my client was told,

25     it's not the right time.  It's not the right time.

O9PMREV2

1          Then the bankruptcy happens.  After the bankruptcy

2    happens, suddenly there is an interest from Britney Brands

3    moving this deal over there.  Is a sense from Britney Brands --

4    again, another nonparty who is not here.  We don't have

5    evidence as to why exactly they did what they did except what

6    they told our clients, right.  They decided Britney Brands,

7    that it was the right time to change horses and they did so, as

8    key to this motion, well before any of the alleged suspicious

9    access that's happened.

10          THE COURT:  If you could overlap the timeline, I hope

11    you can, when Ms. Kidd started speaking with GBB.

12          MR. KEECH:  Sure.  So Ms. Kidd started speaking with

13    GBB in March of 2024.  That was, as part of her search for a

14    job.  She was concerned about her job.  She started speaking

15    with GBB and had interviews, the content of which is the

16    subject of multiple declarations from GBB in March and April of

17    2024.

18          THE COURT:  So she had, as I understand it, she had

19    already been made an offer before GBB signed with Britney

20    Brands?

21          MR. KEECH:  Yes, that's correct.

22          THE COURT:  Okay.

23          MR. KEECH:  Again, this timeline I think is very key

24    in understanding the irreparable harm theory.

25          After that, Revlon waits months before doing anything.

O9PMREV2

On April 15 of 2024, we have evidence from Revlon that Ms. Kidd informed a senior executive that Ms. Kidd tendered her resignation.  Revlon does nothing at the time to cut off Ms. Kidd's access, despite the logical inference that Ms. Kidd was taking another job within the fragrance industry.

On May 30th, 2024, at the latest we have evidence from Revlon right now saying that Britney has closed -- they learned that Britney has closed a licensing agreement with another partner in the beauty and fragrance space that takes effect January 1, 2025.  And then we have another Revlon executive saying they learned in late June of 2024 that these former employees have been hired by and were working at GBB.

Well, Mr. Racich says that he received the drives, he performed forensic analysis and investigation on the devices when they were received by him on July 25.  Weeks and months go by and there is no explanation for why Revlon did not do anything more than they did to provide the drives, *et cetera*, so Mr. Racich or otherwise.

THE COURT:  As far as you know, when did Revlon learn that not only had Britney Brands signed with another manufacturer, another marketer, but that it was GBB and, by the way, their fragrance team was at GBB?

MR. KEECH:  My understanding, your Honor, is that Revlon learned about this no later than April of 2024.  Okay.  They learned that Ms. Kidd had left and was going to GBB.  Let

O9PMREV2

1  me say it a different way, they had various pieces of the

2  puzzle that they put together from April, May and the latest

3  June of 2024.

4          THE COURT:  But even Ms. Kidd in her declaration, as I

5  recall, says she didn't tell anyone at Revlon that she was

6  going to GBB, and, in fact, felt duty bound not to tell.

7          MR. KEECH:  Correct.  That's a fair point of

8  clarification.  Ms. Kidd did not tell, according to the

9  evidence that we have, she did not tell Revlon that she was

10  going to GBB in April of 2024.  That was a fact that they

11  learned subsequent to that.

12          I think the point still remains though, your Honor,

13  there was significant point of delay.  It wasn't years, yes.

14  It wasn't six months, yes.  It wasn't a more significant period

15  of time, but it was still days weeks and, yes, months that went

16  by before these devices went to Mr. Racich for examination.

17  And we think because the Racich examination comes weeks before

18  they bring their complaint and then weeks before they bring

19  their motion for preliminary injunction, it stretches credulity

20  for them to come here and say there is an emergency because of

21  this deal we lost months ago, that's the main point.

22          THE COURT:  When did Steptoe reach out to you?

23          MR. KEECH:  Steptoe reached out to us -- I'll let my

24  colleagues address that point.

25          MS. SCHMELZ:  Your Honor, we didn't talk to Steptoe

O9PMREV2

1   until the lawsuit had been filed.  And at that point, they

2   filed the lawsuit without seeking preliminary injunction for

3   relief right away.

4           THE COURT:  I understand.  But weren't there

5   discussions prior to the lawsuit being filed?

6           MS. SCHMELZ:  No.  Not between us.  There were

7   discussions, to be sure, that started between Revlon and Give

8   Back Beauty in an attempt to try to do this transition, which

9   is customer reason the industry.  That didn't involve Steptoe,

10  your Honor, to my knowledge.

11          THE COURT:  When did those talks again?

12          MS. SCHMELZ:  They were earlier.  They would have been

13  after the April 29 agreement had been entered into.  As they

14  were trying to go ahead and do the transaction and after

15  Britney Brands had been instructed that they should be going

16  forward with the new deal.

17          THE COURT:  Okay.  Mr. Keech?

18          MR. KEECH:  Thank you.

19          Once again, and this is the conclusion of what I'll

20  say in the irreparable harm portion of what I'll say.  There

21  really is no evidence of any misappropriation, no allegations

22  of misappropriation prior to that deal.  The deal was finalized

23  months ago and Revlon sat idle until Give Back Beauty began to

24  do its job.  In our view they've not met the standard of actual

25  and imminent irreparable harm.  These employees are threatening

O9PMREV2

disclosures.  These employees are contacting Juicy Couture or
other people with trade secrets, that's the kind of things that
cannot be remedied by monetary damages, which really is the
standard.

THE COURT:  Why don't you speak about Ms. Fass,
because Ms. Echtman spoke at length about this hard drive that
she took with her to GBB, plugged into her GBB computer, opened
it, presumably read it.  Why isn't that use arguably their
trade secret information?

MR. KEECH:  Right.  And I think talking about Ms. Fass
is the right point.  And moving forward, we did have a slide
dealing with Ms. Fass, specifically.  Ms. Fass had no
involvement in GBB Britney Brands negotiations, that's
undisputed evidence.  She's never saved any Revlon price secret
information, GBB laptop over the systems, that's actually not
in the Racich declaration.  She's never improperly shared
Revlon trade secret information.  In fact, she declares that
she understands and takes seriously her obligations to protect
such information.

THE COURT:  I understand that she says that.  But the
information that I have is that she, at the very least, had the
Juicy Couture contract, which, you know, on the face of it
would seem to be a Revlon trade secret.

MR. KEECH:  Two things, I was going to address this
earlier in my presentation, number one, it's hard to

O9PMREV2

1   understand, and this is why courts have the particular burden

2   requirement.  It's sometimes hard to understand what exactly we

3   are talking about is a trade secret.  There is a bit of a

4   shifting stands issue here.  But let's assume for the sake of

5   actor, and I agree with the Court, a confidential licensing

6   agreement with confidential proprietary terms could, under the

7   right circumstances, constitute a trade secret.  I have not

8   seen the evidence in the record.  I have not seen Mr. Racich

9   declare, go so far as to say, certainly that record, as far as

10  we know it, does not support that she opened any licensing

11  agreement, Juicy Couture or otherwise, while it was connected

12  to a GBB computer and that licensing agreement migrated from a

13  drive to the computer.

14          At most what we have, and I believe this is in the

15  reply declaration, and it probably should be stricken, but most

16  of what we have is conjecture that it could have happened.

17  That by connecting a drive to a computer, it is possible for

18  files to say migrate from that kind of to the computer.  We

19  don't know what migrates.  We don't know whether the contents

20  of the files migrates.  We don't know whether it displays on

21  the computer.  We don't know if it's printed or photographed or

22  what.  All we know is that it's possible, and at most we know

23  that it's possible for a licensing agreement to go from drive

24  to computer.

25          So assuming that, assuming all the other factors, and

O9PMREV2

```
 1   assuming, as I think the Court is correct, that a licensing

 2   agreement, under the right terms, could constitute a trade

 3   secret, we simply don't have the evidence that plaintiffs claim

 4   they have of use of that or even migration of that licensing

 5   agreement at GBB.

 6             THE COURT:  Okay.

 7             MR. KEECH:  I want to -- I understand the Court is

 8   really focused on certain aspects of this.  I'm happy to

 9   continue to address questions as they come up out of order.

10             THE COURT:  Out of order?

11             MR. KEECH:  Out of order of my planned presentation,

12   your Honor.

13             THE COURT:  Okay.

14             MR. KEECH:  We want to just make clear that without

15   irreparable harm, as the Court knows, you need not reach the

16   rest of the merits.  If you find no irreparable harm, that's

17   it, at this point.  They may have a viable trade secrets claim,

18   but without irreparable harm they don't get injunction.

19             But with the merits, we think they fail as well.  We

20   think they fail, because, as I alluded to, Revlon failed to

21   allege what its trade secrets are with sufficient

22   particularity.  There are, what we would characterize at least

23   in trade secrets parlance, as cookie cutter declaration that

24   things could be trade secrets, but there is not really

25   particularity.
```

O9PMREV2

         What we can tell that Revlon alleges are not its trade

secrets.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXX

         THE COURT:  Where is Givaudan here?

         MR. KEECH:  Exactly right.  You can take judicial

notice of the fact that Givaudan filed a lawsuit against former

executives who had departed for a competitor in 2008.  And from

2008 to 2016, just across the river before Judge Sheridan in

the District of New Jersey, Givaudan was engaged in very-hard

fought litigations against those employees because they had

allegedly secreted away fragrance formulas, 584 including the

formulas for the Britney fragrances.  They said that these

formulas were its secret sauce, belonged to it.  And its former

employees had no right to go to another fragrance house and

take these formulas with them.

         THE COURT:  And why did it take eight years, and who

won?

         MR. KEECH:  Ultimately, the former employees

prevailed.  And part of the reason that the former employees

prevailed was because Givaudan did not allege its trade secret

with particularity.  Givaudan, and this is a matter of public

record, Givaudan alleged generally that formulas were its trade

secrets.  And what the Court held was that that's not

O9PMREV2

1  sufficient.  You need to provide the actual ingredients and the

2  actual proportion of each ingredient in order for the

3  defendants to be able adequately defend against that kind of

4  trade secret claim.  And so before trial --

5        MS. ECHTMAN:  Your Honor, I just want to move to

6  strike this.  Because none of this is in the opposition brief.

7  And they moved to strike our reply declarations --

8        THE COURT:  I asked.

9        MS. ECHTMAN:  Okay.

10        THE COURT:  I asked.

11        MS. ECHTMAN:  They don't cite this case.  They don't

12  bring up these facts.  None of this is in their opposition.

13        THE COURT:  But it's going in your favor.

14        Mr. Keech.

15        MR. KEECH:  Thank you, your Honor.

16        THE COURT:  What I meant by that is what happened in

17  New Jersey, not what's happening here.

18        MR. KEECH:  Thank you for the clarification.  In New

19  Jersey there was a jury verdict that was in favor of the former

20  employees.  It was not because, though, Givaudan did not own

21  its trade secrets.

22        Revlon's deal with Britney Brands is not a trade

23  secret.  It's been the subject of other litigation.  The

24  identity of vendors is not a trade secret.  The identity of

25  fragrance houses is not a trade secret, and we haven't heard

O9PMREV2

1    anything, and I'm glad we haven't heard anything that kind of

2    the now marketing lingo, like trends towards 90s and rebirth of

3    90s trends and pop culture, that's not a trade secret either.

4         MS. ECHTMAN:  Your Honor, Mr. Brondi in the courtroom

5    while he's quoting from our documents or purporting to quote

6    from our documents.

7         THE COURT:  Are you quoting were her documents,

8    Mr. Keech?

9         MR. KEECH:  I'm trying to speak generally with respect

10   to things.  I'll differ to counsel for plaintiffs if they

11   believe this is too close to protective order information.  And

12   we are happy to defer to them in excluding Mr. Brondi from the

13   courtroom.

14        THE COURT:  Okay.

15        (Mr. Brondi exits courtroom)

16        MR. KEECH:  I don't want to spend too much time on

17   this, but it's our view and we said this in the papers that

18   they haven't alleged trade secrets with sufficient

19   particularity.  It is possible that somebody may own and,

20   indeed, I would concede that somebody owns trade secret rights

21   in formulas, that sounds like a trade secret.  Somebody may own

22   trade secret rights in a properly protected licensing

23   agreement, that sounds like a trade secret too.  But we don't

24   actually know from the compliant and in the papers, which are

25   before the Court, anything other than the kind of shifting

O9PMREV2

1    description of what these trade secret are.

2            THE COURT:  I don't know that they are shifting.  And,

3    again, I ask Ms. Echtman to assume that the types of documents

4    that they described as having been taken, would likely

5    constitute trade secrets.  You should do the same.

6            MR. KEECH:  Sure.

7            So, you know, the reason that I make that point is

8    only because it is the law of the federal courts that the onus

9    is on the former employer to come forward and put the current

10   employer on specific notice of trade secret protection,

11   including immediately describing the alleged trade secret with

12   precision, so as to inform the defendant exactly what the

13   plaintiff alleged has been misappropriated.  So --

14           THE COURT:  Can I interrupt, and I don't want to take

15   us too far afield.  But I guess I'm not understanding why, if

16   Givaudan owns the formula and went to federal court to enforce

17   its rights, why it didn't or couldn't or wouldn't provide the

18   formula to the district court so that the district court could

19   say, okay, now it's sufficiently particular?

20           MR. KEECH:  In that case what happened was that these

21   former employees had gone over to a competitor.  And what

22   Givaudan was concerned about, or at least purported to be

23   concerned about, is that the competitor, through the discovery

24   process, would learn about its formulas and would then utilize

25   those formulas in a way that is competitively disadvantageous

O9PMREV2

1    to Givaudan.  The Court did not accept that, I think rightly

2    so, as a justification to avoid discovery.  But the remedy that

3    there the Court ordered was that we're going to strike

4    everything but 34 of the trade secrets you alleged.  That's

5    what happened in New Jersey.

6            THE COURT:  Okay.  You can bring us back.

7            MR. KEECH:  Thank you.

8            I want to move on and actually address the agreement

9    that Revlon has with Givaudan.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXX

20           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24           XXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV2

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6         MR. KEECH:  That's a great question, and I want to

7    clarify things just a little bit.

8            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV2

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXX

6         XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXX

9         Does that make sense?

10        THE COURT:  That does.

11        MR. KEECH:  Thank you, your Honor.

12        We have -- I actually don't know that they are

13   claiming this anymore, but there was some suggestion in the

14   papers that the identity of fragrance houses is a trade secret.

15   They've certainly asked for an injunction preventing that.

16        Well, the identity of fragrance houses is public

17   knowledge.  Givaudan's association with Revlon is a

18   longstanding, publicly disclosed fact.  It's been disclosed in

19   bankruptcy proceedings.  Again, as I mentioned, Givaudan

20   claimed that the fragrance formula was a trade secret.

21        The Britney deal is also not a trade secret.  Now, I

22   know we've had a little bit of a shift.  We were talking about

23   the Juicy Couture deal now, and I acknowledge that.  But I want

24   to note for the record that the Elizabeth Arden Britney deal

25   was the subject of public litigation in California Superior

O9PMREV2

1    Court.  Where the agents that claimed to have gotten this

2    lucrative deal for Britney Brands claimed that they were

3    effectively stiffed, so to speak.  And they brought suit

4    against Britney Brands.  And as part of that suit, they said,

5    "the Elizabeth Arden agreement is highly lucrative for

6    Ms. Spears and provides for royalty and minimum guarantee of

7    over $15 million."  This is Case No. BC458461 in the Superior

8    Court Of California.  And they actually attached the agreement

9    as Exhibit B to their complaint.  It's long been public

10   knowledge.

11           Retailing information is also public.  Again, I

12   haven't heard that as part of the presentation.  I don't want

13   to spend too much time on this.  But if you go to Revlon

14   website you can find where their products are sold.

15           Again, the banal market lingo, which is part of these

16   documents, that's nonpriority.  Talking about the 90s coming

17   back is something that many people have talked about.  It's

18   been in the Wall Street Journal, it's everywhere.

19           THE COURT:  Is banal marketing a term of art?

20           MR. KEECH:  Banal marketing is not a term of art from

21   the case law, if that's the Court's question.

22           From our perspective, Revlon's also failed to make a

23   showing on the remaining factors.  I'm not going to spend too

24   much time on the independent economic value and the reasonable

25   measures end of things.  But I do want to specifically address

O9PMREV2

1    each of the four employees because I do think it's key.

2             Dominic Romeo, I want to have this all up here.

3    April 29, 2024, GBB and Britney Brands enter into their deal,

4    May 7th Mr. Romeo receives his GBB offer letter.  What he does,

5    and from my perspective it's not nefarious, he accesses his

6    personal gmail account during his employment with Revlon to

7    perform job duties.  Accessing gmail without more, without some

8    evidence that you are sending secret sauce from the server to a

9    gmail account is not evidence of misappropriation.  And the

10   fact that he went to a competitor doesn't change that analysis.

11            Reid Mulvihill, May 17, 2024, he receives his GBB

12   offer letter.  He learns of the deal request Britney Brands

13   after leaving Revlon.  And he accessed the document during his

14   employment with Revlon which he says contained his passwords.

15   Looking at one's own passwords is not trade secret

16   misappropriation, especially when you access that document when

17   you are still employed with Revlon.

18            Now, Vanessa Kidd, I want to address this.  We had so

19   much presentation here today on the supposedly suspicious

20   access between 9:45 and 12:15 at night and that seems really

21   strange.  I want to just talk a little bit about the math here.

22   First of all, Mr. Racich does not find that any documents were

23   actually misappropriated.  He doesn't find any artifacts of the

24   printing.  He doesn't find any artifacts of uploading that

25   would have been there on the computer unless eraser technology

O9PMREV2

1    was utilized, that he found no evidence of.

2           He mentions and speculates about printing or

3    photographing.  It's virtually impossible to print or

4    photograph every page of 259 files in 150 minutes.  It just

5    doesn't make sense.  To photograph each individual page as you

6    go through, unless you are some sort of expert just does not

7    compute as a matter of math.  Ms. Kidd's explanation --

8           THE COURT:  Well, I guess that would depend on the

9    size of the files; right?

10          MR. KEECH:  It's the size of the files, it would take

11   more time for those files to open, correct.  And so, you know,

12   once, again, I just want to, sort of, make that point that the

13   theory that these documents were somehow photographed doesn't

14   really fit what was actually found in the drive.

15          THE COURT:  Okay.

16          MR. KEECH:  Ms. Kidd learned of GBB's negotiations

17   with Britney Brands after accepting her offer.  April 8th she

18   signs her GBB offer letter.  April 29th is when they enter into

19   that deal.  April 30th, Mr. Brondi inform Ms. Kidd of the deal

20   and she accesses Revlon information to perform her job duties.

21   Uploading confidential information to Revlon servers is not

22   trade secret misappropriation.

23          Now, Ms. Fass, I've already addressed.  I'm not going

24   to address her again unless the Court has additional questions.

25          THE COURT:  No.

O9PMREV2

1          MR. KEECH:  I would like to briefly mention the

2    balance of hardships and the public interest.  Balance of

3    hardships do not favor injunction.  The reason is that Revlon's

4    damages are past and they're quantifiable.  They know what

5    money they were making from the licensing deal that was

6    allegedly secreted away as a result of misconduct.  They can

7    quantify that.  In theory, yes, trade secret misappropriate can

8    sometimes be nonquantifiable, but we know the deal that's at

9    issue here.

10         Revlon's injunction will cause, however, irreparable

11   harm to GBB, as well as nonparty Givaudan and Britney Brands.

12   The reason it will cause such hardship to them is because the

13   more that we delay in the stability testing of Givaudan's

14   materials, the more we delay in that work, the greater the

15   likelihood is that Britney fragrances will not be available on

16   the market 1/1/25, pursuant to the deal that Britney Brands has

17   made with GBB.  That's extraordinary hardship for my client.

18         We also want to point to out that the public interest,

19   for similar reasons, does not favor an injunction.  There is a

20   public interest in free and fair competition.  You have to look

21   at not the words of the injunction alone but the effect of the

22   injunction.  There are mandatory aspects of this injunction

23   that would effectively mean that Britney Brands can do business

24   with Revlon but be delayed or prevented from doing business

25   with GBB.  Any further delay would have the potential and the

O9PMREV2

1   likelihood of removing Britney fragrances, used by many people

2   around the world, from the market.

3          THE COURT:  I think in your papers somewhere you've

4   indicated what you offered to do prior to the lawsuit.  Isn't

5   what they're asking for essentially what you offered to do?

6          MS. SCHMELZ:  Before the lawsuit or before the motion,

7   your Honor?  Do you mean during the meet-and-confer process?

8          THE COURT:  Yes.

9          MS. SCHMELZ:  Let me make that point.

10          THE COURT:  Sure.

11          MS. SCHMELZ:  They have asked for us to return all the

12   confidential materials.  We have, as we indicated sequestered.

13   We have the four laptops, and we have the hard drive.  And we

14   agree there are privacy concerns that relate to the fact that

15   the servers for GBB are in Europe.  There are serious laws and

16   privacy concerns there.  There are privacy concerns with regard

17   to the drive because it includes Ms. Fass's private

18   information.  So what we have talked about is coming up with a

19   protocol, getting a third party, a forensic expert who will --

20   we don't believe they are entitled to the computers, because

21   there's been no showing there's anything on the GBB drives.  We

22   understood with regard to the drive and what we had offered was

23   to say, we will go, and we will get a forensic accountant, a

24   person to come in, review that.  And once you identify for us

25   what you consider to constitute your personal trade secret

O9PMREV2

1    information, we will go to the drive and search for that.  Even

2    after the motion was filed, your Honor, I've had conversations

3    with lead counsel for Revlon, and we made progress where he has

4    identified for me what they now consider, very specifically,

5    certain supplier information and pricing, certain distribution

6    agreements that include pricing, and the formulas, and those

7    are the three categories that have been identified.  And we are

8    prepared to go through those categories looking for that

9    pricing information.  Because, again, distributors, everybody

10   knows where you can buy it.  Supplier Givaudan is public

11   knowledge.  The formulas, we don't have them.  But we're

12   willing to go to the drive, review those categories of

13   information, see if we find it.  And we told them there's no

14   need for injunction.  We would agree if we find it on there,

15   we'll either destroyed it or return it to you.  And that, we

16   continue to be prepared to do.

17        They also asked us, your Honor, for the injunction,

18   stopping us from using that information.  Well, we already

19   attested to the fact that we don't have it, and we're not using

20   it.  We don't have any interest in their marketing plans.  We

21   don't need to know what's in the juice, if you will, the

22   formulas.  We just want to be able to do testing.  So that idea

23   of we don't want it; we haven't used it; we've never seen it.

24   We will return it to them.  So there is nothing to enjoin.  We

25   are not using it.  And there are attestations to that in the

O9PMREV2

1    record.

2              They then want to bar GBB from taking these four

3    employees and doing any work in the marketplace.  Two of them

4    who already said they don't have anything, Mulvihill and Ashley

5    Fass, have nothing to do with the Britney Brands.  It's only

6    Ms. Kidd and Mr. Romeo, and both of those individuals have

7    already said they are not using any information from Revlon,

8    trade secret or otherwise, for those purposes.

9              THE COURT:  Yeah, but they're also more generally

10   prevented from reaching out to other business partners of

11   Revlon; correct?

12             MS. SCHMELZ:  There's no non-solicitation agreement in

13   that regard.

14             THE COURT:  I thought there was.

15             MS. SCHMELZ:  There's a non-solicitation for

16   employees.

17             THE COURT:  I see.

18             MS. SCHMELZ:  There's an employee non-solicitation

19   that they adhere to, but there's nothing that stops her from

20   being able to operate in the marketplace.  And there is no

21   evidence that they used any information of Revlon's in order to

22   compete in the marketplace.  So what they are trying to do here

23   is try their case and at the end of the day and in the

24   meanwhile stop GBB from being able to do their business.

25             THE COURT:  And you, I believe, also agreed to wall

O9PMREV2

1    off these four employees.

2         MS. SCHMELZ:  Two of them are irrelevant because they

3    don't do anything with Britney Brands.  With regard to the

4    other two, they are not doing anything that they are not

5    otherwise entitled to do.  In other words, they're not seeking

6    to manufacture, market, trade, or do anything.  The only thing

7    those individuals are trying to do is get the company, GBB,

8    ready so that when January 1, 2025, comes they could continue

9    to go ahead and sell these products.

10        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV2

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXX

12            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXX

24            THE COURT:  I don't see how Revlon is standing in the

25   way of you doing that.

O9PMREV2

1          MS. SCHMELZ:  It's well known within the industry you

2     don't just flip the lever on the day -- this transfers at the

3     end of this year.  In order to get ready to market, we must be

4     able to do certain things to get ready, as you can imagine.  We

5     need to start ordering bottles, labels and the like.  XXXXXXXX

6     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXX  We just want to take it to a third party, they'll

12    ship it to somebody who will do stability testing to make sure

13    that the juice is compatible with the bottles that GBB is now

14    going to be using to market this.

15          THE COURT:  Again, we don't have to spend a whole lot

16    of time on this because there is no counterclaim, at least not

17    yet.

18          MS. SCHMELZ:  We haven't had the opportunity.

19          THE COURT:  To the extent that anyone is prevented

20    from you doing that, it's Givaudan.  They are the ones, to

21    Mr. Keech's theory, are being overly cautious.

22          MS. SCHMELZ:  Your Honor, we do believe we have

23    serious counterclaims for interference.  As you might imagine,

24    the lawsuit was just recently filed.  And then on the eve of

25    that, we have been busy over the last week or so getting ready

O9PMREV2

1    for this hearing.  We are in the process of preparing, and

2    certainly do intend to file counterclaims for interference and

3    disrupting our relationship and the ability of these four

4    individuals to do the job they are entitled to do and to

5    compete in the marketplace.  There's no showing here and

6    there's no basis upon which to stop them.  They could have

7    provided for a non-compete.  They could have paid for that at

8    Revlon, they didn't.  So these individuals, who walked out the

9    door, are entitled to go to Givaudan with their knowhow,

10   granted, they are not allowed to use trade secrets to do their

11   work, but there is absolutely no evidence that these

12   individuals are doing so.  And, in fact, that the evidence is

13   to the contrary if you review each of the declarants.

14            THE COURT:  Okay.

15            MR. KEECH:  So I'm going to end my presentation there.

16   I thought that my colleague did a good job emphasizing some of

17   these points.  I don't know what the Court wants to do in the

18   expedited discovery motion, but it will not be me addressing it

19   for the defendants.

20            THE COURT:  Let me ask Ms. Echtman just a couple of

21   questions.  Why didn't you take their offer?

22            MS. ECHTMAN:  Your Honor, the offer was insufficient.

23   So we said give us back our documents, give us the hard drive,

24   give Revlon back everything that was taken.  And give us

25   assurances that you won't use our trade secrets, XXXXXXXXXXXXX

O9PMREV2

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXX  We did not get an agreement on those requests, as

4   Ms. Schmelz has just said, they refuse to give us the hard

5   drive.  I actually sent an email to Mr. Cotter or my colleague

6   did.  And said, give us an inventory of what's on the hard

7   drive.  We did not get that.

8         There is also, just frankly, a lack of trust with the

9   other side and between counsel.  I was party to a conference

10  call with attorneys from K&L Gates on September 10th where we

11  talked through what we would need in order to stand down and

12  not move for a preliminary injunction.  Mr. Cotter represented

13  that the employees effectively already were walled off.  That's

14  reflected in our notes of the conversation.

15        We learned later, in the opposition to the preliminary

16  injunction that that was not accurate.  Because I followed up

17  and said, you said the employees are effectively already walled

18  off, what does that mean?  And I was told that meant was they

19  were not working on Britney Brands.  And when we received the

20  opposition to the preliminary injunction we learned that was

21  not accurate.  I don't know why it is not accurate, but the

22  papers that we received show that both Ms. Kidd and Mr. Romeo

23  are actively working on Britney Brands.

24        So I have lot more to say in reply.  I would also very

25  much like to show you the relevant portion of the Givaudan

O9PMREV2

1    agreement, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7           THE COURT:  Is that the same document Mr. Keech was

8    reading from?

9           MS. ECHTMAN:  It's the same document that he read

10   from, but he didn't read from this particular page, and he

11   didn't read from this particular document, which I will bring

12   up on the screen.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16          THE COURT:  You need to slow down when you read.

17          MS. ECHTMAN:  Let me see if I could get this on.

18          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV2

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXX

10          THE COURT:  But for a period certain?

11          MS. ECHTMAN:  There is no limitation on the time

12   period in which these product formulas are proprietary to

13   Revlon.

14          Now, defense counsel said that the Revlon agreement

15   with Britney Brands is not confidential and that it was filed

16   publicly in a lawsuit involving a licensing company.  They

17   didn't mention that in their opposition papers.  We found that

18   lawsuit, and that's not the current agreement.  It's a prior

19   agreement; it's got different terms.  It's not the agreement

20   that's currently in effect.  It's not the agreement that we

21   filed under seal here.  It's an old agreement between Britney

22   Brands, a company known as Brand Sense and Elizabeth Arden.

23   The operative agreement, which we submitted to the Court, which

24   dates from January 2010, has not been publicly disclosed.  XX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV2

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13        But this is all a red herring.  This not what this

14   case is about.  They are trying to make this case about the

15   theft of the Britney Spears relationship.  While we believe

16   there was wrongdoing there and we believe that there Ms. Kidd

17   gave information to GBB during the interview process that

18   allowed them to swoop in and steal our agreement, that is done.

19   They have a relationship now.  We are not trying to take that

20   back.  What we are moving on here is the misappropriation of

21   trade secrets that happened likely after GBB inked that

22   agreement.  Just because they inked an agreement on April 29,

23   2024, doesn't mean that Revlon's former employers, as they were

24   walking out the door, didn't take trade secrets to use at their

25   new employment where they knew they were going to be working

O9PMREV2

with Britney Brands and where they likely wanted to bring some
of their other businesses with them.

THE COURT:  Okay.  We do have to, at some point, end.
So let me ask you to turn, if you would, to the motion for
expedited discovery.

MS. ECHTMAN:  On the motion for expedited discovery, I
think that the presentation you heard from defense counsel
shows exactly why we need that expedited discovery.  They keep
saying you don't know what's on the hard drive.  You can't say
that there are trade secrets on the hard drive.  You don't know
what Ms. Kidd did with the documents that she was opening
between the hours of 9:45 and 12:15 a.m.  Well, we don't know
it because it's in their possession.  They are saying they are
not using Revlon's trade secrets, in order to commercialize
what they want to commercialize for Britney Brands.  Well, we
haven't seen whether their marketing plans copy ours.  All of
this information is in their knowledge, and they are trying to
say -- I think we've shown you enough for preliminary
injunction, but we don't know everything that they took.  What
Mr. Racich was able to find is the tip of the iceberg.  There
is only so much he can see from a forensic examination of a
laptop that Ms. Kidd admittedly wiped clean.  There is only so
much we can see about what folders Ms. Fass took from the
system.  We don't know whether things were uploaded on to the
GBB system.  We don't know whether copies were made on a GBB

O9PMREV2

1    lap it top.  Ms. Schmelz seems to be concerned that Revlon's

2    documents may be on a server in Europe.  Well, that's a serious

3    concern.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PMREV3

1          MS. ECHTMAN:  This shows exactly why we know that

2    Revlon's confidential information was taken.  We need to get it

3    back, and we need to have expedited discovery so that the Court

4    can give us full and complete relief to prevent the misuse of

5    our trade secrets in their business.

6          And, in addition, in terms of Ms. Schmelz's concerns

7    that they need to get certain oils or things for stability

8    testing, if they only want to use publicly available

9    information, then they can get some Britney Fragrances off the

10   shelf and they can test anything they want.  They can try to

11   reverse-engineer anything they want.  But they can't have

12   Revlon's proprietary and confidential information.  Thank you.

13          THE COURT:  Ms. Love.

14          MS. LOVE:  Thank you, your Honor.

15          We are here because plaintiffs are asking the Court to

16   deviate from the normal rules of discovery, and they would have

17   you believe that all they want is simply the return of their

18   documents.  And if that is in fact all that the plaintiffs were

19   asking for today, we probably wouldn't need the Court's

20   intervention because as my colleague, Ms. Schmelz, has said, we

21   are having ongoing discussions to address some of those

22   concerns.

23          However, plaintiffs in this motion are asking for a

24   lot more than just a look at the drive or the return of their

25   documents.  And not only do they want a lot more than that, but

O9PMREV3

1    they want it really fast.  They want it before the parties'

2    Rule 26 conference, and they want it before the defendants have

3    even been able to answer the complaint.  They are talking about

4    expedited discovery as though they are entitled to it as of

5    right, but they are not.

6           There are standards that courts in this circuit have

7    applied, and, under both of them, plaintiffs have to make a

8    showing, based on reliable evidence, that there is some good

9    cause that justifies the need for expedited discovery.  They

10   have to show that there is some need for that discovery based

11   on some kind of imminent harm.

12          Not only do they have to do that, but there has to be

13   a balancing of the relative risks between the parties.

14   Expedited discovery should be rejected if the benefits of

15   expedited discovery outweigh -- if the burdens outweigh its

16   benefits.  Here they do.

17          Plaintiffs characterize their request as not a big

18   ask, but look at what they are requesting for.  Seventy-two

19   document requests, because there are eight different requests,

20   each given to five different GBB entities and four individuals.

21   Plaintiffs complain that defendants are exaggerating about this

22   number, but this is just what it all adds up to, and indeed we

23   are going to have to respond to 72 document requests if the

24   Court orders these discovery requests -- if the Court grants

25   this motion.

O9PMREV3

1          THE COURT:  As a practical matter, don't you only have

2     to go to the four employees and one server?

3          MS. LOVE:  Going to one server, your Honor, is

4     actually a very big ask because the servers are located in

5     Switzerland.  So in order to search those servers, we would

6     have to -- we cannot do a bulk data transfer to the United

7     States.  We would have to go to Europe.  We would have to do a

8     search there.  We would have to segregate relevant information

9     from nonrelevant information, and then we would have to, per

10    the terms of the parties' stipulated protective order, redact

11    any personal information of European residents from relevant

12    documents before we could answer these requests, even before we

13    could review them here in the United States, so this is a big

14    ask.

15         Plaintiffs could have asked for something much more

16    narrowly tailored.  They have tried to do that in their reply,

17    and they are now asking the Court to tailor this discovery for

18    them.  That's what they actually asked for.  On this motion,

19    what's before the Court, the requests are much more broad.

20    They are asking for all communications between GBB and the

21    individual defendants, all communications between GBB and

22    Britney Brands, all communications among GBB about the

23    transitioning of Britney Brands and between GBB and other

24    prospective brand partners.  So this is really merits

25    discovery.  It is very, very broad, and they are not entitled

O9PMREV3

1    to it yet because they have not made a showing.

2              The forensic examination that we have been talking

3    about is not -- we are not just talking about one external hard

4    drive that's here in the United States.  What they have

5    requested is far more than that.  They want every single one of

6    the professional devices of all four of the individual

7    defendants, including cell phones, laptops, desktops, tablets,

8    external hard drives.  They have also asked for the same kind

9    of forensic examination for those devices from the individual's

10   personal devices.  So in my family we have more devices than we

11   have people:  Six computers, two tablets, four cell phones.

12             This request, as drafted, doesn't even specify the

13   logical limitation that forensic exams should be of devices

14   that the individual defendants used for work purposes.  Does

15   this include a desktop that they share at home with their

16   family?  Unclear.  All of this the plaintiffs want within 10

17   days, and that's also a very big ask.

18             Beyond that, plaintiffs want three 30(b)(6)

19   depositions of GBB LLC, GBB International LLC, and GBB Americas

20   LLC.  And the topics that they want to ask these entities about

21   are these vague discovery requests, most of which are

22   communications between various entities that are not limited by

23   any subject matter.  So I don't know how a 30(b)(6) deponent

24   could be prepared except by reading all of these documents.

25             In addition, plaintiffs want four depositions of the

O9PMREV3

1    individual defendants despite vastly disparate facts that would

2    justify those depositions as pertains to Ms. Fass, Mr. Romeo,

3    Mr. Mulvihill, and Ms. Kidd.

4        I want to return to what else plaintiffs are asking

5    for because plaintiffs are asking for this extraordinary

6    expedited access, regardless of showing any nexus between what

7    they are asking for and the imminent harm that they are

8    alleging here.

9        I think in the reply papers they have more or less

10   conceded the fact that they have no basis for injunctive relief

11   surrounding the correspondence and communications that have

12   occurred with respect to the Britney Brands deal.  That's over.

13   So they don't need communications between GBB and Britney

14   Brands.  This is just one example of the overbreadth of these

15   requests.

16       This is not tailored to preserve the status quo.

17   GBB's privileged information is at risk, as well as its own

18   trade secrets.  The plaintiffs are asking for information so

19   broad that it will put at risk GBB's own information, the

20   individual defendants' personal information, and this is all,

21   again, regardless of any relationship to undefined Revlon

22   confidential information.  Many of the document requests do not

23   reference Revlon confidential information at all.

24       One point I want to make about this lack of nexus.

25   Your Honor asked some questions about Ms. Fass and her hard

O9PMREV3

drive and why we shouldn't be concerned about that.  I'm not

saying that there is no concern, but we must note that there is

really a lack of connection between Ms. Fass opening files from

her hard drive and any of the work that she is doing at GBB.

Plaintiffs have raised concerns about Juicy Couture,

but Ms. Fass doesn't work on Juicy Couture.

THE COURT:  Was she the one that had some

communication with GBB thanking them for providing a position

that had a market development aspect to it?  Doesn't that

suggest that she would have responsibilities for bringing in

business like, for example, Juicy Couture?

MS. LOVE:  Ms. Fass' work focuses on the Tommy

Hilfiger brand.  This is not a Revlon licensor.  And there is

no information in the record that she is doing any kind of

brand development with Juicy Couture.  She is not doing

prospective business with them.

Furthermore, GBB and Britney Brands contract

negotiations are complete, so nothing related to that really

provides any basis for expedited discovery.  And, again, in the

record there is really no evidence presented by Revlon of any

prospective injury.  Everything that they have put in the

record is speculative as to what the individual defendants

might remember about their time at Revlon and might be using at

their jobs at GBB.  But there is no evidence in the record that

anything untoward is actually occurring, and in fact there are

O9PMREV3

1    a number of protective measures already in place that make

2    expedited discovery unnecessary.

3            Ms. Kidd and Mr. Romeo contracted not to use Revlon

4    confidential information, and it's rather perverse that in a

5    lawsuit where plaintiffs are attempting to enforce those

6    contractual provisions, they are also arguing that the Court

7    should presume they are futile and that there will be

8    inevitable dissemination of confidential information.

9            Further, Revlon's suppliers, as we have heard today,

10    have contracted confidentiality obligations, and it has been a

11    topic of discussion today, and we have seen that those in fact

12    have been effective in protecting Revlon's interests.

13            Furthermore, defendants are aware, of course, of their

14    duty to preserve evidence, and GBB's computers and Ms. Fass'

15    hard drive have all been sequestered by counsel.  We can

16    preserve the status quo without having to do expedited

17    discovery.

18            Again, my last point is the timeline that Mr. Keech

19    already took the Court through with respect to how long it took

20    Revlon to seek this relief.  It's true that the lawsuit was

21    only filed three or so weeks ago, but, actually, there has been

22    quite a long history of information coming slowly to Revlon

23    about Ms. Kidd leaving, about the loss of the Britney Brands

24    deal, about the rest of the team's departure from Revlon.

25            And the papers don't say exactly when the plaintiffs

O9PMREV3

1    started to become suspicious, but we do know, of course, that

2    it was at least two months ago when they sent the laptops for

3    forensic examination.  This just belies any exigency to the

4    need for expedited discovery.

5         THE COURT:  Two months ago is when they sent the

6    laptops or the computers for forensic examination.  Could they

7    have responsibly brought a motion for preliminary injunction in

8    the absence -- even the evidence that they have now, you say,

9    is not enough.  Could they have responsibly brought this motion

10   before receiving the forensic examination?

11        MS. LOVE:  They could have reached out to GBB.  These

12   are competitors.  They work together.  In fact, they were in

13   communication about this transition and there was no mention.

14   GBB learned about these allegations on August 26, when this

15   lawsuit was filed.

16        THE COURT:  I'm sorry.  We are going to have to come

17   back to Ms. Echtman on that point, but you can finish up,

18   Ms. Love.

19        MS. LOVE:  Your Honor, at the end of the day, there

20   simply has to be a balancing of the relative risks to the

21   parties, and what we have here is hefty burdens to GBB.  These

22   discovery requests are voluminous.  They are going to require a

23   lot of preparation in a very short amount of time.  They are

24   overbroad and invasive because they put at risk GBB's own trade

25   secrets, irrelevant personal information belonging not only to

O9PMREV3

1  the individual defendants, but also to potentially some

2  European data subjects, and, of course, they risk the violation

3  of privacy laws with a swift response to document requests that

4  would prevent the parties from being able to even comply with

5  the stipulated protective order and redact personal information

6  that comes from Europe.

7         MS. SCHMELZ:  Your Honor, may I just make one closing

8  point, if I may?

9         THE COURT:  Sure.

10        MS. SCHMELZ:  Thank you.

11        I think it's very important because these motions have

12  been brought in tandem.  We understand the exigency with regard

13  to the concern that they have about purported trade secrets

14  which they have not yet identified, but this goes far beyond

15  that, beyond the scope of even what they are asking for.

16        What may make some sense, and I want to offer, because

17  we are continuing to have these conversations, is that we

18  continue to believe that there is no need for the Court to

19  order the injunction.  We understand the concern vis-a-vis the

20  drive, and we are prepared to work -- now that they have

21  further identified what the trade secrets are, these three

22  categories have been identified, we are prepared to go to and

23  get a third-party forensic expert who will go in and do the

24  examination to determine whether that data is on that drive.

25        There is no reason and basis for going into the

O9PMREV3

1    computers.  That's what we should be dealing with and that's

2    what they are entitled to.  The rest of the scope of relief is

3    beyond that.

4            I want to close out with one other issue, your Honor.

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXX

16           THE COURT:  You are quoting from your papers, but what

17   are you citing to?

18           MS. SCHMELZ:  Citing to the Revlon Britney Brands

19   agreement XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O9PMREV3

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXX

3          MS. LOVE:  Your Honor, I don't have a lot more than

4    that.

5          What I'm trying to say is that in these circumstances,

6    in light of what the parties have already been discussing, in

7    light of the protective measures that have been taken already,

8    and in light of the considerable risks and burdens that this

9    particular discovery would impose on GBB, those burdens are not

10   outweighed by the benefits of expedited discovery to the

11   plaintiffs.

12         THE COURT:  Thank you.

13         Ms. Echtman, can I just ask you to address briefly the

14   exigency issue, why you're bringing this motion for preliminary

15   injunction now.  For example, I was surprised when I saw the

16   complaint.  In fact I told my clerk, except a PI motion today

17   or tomorrow.  Even then it came a little bit later.

18         What efforts were being undertaken prior to filing

19   this motion?

20         MS. ECHTMAN:  First, I'd like to just explain the

21   timing of the complaint.

22         In the first instance, Revlon didn't know where these

23   employees were going.  It had heard through Britney Brands that

24   Vanessa Kidd was going to GBB.  She wouldn't tell them where

25   she was going.  The others didn't tell Revlon where they were

O9PMREV3

going.  It took Revlon a while to learn that they had all gone
to GBB.  From what I understand, some of their LinkedIn pages
still say that these folks work at Revlon.

And it was while Revlon was told at the end of the May
by Britney Brands that they had signed with someone else, they
didn't learn what entity they had signed with.  Vanessa Kidd
didn't tell them what entity they had signed with.  I don't
think it was until July that they learned that -- or late June
or July that they learned that GBB, where these employees had
gone, had the Britney Brands licensing agreement come 2025.

So at that point Steptoe was retained, and we
commissioned Mr. Racich to do a forensic investigation of the
laptops.  We got the results around August 8 or so.  And, no,
we didn't reach out to GBB because we had serious concerns
about spoliation.

So we filed on August 26, and Ms. Schmelz promptly
reached out to my colleague, Michael Dockterman, and they
started talking about ways that this could be resolved in the
absence of a preliminary injunction.  And we had repeated
conversations about Revlon wanting its information back and
additional protections.  Those discussions went nowhere.

Another thing we talked about was entering into a
protective order so that the parties could change their Britney
Brands agreements and compare them to see whether Revlon's
agreement had been copied.  And the agreement was, we are going

O9PMREV3

1    to enter into a protective order, which we also felt we needed

2    before we filed anything with the Court, to make sure that

3    things could be filed on an attorneys'-eyes-only basis.  And we

4    entered into the agreement and the -- the protective order, we

5    filed it with the Court, and we immediately moved for a

6    preliminary injunction.

7          Under the circumstances, I think we acted promptly,

8    and we did it in a way where we could be assured that there

9    would be people with an ethical duty not to destroy things.

10   Even so, while we are being told that everything is being

11   secured, it took until September 19 for counsel to retain --

12   obtain possession of the Fass hard drive.  That remained in Ms.

13   Fass' hands.

14         We don't want their children's PCs.  We want the PCs

15   that they worked on, and I also request that the Court please

16   look at the specific discovery requests that we have because

17   they are much more narrowly drawn than they have been

18   represented to be.

19         Number one is, all Revlon documents taken or retained

20   by the Revlon employees.  That we still haven't gotten.  We

21   want communications in very specific time periods.  We want the

22   former employees' communications with GBB from January 1, 2024

23   through May 31, 2024, which is before they went to work at the

24   company, to find out what, if anything, they told GBB during

25   the recruiting process, to find out whether they gave over

O9PMREV3

1    confidential information in that time period.

2            I also have to correct a misstatement by Ms. Schmelz.

3    She said the only nonsolicitation obligation in the employment

4    agreements is the obligation not to solicit other employees to

5    leave the company.  That's not accurate.  You have those

6    agreements before you.  There is a requirement after you leave

7    the company not to solicit Revlon's business partners, to cease

8    doing business with Revlon.  That applies for one year.  Of

9    course, under both the common law and the trade secret law,

10   they can't use Revlon's trade secrets to compete with Revlon.

11           Thank you, your Honor.

12           THE COURT:  Give me 10 minutes.  Don't go far.

13           (Recess)

14           THE COURT:  I will not issue a preliminary injunction,

15   but I will allow some discovery to be taken on an expedited

16   basis.

17           The test standard for a preliminary injunction in the

18   Second Circuit is well established.  Both parties have cited it

19   to me.  There is no dispute about what the standard is.

20           And on the facts of this case, while it is a close

21   call, I will not be issuing the injunction.

22           I find that the irreparable harm and likelihood of

23   success factors weigh against injunctive relief.

24           With respect to irreparable harm, plaintiffs argue

25   that trade secret dissemination gives rise to a presumption of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9PMREV3

1  irreparable harm under Second Circuit case law, but the Second

2  Circuit has made clear that it is not correct to say that a

3  presumption of irreparable harm automatically arises upon the

4  determination that a trade secret has been misappropriated,

5  citing to *Faiveley Transportation v. Wabtec Corp.*, recorded at

6  559 F.3d 110.

7       The Second Circuit elaborated:  A rebuttable

8  presumption of irreparable harm might be warranted in cases

9  where there is a danger that, unless enjoined, a

10  misappropriator of trade secrets will disseminate those secrets

11  to a wider audience or otherwise irreparably impair the value

12  of those secrets.  Where a misappropriator seeks only to use

13  those secrets without further dissemination or irreparable

14  impairment of value in pursuit of profit, no such presumption

15  is warranted because an award of damages will often provide a

16  complete remedy for such an injury.

17       Indeed, once a trade secret is misappropriated, the

18  misappropriator will often have the same incentive as the

19  originator to maintain the confidentiality of the secret in

20  order to profit from the proprietary knowledge.

21       In this case plaintiffs don't appear to be arguing

22  that defendants are disseminating their trade secrets to a

23  broader audience or other competitors.  Instead, they argue

24  that the individual defendants have disseminated the trade

25  secrets to GBB.  Even accepting the truth of that assertion, it

O9PMREV3

1    doesn't seem to be the kind of widespread dissemination that

2    warrants injunctive relief.  If the trade secrets are contained

3    within GBB and GBB is using them for profit, then, presumably,

4    GBB would be incentivized not to disseminate them any further.

5           To the extent that plaintiffs argue that GBB is

6    improperly contacting Revlon's suppliers and demanding Revlon's

7    fragrance formulas, it is unclear how that constitutes a

8    showing of irreparable harm, and, on the facts that have been

9    presented here this afternoon, there is a real question as to

10   who the actual owner of that formula is.

11          With respect to likelihood of success on the merits,

12   the requirement for showing a misappropriation of a trade

13   secret are similar under state and federal law.  Under New York

14   law, a party must demonstrate (1) that it possessed a trade

15   secret; (2) that the defendants used that trade secret in

16   breach of an agreement, confidential relationship, or duty, or

17   as a result of discovery by improper means.

18          Similarly, the Defend Trade Secrets Act, under the

19   act, a party must show an unconsented disclosure or use of a

20   trade secret by one who used improper means to acquire the

21   secret or, at the time of disclosure, knew or had reason to

22   know that the trade secret was acquired through improper means

23   under circumstances giving rise to a duty to maintain the

24   secrecy of the trade secret or derived from or through a person

25   who owed such a duty.

O9PMREV3

1          I don't agree with the defendants' argument, as I

2     indicated, that plaintiffs have failed to identify trade

3     secrets with sufficient specificity.  Plaintiffs allege, for

4     example, that the information about the Britney Fragrances,

5     including the supply and distribution chains, manufacturing,

6     marketing, and advertising plans, and the costs and revenues

7     associated with the Britney Fragrances was treated as a trade

8     secret.  And I find that the company further sufficiently

9     established that it was treated as a trade secret within the

10    company and that the employees, the four employees, were

11    trained in and assented to company regulations concerning the

12    maintenance of such trade secrets.

13          However, at the same time, I don't believe that

14    plaintiffs have shown a likelihood of success as to the

15    argument that the trade secrets were actually misappropriated.

16    Plaintiffs' theory seems to be that the individual defendants

17    took trade secrets with them when they left Revlon and then

18    used those trade secrets to help GBB secure the Britney Brands

19    partnership, but the affidavits indicate that the individual

20    defendants weren't involved with the GBB Britney Brands deal.

21    And, apparently, I think that the discussion this afternoon

22    suggested that plaintiffs were not arguing or any longer

23    arguing that the four employees helped to bring about the deal,

24    with the possible exception of Ms. Kidd.

25          With respect to the balance of equities and public

O9PMREV3

1    interest, I think that both of those issues are neutral as

2    between the parties.

3                With respect to the motion to expedite discovery, as I

4    indicated, I will allow expedited discovery to take place.  The

5    discovery should be limited generally to what information,

6    including documents, the individual defendants took with them.

7                I think that the deposition of the individual

8    defendants is appropriate on an expedited basis.  To the extent

9    that the parties are unable to agree on that limited scope of

10   discovery, you are welcome to come back.  But, again,

11   plaintiffs should be able to determine as quickly as possible

12   what exactly the four individual defendants took with them, saw

13   after they completed their employment with Revlon, and we will

14   take it from there.

15               MS. SCHMELZ:  One clarification, your Honor.

16               Just a point of clarification.  With regard to the

17   expedited discovery, it's focused on what did the individual

18   defendants take with them.

19               THE COURT:  Yes.

20               MS. SCHMELZ:  And whether any of those documents, if

21   we have them, to return them.

22               THE COURT:  Yes.

23               MS. SCHMELZ:  Furthermore, that the depositions of the

24   four individuals will be limited to what information they took

25   with them or saw since they left Revlon, is that correct?

O9PMREV3

1      THE COURT:  And to the extent that they used any of

2  that information in connection with their duties at GBB.

3      MS. SCHMELZ:  Very good.  I just wanted to clarify,

4  that's the limited scope of the depositions.

5      THE COURT:  Correct.

6      MS. SCHMELZ:  Thank you, your Honor.

7      THE COURT:  Ms. Echtman.

8      MS. ECHTMAN:  Your Honor, may we also have information

9  on what they shared with GBB before they left.  This particular

10  motion was not focused on the tortious interference with the

11  Britney Brands agreement.  That is part of the complaint in

12  this action.  We know, based on Mr. Racich's investigation,

13  that things were taken and retained after the employees left,

14  but we also believe that information was provided to GBB before

15  they left.

16      THE COURT:  Yes, you can ask about that, to the extent

17  that they provided any trade secret information to GBB before

18  they were made the offer.

19      MS. ECHTMAN:  Thank you.

20      MS. SCHMELZ:  Thank you, your Honor, for the

21  clarification.

22      THE COURT:  With that, I think, we are adjourned.

23      Ms. Schmelz.

24      MS. SCHMELZ:  Thank you very much, your Honor.  We

25  appreciate the time and the effort, and, amazingly, how much

O9PMREV3

1   you knew about the record in such a short period of time was

2   very impressive.  Thank you for that.

3            THE COURT:  Have a good evening, all.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25